# AFFIDAVIT OF JEAN-CLAUDE dei FIORI ARNOLD

STATE OF NEW MEXICO)

)§

COUNTY OF RIO ARRIBA)

BEFORE ME, the undersigned authority duly authorized to take acknowledgements, personally appeared Jean-Claude dei Fiori Arnold (also known as Jake Arnold and also known as Jean-Claude dei Fiori), who, first being duly sworn, deposes and states as follows:

1.) My name is Jean-Claude dei Fiori Arnold. I am also known and go by two other versions/variations of my name, Jake Arnold and Jean-Claude dei Fiori. I am currently 69 years of age. I am currently semi-retired/self-employed. I am the owner of a business known as "Flores, Arnold & Fiori" (FAF), via which I engage in consulting work and provide other professional and management services.

From January 1, 2011, to August 5, 2014, I served as the Public Affairs Officer of the Rio Arriba Sheriff's Office (RASO). I served in that position at RASO pursuant to appointment by Rio Arriba Sheriff Thomas R. Rodella and at all times fulfilled the duties of that position, as well as performing other RASO-related duties, under the sheriff's authority and direction.

Since August 6, 2014, I have been on "extended leave" from that position, but have still provided certain services to RASO and the sheriff (in his capacity as an elected official) in regard to certain uncompleted projects.

During my period of service as the Public Affairs Office for the Rio Arriba Sheriff's Office I was either compensated for my services via a professional services contract between my business, FAF, and RASO/Rio Arriba County (RAC) or I provided those services to RASO/Rio Arriba County on a pro bono basis.

From time to time during the aforementioned time period of my service to RASO I worked or was on duty regarding RASO-related projects at the RASO headquarters in Espanola, New Mexico (where I had an office equipped with a RAC telephone, computer and office furniture) at various remote locations such as courthouse and other governmental facilities, and at my own personal office in El Rito, New Mexico, where I have my own personal (FAF) telephone and computer.

In the performance of those RASO-related duties I utilized RAC/RASO services telephone at RASO headquarters, or my own personal (FAF) telephone service in El Rito, or a personal cellular telephone service.



EXHIBIT 1

In the course of performing my RASO-related duties I often did so utilizing e-mail communications. The e-mail communications in question involved transmissions from, to, and between a RAC-provided e-mail account and one or more of my personal (FAF) e-mail accounts.

In the course of performing my RASO-related duties I often communicated with other RAC officials, including County Attorneys Ted Trujillo and Adan Trujillo. I did so utilizing the aforementioned telephone services and e-mail accounts.

On the occasions when I performed RASO-related duties while situated at my personal (FAF) office in El Rito, both the sheriff and I considered the situation to be "tele-commuting."

In late April of 2014, the sheriff received communications from the Office of the U.S. Attorney for New Mexico, specifically from Executive Assistant U.S. Attorney Elizabeth Martinez.

Those communications involved an invitation from then-Acting U.S. Attorney Damon Martinez for the sheriff and other RASO/RAC personnel to meet with him regarding controversies and other issues involving the conduct of U.S. Department of Agriculture/U.S. Forest Service (USDA/USFS) law enforcement officers and the relationship between those federal officers and the sheriff/RASO.

This invitation to RAC officials other than the sheriff indicated that the sheriff should coordinate the transmittal of the invitation (and acceptance of it) to the other RAC personnel on behalf of the Office of the U.S. Attorney.

In my role at RASO, I had been deeply involved in those controversies and other issues. I was quite familiar with those matters as a private citizen/resident of Rio Arriba County and as a full or part-time resident of other counties in New Mexico since 1972. Many of these matters were related to land grants of the Spanish Colonial and Mexican Eras in what is now the State of New Mexico and the legal status of those land grants during the New Mexico Territorial and Statehood periods.

My familiarity with these inter-related controversies, issues, and matters stemmed not only from my work for RASO, but from my endeavors as an investigative journalist, academic researcher, investigator (for law firms and public officials) since the mid-1960s in Washington D.C., New Mexico, Texas and elsewhere in the Western United States.

After speaking with Elizabeth Martinez, regarding the aforementioned invitation, the sheriff assigned me to coordinate all arrangements for the proposed meeting in question on his behalf and to serve as the communications link between RASO and other RAC personnel regarding the invitation. The sheriff also asked me to seek the participation of any appropriate individuals (who were not currently RAC personnel, but were "stakeholders" in these interrelated matters) in this proposed event.

2

(Numerous documents related to the meeting proposed by the Office of the U.S. Attorney and the aforementioned interrelated matters are attached to this affidavit and I hereby attest to their authenticity as original documents, true photocopies of such documents, or computer printouts of electronic ., i.e. computer/e-mail, text.)

I did speak over the telephone with Ms. Martinez and engage in other communications with her. For the week preceding this meeting—which did occur on May 7, 2014, at the offices of the U.S. Attorney for New Mexico in Albuquerque, New Mexico—Ms. Martinez and I did coordinate the arrangements for this event as the representatives of our respective agencies and I did communicate with other RAC personnel outside RASO and other "stakeholders" regarding their possible participation in this event.

(Many of the issues to be discussed at the May 7 meeting—that Ms. Martinez and I had agreed should be discussed as we formulated an agenda for that May 7 meeting—were the subjects discussed at a prior meeting, in February, 2014, between myself, the sheriff, New Mexico state Representative Debbie Rodella and U.S. Forest service law enforcement Patrol Captain Dan Reed at Rep. Rodella's office in the state capitol building.)

Included in the "Rio Arriba delegation" that attended the May 7 meeting in question were Sheriff Thomas Rodella, Rep. Debbie Rodella, former RAC Commissioner Felipe Martinez, and myself (who all attended personally) as well as RAC Clerk Moses Morales and RAC Attorney Ted Trujillo (who attended telephonically).

(RAC is one of the plaintiffs in a civil action now pending in U.S. District Court for New Mexico. The defendants in that lawsuit include the USDA/USFS and USFS personnel.

This lawsuit is one of the underlying/related issues mentioned above in regard to the disputes of USFS law enforcement officer activities in RAC.)

Among the "U.S. Attorney's delegation" were Damon Martinez, Elizabeth Martinez, several assistant U.S. attorney, USAFS attorneys and several USFS law enforcement officers.

Ms. Martinez and I agreed upon an agenda that included discussion of a number of technical legal issues regarding USFS law enforcement officer authority and practices both inside and outside the boundaries of the national forests and related aspects of both federal and state law as well as constitutional issues.

During that meetings, at which Damon Martinez requested no recordings be made and the matters under discussion remain confidential, the "U.S. Attorney's delegation" only two of the agenda items and did so only partially despite questioning of a clear and concise nature by myself, the sheriff and other members of the "Rio Arriba delegation."

Many of the critical points addressed at the earlier meeting in Rep. Rodella's state capitol office and issues raised at other prior meetings between RAC officials (and other state officials) and USFS officials, many of which were the subject of news media coverage over the course of the preceding several months, remained unaddressed by the "U.S. Attorney's delegation."

However, at that meeting, Damon Martinez did threaten Sheriff Rodella with arrest/prosecution if the sheriff or any of his deputies in any way interfered with any USFS law enforcement officer carry out his/her supposed legitimate mission anywhere in Rio Arriba County. Damon Martinez, in making those comments, chastised the sheriff for challenging the authority and practices of USFS law enforcement personnel and, by doing so, fomenting unrest among the citizenry of the sheriff's jurisdiction.

It was clear to me and other members of the "Rio Arriba delegation" that Damon Martinez was referring to previous public comments by the sheriff in which he had stated that USFS law enforcement officers were violating the law by stopping travelers on the highways outside the boundaries of the national forests without reasonable suspicion or probable cause and were doing so lacking status as New Mexico peace officers.

This issue was one of the unaddressed items on the agenda for that meeting (as memorialized on the printed agenda handed out to participants by Elizabeth Martinez at the beginning of the meeting.

Sheriff Rodella had previously declined to deputize/commission any USFS law enforcement officers as RASO deputies, an action that would otherwise have conferred upon them peace officer status in Rio Arriba County under New Mexico law.

At that meeting, Sheriff Rodella reiterated his intention to hold USFS law enforcement officers accountable for any violations of state law or violations of the constitutional and other legal rights (acting under "color of law") of citizens of Rio Arriba County.

It was clear to me that Damon Martinez had threatened Sheriff Rodella and that sheriff refused to "back down" from his position in the face of that threat.

I was particularly disturbed by this turn of events since a fruitful and cooperative discussion of the legal issues regarding USFS law enforcement officer authority—as indicated on the agenda—had not occurred at that meeting.

It was apparent to me that an honest and cooperative discussion of the agenda items, and sincere responses to the serious legal issues RASO personnel and others in Rio Arriba County had raised in the preceding several months (on the part of the "U.S. Attorney's delegation") was not the actual purpose of the meeting.

It was clear to me that the "U.S. Attorney's delegation" was unprepared, unwilling or under orders not to respond or otherwise address the issues RASO personnel had raised—as indicated on the agenda, which was obviously bogus.

It was also clear to me that the real purpose of the meeting was to threaten Sheriff Rodella in hopes he would back down from his statements regarding USFS law enforcement officer transgressions and his efforts to protect the citizenry of his jurisdiction from what appeared to be illegal and/or unconstitutional conduct on the part of USFS law enforcement officers.

FURTHER AFFIANT SAYETH NAUGHT.

_____

Jean-Claude dei Fiori Arnold (Jake Arnold)

ACKNOWLEDGED BEFORE ME this 26th day of August, 2014, who is personally known to me

(seal) _____

Notary Public

My commission expires: ____April 5, 2015____

5



# FOREST SERVICE

## COMPLIANCE REVIEW REPORT

## CIVIL RIGHTS PROGRAM REVIEW

### Conducted At:

### Regions Two and Three
### April 1- June 14, 2013
### Onsite: April 15-19, Colorado and New Mexico

Conducted By:

## Office of Compliance, Policy, Training and Cultural Transformation

Report Date:
June 2013

This document is for <u>OFFICIAL USE ONLY</u>. The content is not to be distributed outside the Department, nor duplicated, without prior clearance from the Office of Compliance, Policy, Training and Cultural Transformation.



USDA United States Department of Agriculture
Office of the Assistant Secretary for Civil Rights

**Dates of Review:** April 1- June 14, 2013
April 15 - 19, 2013, Colorado and New Mexico

**Review Conducted By:** Office of the Assistant Secretary for Civil Rights (OASCR)
Office of Compliance, Policy, Training and Cultural
Transformation (OCPTCT), Compliance Division

**Team Members:** Geraldine Herring, Chief, Compliance Division
Daruss Golden, Co-Team Lead
Sheila McKie, Co-Team Lead
Henry Bourgeois, Team Member
Albert Amissah, Team Member

Approved: _Ronald Branch_ Date: _6/24/13_
Ronald D. Branch, Acting Director, Office of Compliance, Policy, Training and
Cultural Transformation

# TABLE OF CONTENTS

Executive Summary                                                            4

Introduction                                                                 6
    Background                                           6
    Purpose and Scope                                    6
    Methodology                                          7
    Program Description: Grazing and Special Use Programs   7
    Demographic Data: States, Regions and Districts Visited   8

Findings, Summary of Documentation and Corrective Actions                    9

  Civil Rights Training and Technical Assistance                    9
  Public Notification and Outreach                                  10
  Data Collection and Analysis                                      12
  Program Participation                                             13
  Program Accommodation and Facility Accessibility                  14
  Compliance Reviews                                                15
  Assurance Agreements                                             16
Conclusion                                                                   17

Corrective Action Plan                                                       19

Appendix A                                                                   20

Demographics for Colorado                                                    21
Demographics for New Mexico                                                  22

During the period April 1 through June 14, 2013, the U.S. Department of Agriculture's (USDA) Office of Compliance, Policy, Training and Cultural Transformation (OCPTCT), conducted a Civil Rights (CR) Compliance Review of the Forest Service (FS) Region Two in Colorado and Region Three in New Mexico.

The Review Team (Team) evaluated the following aspects of the CR program of FS Regions Two and Three:

- The technical assistance and training provided to program participants to determine compliance with applicable CR laws and regulations;

- The public notification and outreach program;

- The system for collection and analysis of data necessary to determine compliance with Title VI of the Civil Rights Act of 1964;[1]

- Trends and patterns of participation in the Grasslands Program and Recreation Program at the San Juan, Carson, and Cibola National Forests;

- The accommodations and facilities accessibility for persons with disabilities;

- The effectiveness of the Agency's CR compliance review program; and

- The Agency's Assurance Agreement process.

This review found that both Regions Two and Three were non-compliant with several CR requirements; inconsistent implementation of USDA/FS regulations, procedures and other mandates.[2] They include the following:

- Failure to educate program participants on their civil rights program responsibilities and to provide technical assistance in accordance with Departmental Regulation (DR) 4330-002;[3]

- Failure to collect demographic data on program participants in order to determine the extent to which members of minority groups are beneficiaries of Federally assisted and conducted programs;[4]

---

[1] 42 U.S.C. §§ 2000d – 2000d-7.

[2] Executive Order 13166, *"Improving Access to Services for Persons with Limited English Proficiency,"* 65 FR 50121-50122; and U.S. Department of Justice, Policy Guidance Document, *"Enforcement of Title VI of the Civil Rights Act of 1964–National Origin Discrimination Against Persons With Limited English Proficiency"* (65 FR 50123-50125).

[3] DR 4330-002, *Nondiscrimination in Programs and Activities Receiving Federal Financial Assistance from USDA* (March 3, 1999); reference *§ 7e (6) Chapter 7.*

[4] 28 C.F.R. § 42.406 Data and information collection.

- Failure to provide a non-discrimination statement to program participants in a Federally assisted program in accordance with *FS Civil Rights Handbook 1709.11, 20.3 #3*;

- Failure to update FS regulations;

- Terminating or suspending grazing permits; and

- Lack of a written LEP plan or framework for the provision of timely and reasonable language assistance for eliminating or reducing LEP as a barrier to accessing USDA programs and activities.

Finally, this Report details the findings and lists corrective actions to be taken on all noted deficiencies.

### Background

The Office of the Assistant Secretary for Civil Rights (OASCR), Office of Compliance, Policy, Training and Cultural Transformation (OCPTCT), Compliance Division (CD) conducted a CR Program Compliance Review of the Forest Service (FS) grazing and recreational programs in Regions Two and Three on April 1 thru June 14, 2013. The on-site review was from April 14–19, 2013, in Colorado and New Mexico.

The review determined whether of Regions Two and Three complied with CR laws and regulations in the administration and delivery of Federally assisted and conducted programs, services, and activities.

### Purpose and Scope of Review

The review evaluated the CR programs and the FS Recreational Special Uses and Grazing Management programs to determine compliance with the Agency's regulations. In addition, the review determined the Agency's compliance with CR laws, USDA Departmental Regulations, procedures and policies pursuant to Title VI (Federally Assisted Programs) and Title VII (Equal Employment Opportunity).

The following were included in a review of the Agency's grazing land management and recreational accessibility policies for Hispanics and Native Americans (American Indians);

- Evaluating program delivery services in accordance with Sections 504 and 508 of the Rehabilitation Act of 1973;

- Evaluating the CR training provided to FS program participants and staff;

- Assessing the grazing permits process;

- Evaluating the implementation of the limited English proficiency (LEP) policies and procedures;

- Evaluating minority access to the National Forests in accordance with recreational, travel and land management regulations and policies; and

- Reviewing the travel and land management policies and practices as they relate to the overall accessibility.

The regions visited were:

- Region Two – **San Juan National Forest**, Southern Colorado (Durango, Colorado), Columbine Ranger District (Bayfield, Colorado), and Pagosa Ranger District (Pagosa Springs, Colorado);

- Region Three – **Carson National Forest**, Northern New Mexico (Taos, New Mexico) and Jicarilla Ranger District (Bloomfield, New Mexico);

- Region Three – **Cibola National Forest**, Central New Mexico (Albuquerque, New Mexico), Grants Mt. Taylor Ranger District (Grants, New Mexico), and Sandia Ranger District (Tijeras, New Mexico); and

- Region Three – **Southwestern Region Headquarters**, Albuquerque, New Mexico.

## Methodology

The review was conducted in three phases:

1. Pre on-site preparation, planning, data collection and review;
2. On-site evaluation,[5] data collection and observation; and
3. Off-site analysis and report preparation.

The on-site evaluation and data collection were conducted at selected District Ranger Offices within the San Juan, Carson, and Cibola National Forests.

The Team interviewed approximately 100 FS managers and employees; and contacted over 135 program participants including more than 50 participating by telephone. Also, the Team conducted a Focus Group of 10 present and former program participants.

## Program Description: Grazing and Special Uses Programs

The FS manages 191.6 million acres of national forests and grasslands that comprise the National Forest System (NFS). The Agency's Special-Uses Program authorizes use of the land that provides a benefit to the general public while preserving the National Forest.

Under the Special-Uses Program, each year FS receives thousands of individual and business applications for authorization to use NFS land for such activities as water transmission, agriculture, outfitting and guiding, recreation, telecommunication, research, photography and video productions, and granting road and utility rights of ways. FS reviews each application to determine how the request affects the public's use of NFS land. Normally, the NFS land is not made available if the overall needs of the individual or business can be met on non-Federal lands. FS issues a special-use authorization such as a permit, lease, or easement which allows occupancy, use rights, or privileges of NFS land and is granted for a specific use of the land for a specific period of time.

The authorizations are granted based on: (1) a need to occupy, use, or build on NFS land for personal or business purpose; (2) a fee being charged or income being derived from the use; and (3) activity involving people or organizations with 75 or more participants or spectators. Permit holders pay an annual rental fee based on the fair market value for the uses authorized.

---

[5] On-site evaluations were conducted through the use of questionnaires. Interviewees were notified that their identities would remain confidential and their participation in the Civil Rights Compliance Review is protected from retaliation and reprisal by the *Civil Rights Act of 1964, as amended.*

The three types of grazing permits are:

- **Temporary Grazing Permits** are generally issued for a short period of time to allow livestock to remain on the National Forest land.

- **Livestock Use Permits** are issued for a year or shorter for incidental use and are not intended to authorize commercial livestock production on National Forest lands. A common situation for issuing a Livestock Use Permit is to authorize Guide/Outfitter's stock during the period they are operating on the National Forest; and

- **Term Grazing Permits** are issued for up to 10 years to livestock producers throughout the West. When a Term Grazing Permit is issued to a newly qualified applicant, one must meet the base property ownership requirement to obtain a permit. This is met mostly through the purchase of existing base property that is recognized under an existing Term Grazing Permit. Individuals or businesses may inherit, obtain through foreclosures, or other means become owners of base property.

## Demographic Data: States, Regions, and Districts Visited

According to the 2012 Census population data for the State of Colorado, 20.4 percent are Hispanic/ Latino; 70.3 percent White; 3.7 percent Black; 2.7 percent Asian American; and 0.6 percent American Indian. In the State of New Mexico, 45.9 percent are Hispanic/Latino; 72 percent White; 2 percent Black; 1.3 percent Asian American; and 9.3 percent American Indian. The major American Indian tribes in Southwestern Colorado and Northern New Mexico are the Apache, Mountain Ute, Navajo, and Ute. (See Appendix A for a demographic breakdown of the sites visited.)

| FINDINGS | RULE | CORRECTIVE ACTIONS |
|---|---|---|
| • Based on interviews, Region Two staff indicated they completed all mandatory CR training on AgLearn for 2013 but found it to be ineffective. The employees interviewed did not remember specific course topics they received in the last year. The only face-to-face training or course discussed was one held in preparation for the fire season.<br><br>• Many program participants interviewed stated they had not received CR training and were unaware of their CR compliance responsibilities.<br><br>• Interviews with senior management officials disclosed they had not taken CR training in several years although the CR program is a critical element in their performance plans.<br><br>• FS employees and program participants have not been provided limited English proficiency (LEP) guidance and training. | DR 4300-5, *Agency Civil Rights Programs* (January 14, 1998), requires the Agencies to conduct annual CR training and collect and maintain employee participation records. These records must be submitted to the CR Director to ensure and document that all employees have received the training.<br><br>Further, mission areas and Agencies must support the CR training with funding, staff assistance, and on-site coordination of training delivery, and by encouraging employees to apply the principles learned in the workplace. Agencies must also take the necessary steps to ensure that CR professionals and officials who are responsible for integrating the CR requirements into programs and activities receive the technical training necessary to properly carry out their responsibilities. (See also DM 4330-001, *Procedures for Processing Discrimination Complaints and Conducting Civil Rights Compliance USDA Conducted Program and Activities* (October 18, 2000), Chapter 5. | • Design training modules that are interactive; related to the mission of the unit; and targeted for specific purposes for an effective CR program.<br><br>• Develop and implement a 3-year CR training plan (Plan) for all employees and program participants, and incorporate the Plan in the proposed Regional Strategic Plan. The Plan should include the following:<br><br>a) Interactive discussions on subjects related to the CR responsibilities of employees and program participants, such as public notification, data collection, monitoring, reporting, and data maintenance to evaluate program participation;<br><br>b) Training modules that address the LEP guidance and requirements;<br><br>c) Time tables for implementation;<br><br>d) The types of program participants, including Special Uses and Grazing permittees (i.e., allotment owners) to receive training; and<br><br>e) The staff person(s) responsible for providing the training.<br><br>• Submit the Plan to the Regional CR Director for approval prior to dissemination and |

| FINDINGS | RULE | CORRECTIVE ACTIONS |
|---|---|---|
| | | implementation. A copy of the approved plan should be sent to OASCR, OCP1CT, Compliance Division. |
| | | • Ensure that senior management officials demonstrate a commitment to CR by timely completing the mandatory CR and EEO training. |
| • The non-discrimination statement was consistently omitted from key documents, such as the grazing permit applications. | 7 C.F.R. Section 15.5(d), requires Agencies and recipients to ensure that program participants/beneficiaries and other interested persons are informed of the CR requirements of Title VI. [See also 28 C.F.R. Section 42.106(d).] The information, including complaint procedures, must be prominently displayed on posters and in pamphlets or other materials that are distributed to the public to describe the recipient's programs. (See 28 C.F.R. Section 42.405.) | • Include the required non-discrimination statement on all documents, and advise program participants of the meaning of the statement. All program participants should confirm their receipt of notification and understanding by signature and date. |
| • The program brochures lacked diversity and included only images of White males and females. | | |
| • There was no documentation that brochures were in an alternative language except for a children's coloring book in Spanish at one of the District Ranger Offices. | | • Ensure that the Regional, Forest Supervisor, and District Ranger Offices, and program participants include the non-discrimination statement on all outreach and recruitment materials; news articles submitted to newspapers for publication; and any other written material that is distributed to the public. |
| • In most of the Ranger District Offices visited, the "And Justice for All" posters, CR policy statements, anti-harassment policy statements and EEO policy statements were not prominently posted in public areas. | Based on Federal law, each Agency shall prepare a plan to improve access to its programs and activities by eligible LEP persons. Agencies are required to examine the services they provide, identify any need for services to those with LEP, and develop and implement a system to provide those services and meaningful access to them. | • Educate program applicants, who advertise on the website, about the importance of the non-discrimination statement and alternative communications methods as part of the Assurance Agreements and contracts. |
| • FS staff indicated there was no LEP plan, guidance or informational materials available in the Regional and Ranger District Offices. | USDA Agencies must develop a written LEP plan (Plan) to provide timely and reasonable language assistance and for eliminating or reducing LEP as a barrier to accessing USDA programs and services. (See Executive Order | • Ensure that the Regional, Forest Supervisor, and District Ranger Offices, and the program participant offices prominently display the USDA's "And Justice for All" poster, and widely |
| • Many program participants indicated the FS | | disseminate the "Complying with Civil Rights |

| | | |
|---|---|---|
| • did not provide interpreters or LEP materials to Hispanic/Latino ranchers and other participants who spoke little English. In addition, FS websites did not contain links to its services in other languages that were commonly spoken in the area. | 1316A, *Improving Access to Services for Persons with Limited English Proficiency* (August 11, 2000); DR 4330-005.)<br><br>Also, the CR non-discrimination policy must be communicated to the public through all appropriate USDA public information channels in English and in languages appropriate to the local population, and in alternative means of communication (Braille, large print, audiotape, etc.). | *Requirements*" brochure.<br><br>• Develop and implement a written Plan to address and identify the needs of the LEP populations served in the FS Regions. |
| • Most of the websites for program participants did not contain the non-discrimination statements or information on alternative methods of communication. | | • Develop program literature and informational materials with images and photos that represent a diversity of participants. |
| • Most program participants indicated that the outreach efforts by both Regions were minimal or non-existent. | Agencies must develop and implement a communications plan that includes an adequately funded outreach component to ensure that publications, documents, advertisements, and other program information materials are in appropriate format and language to accommodate all program participants. | • Implement a language assistance service through both oral and written notice in primary languages spoken by a significant number of customers and potential customers in the service areas. |
| • FS representatives are required to meet with program participants and discuss the Annual Operating Instruction (AOI). According to the program participants, FS staff prepares the AOI and tells them "to take or leave it" with little or no discussion. | | • Provide Interpreters when conducting a technical assistance review with the LEP program participants. |
| • All program participants interviewed stated "the AOI is supposed to be a joint venture," but FS cuts and pastes the AOI and arbitrarily changes the allotment size from year to year." As a result, this delays entry dates and reduces the grazing period, thereby causing a loss of money. | In regard to outreach efforts, the Agency is required to use positive images and examples of employment and program participation by minorities, women and other protected groups in pictures and other visual and audio public information materials. | • Require public notification and outreach strategies include the minority media and the program materials are available in languages appropriate to the community being served. Websites should provide available links to other languages commonly spoken in the area. |
| | | • Provide a written report to the Regional CR Director regarding the status of the actions and activities identified in the Public Notification and Outreach Plan. |
| • Many program participants indicated the technical assistance meetings are intended by FS to threaten discontinuance of benefits and/or to announce cuts in services once afforded by permits and contracts. | | • Utilize the technical assistance meetings as outreach opportunities to provide information and positive assistance on contracts, permits, and discuss CR issues. |

| FINDINGS | Data Collection and Reporting | | CORRECTIVE ACTIONS |
|---|---|---|---|
| • Program participant data is not collected by race, color, and national origin. | | 7 C.F.R. Section 15.5(b) requires that recipients of Federal assistance ensure the collection and maintenance of program participant data in order to determine the extent to which members of minority groups are beneficiaries of Federally assisted programs. | • Establish a system to collect and maintain accurate data on potential and actual program participation in order to determine how effectively the programs are reaching protected groups and to provide input for management purposes. The demographic data must be organized and analyzed based on the Region and District Ranger Offices. |
| • The program management officials and employees interviewed from either Region were unaware of the statutory requirement for collecting and maintaining program eligibility and participation data according to race, color, and national origin. | | Further, the Agencies are required to install a system for the statistical evaluation, analysis and reporting in order to measure program participation and determine the extent to which underserved communities benefit from the programs and activities of the Agency. (See DR 4300-005.) | • Develop data collection guidelines and procedures that address the population of recipients and program participants to ensure that adequate data is available and evaluated. The guidelines and procedures should be tailored appropriately for each type of program participant. |
| • The Team randomly examined records and files representing the Recreational Special Use Program and the Grazing Program at the various sites which found no relevant data reflecting compliance with USDA's policies on data collection and reporting. Also, there were no files or records that addressed the issue or reflected the status of parity in program participation. | | In accordance with the Food, Conservation, and Energy Act of 2008 (2008 Farm Bill),[6] the U.S. Congress requires an annual report of the participation rate of socially disadvantaged farmers and ranchers for each USDA program established for farmers and ranchers, according to race, ethnicity and gender, by county and State. | • Train FS program management officials and employees regarding the Departmental regulatory requirement to collect and maintain data on program participants according to race, ethnicity and gender. |
| | | | • Collaborate with Human Resources to build relationships that support sharing information regarding hiring data to create a more diverse workforce. (Reference the Equal Employment Opportunity Commission's Management Directive 715.) |

---

[6] See Food, Conservation, and Energy Act of 2008 (June 18, 2008), "Transparency and Accountability for Socially Disadvantaged Farmers and Ranchers," Section 14006, Public Law 110-246 (7 U.S.C. § 8701).

| FINDINGS | RULE | CORRECTIVE ACTIONS |
|---|---|---|
| • FS does not collect any program data regarding the potential, eligible and actual client populations served in both Regions. Therefore, it was not possible to provide a definitive analysis of the level of compliance with USDA's non-discrimination requirements. | 7 C.F.R. Section 15.3 states that, "The regulations implementing Title VI prohibit recipients from denying program services or benefits to any person based on race, color, or national origin." Thus, the Agencies are responsible for enforcing the Title VI[7] compliance responsibilities of all program participants. | • Establish a data collection system of all Title VI program participants in accordance with Section 3 above (*Data Collection and Analysis*). |
| • Most program participants interviewed were unaware of the Federally assisted program CR responsibilities. | | • Provide program participants with updated policies and procedures in written form. |
| • The regulations for penalties regarding allotments are not clearly articulated or consistent for fines and violations. The FS point of contact referred the Team to Handbook 2209-13-2012 chap. 16 pg. 34, which does not specifically define the penalties. | Forest Service Handbook (FSH) 2209.13 – *Grazing Permit Administration Handbook, Chapter 90 – Rangeland Management Decision-making* (June 8, 2007)

FSH 2231.22 – *Qualification Requirements, 2231.22a – Term Permits. To qualify for a term grazing permit, an applicant must own base property and livestock (except leased breeding sires – Forest Service Manual (FSM) 2234.1?) to be permitted.* | • Develop a focus group to improve working relationships and communications between FS and program participants.

• Provide clarity and articulate the intent of the *Taylor Grazing Act of 1934(Grazing Act)*[8], for program participants, of which many perceive as superseding the authority of FS regulations on rangeland management. The *Grazing Act* authorizes the Secretary of the Interior to establish grazing districts on Federal public lands, and it does not impact FS grazing regulations and policies. |
| • Most program participants stated the grazing regulations are outdated, and the prohibitive cost of property makes it difficult for program participants (such as allotment owners) to meet the grazing requirements. | FSH 2209.13, section 12.2 – *Qualification Requirements. To qualify for a grazing permit with term status, an applicant must own base property and livestock to be permitted.* | • Implement the FS regulations in a more consistent manner with program participants. There is an inconsistency in the implementation of the procedures in Regions Two and Three in contrast to the procedures administered by Headquarters. |
| • Many program participants indicated the terms and conditions in the AOI are not achievable, stating, "FS staff does not use | FSH 2209.13, section 12.21 – *Base Property Ownership Requirements. Where base property is jointly owned, all of the owners* | • Develop and implement a uniform application of the FS grazing permit validation procedures in |

---

[7] 28 C.F.R. Section 42.401; 7 C.F.R. Section 15.3; DR 4330-2 Section 8(a) (March 3, 1999).

[8] 43 U.S.C. Section 315

| FINDINGS | RULE | CORRECTIVE ACTIONS |
|---|---|---|
| the best science to develop the terms." As a result, program participants feel they are forced to do what FS staff dictates or they will not be allowed access to FS grazing lands for their livestock. | must apply for the term permit. In other words, an individual's permit application will be rejected if the base property identified therein is jointly owned and the other owners are not listed as applicants for the permit." | accordance with FS regulations.<br>• Provide technical assistance to the program participants in developing the AOI to ensure an open, cooperative and inclusive process. |
| Many program participants stated the FS staff uses "Gestapo" intimidation tactics, such as constant threats, suspension of permits, retaliation, and discrimination. | FSH 2209.13, WO Amendment 2209.13-92-1(14.33) - Certificates of Brands, Require that an applicant submit a copy of the certificate of brand for the record.<br><br>FSH, Chapter 96.3, Annual Operating Instructions (AOI) – To the extent feasible, the AOI should be developed with, and signed by the permittee. | |

**Physical and Programmatic Accessibility**

| FINDINGS | RULE | CORRECTIVE ACTIONS |
|---|---|---|
| • The three National Forest Offices that were visited by the Team fulfilled most of the requirements for reasonable accommodations and accessibility guidelines regarding persons with disabilities. However, the Team did find doors at some sites were not in compliance with the Americans with Disabilities Act (ADA). The doors were extremely difficult (i.e., too heavy) to open; and there was an issue with the access ramp at two sites visited. | 7 C.F.R. Part 15b states that, "Regulations implementing Section 504 of the Rehabilitation Act of 1973, prohibit recipients from denying benefits or services to persons on the basis of handicap." The regulation further states that the Agency is responsible for ensuring the compliance of its recipients and program participants with the applicable Federal non-discrimination statutes, regulations and policies. (Reference Civil Rights Act of 1964, as amended (Title VI); 28 C.F.R. Part 41; and DR 4330-002.) | • Conduct a facility accessibility survey and develop a transition plan with specific target dates for completion to address all identified barriers.<br>• Educate FS staff about the disability issues and reasonable accommodations policy; and also ensure that they are aware of the designated Disability Program Manager responsible for the Region. The Staff should know who to go to if there is a reasonable accommodation issue, and the Disability Program Manager needs to be fully knowledgeable of their job responsibilities. |
| • FS staff was unaware of either the disability requirements or the reasonable accommodations policy.<br>• Most FS staff stated they were unaware of the reasonable accommodation process or | | |

the name of the Disability Employment Program manager.

- Many FS stated the Facility and Program accessibility was in compliance with Section 504 and the ADA; several noted they needed to improve especially with respect to Section 508 accessibility.

| FINDINGS | RULE Compliance Reviews | CORRECTIVE ACTIONS |
|---|---|---|
| The Review Team determined the Agency's methodology for evaluating the CR compliance of the Regions Two and Three is insufficient. The Agency's methodology does not allow for a thorough and objective analysis of its program delivery services.<br><br>a) The Agency's timetable for initiating a compliance review of its programs is not in accordance with their proposed fiscal year schedule.<br><br>b) The Agency, in the alternative, utilizes FS *Form 1700-5*, which is a checklist and does not allow for appropriate analysis or comprehensive description of program activities.<br><br>c) Based on interviews with FS recreation management officials, the Reviews are conducted by staff who are either directly responsible for the Recreational Special Use Permits and Range Management Programs or by the administrative staffs at the Forest level. Further, there is no evidence that the | 7 C.F.R. Section 15.3 requires the Agency to review and monitor the activities and program service delivery mechanisms of recipients to determine whether they are complying with the appropriate CR laws and regulations. | - Develop and implement a compliance review and evaluation system that incorporates the requirements of the CR laws, regulations and policies.<br><br>- Conduct compliance reviews according to set time schedules and in collaboration with the FS and USDA CR staff.<br><br>- Ensure that the findings and corrective actions from the compliance reviews are incorporated into the appropriate management reports. |

| FINDINGS | REQUIREMENTS | CORRECTIVE ACTIONS |
|---|---|---|
| information obtained is used to produce a regional or forest-wide document that can be used for reporting, monitoring and follow-up. | | |
| d) Most interviewees indicated that few compliance reviews were being done. However, the data requested from FS indicates that over the course of the last three years, the CR Office reported in had completed 2202 desk audit reviews, and 214 compliance reviews. | | |
| e) Many of the program participants stated that National Forest Service has not demonstrated their commitment to CR. | | |
| f) Some FS employees emphasized compliance reviews should include clients of the program participants. | | |

*Assurance Agreements*

| FINDINGS | REQUIREMENTS | CORRECTIVE ACTIONS |
|---|---|---|
| • Interpretations of the Assurance Agreements are inconsistent, and many FS staff did not understand the process or could not provide an office policy or procedure. | Departmental regulation requires the Agencies to obtain written Assurance Agreements from all recipients applying for Federal financial assistance, and to assure that the current agreements are maintained, reviewed, and monitored. | • Provide consistent, standard operating guidelines on Assurance Agreements and the regulations that govern them. |

Based on the overall findings regarding FS Regions Two and Three, the Team has determined that FS is in non-compliance with many CR program requirements and responsibilities.

Many FS management officials and employees were unaware of the basic CR requirement to include the non-discrimination statement in the program brochures and contracts. The inconsistent use of the non-discrimination statement on its brochures and other public documents violates Departmental regulations that require all public documents include the non-discrimination statement.

During the interviews with FS management officials, employees and program participants, it was apparent that effective CR training is lacking in the different regional and district areas. For example, the lack of definitive responses from both employees and program participants, regarding CR training, shows training is not reviewed or regarded as an essential performance responsibility or obligation. Both management and non-management employees were unable to differentiate between CR and Equal Employment Opportunity (EEO) training. More troubling was the disclosure by management officials that they had not received CR training in several years. It is essential that FS provide effective CR training to all employees to include conducting effective outreach methods; improving LEP guidance; providing reasonable accommodation; and ensuring equal opportunity in the delivery of program services for all participants. Additionally, FS should develop and implement a 3-year CR training plan for both employees and program participants.

The Agency's outreach efforts were minimal or non-existent. Public notification and outreach efforts to program participants were limited to a couple of programs with two local colleges. Based on interviews with program participants and the focus group, many felt FS omits them from the decision-making process when changes are implemented in the grazing program. For instance, many program participants pointed out that at the beginning of each grazing season, FS representatives are required to meet with them to discuss the Annual Operating Instruction (AOI). Instead of the process being a collaborative effort, the Team was repeatedly told FS staff prepares the AOI and tells the program participant "to take it or leave it" with little or no further discussion on the matter. The Team was further informed that the AOI is arbitrarily changed each year regarding the allotment size. As a result, this practice delays the entry dates and reduces the grazing period, thereby causing a loss of money for the program participant.

There were no LEP initiatives to provide outreach to the communities where English is a second language. FS must take reasonable steps to ensure LEP individuals receive the language necessary for meaningful access to USDA programs and activities. For example, the special use and grazing permits were written in English, but not translated in Spanish, which shows that neither the Regional Offices, nor Headquarters are serious about LEP services. The lack of required resources for LEP individuals does not support USDA's policy for ensuring equal access to FS programs. FS must improve its relationship and communications with the Hispanic program participants by providing them the requisite LEP services, technical assistance and outreach services to engage them fully and openly.

FS has no system in place for program management officials or employees to collect program participant data according to race, color, and national origin. This information would improve

the operation of the program; help design additional opportunities for program participation; monitor adherence to laws that require equal access for eligible persons; and develop effective compliance reviews of programs and participants. Many of the program participants raised concerns of discriminatory treatment towards minority participants, resulting in many of them having their grazing permits either terminated or suspended. It is essential that FS develop data collection guidelines and procedures to address the population of program participants.

The interpretation and understanding of the Assurance Agreements by program participants appears to be inconsistent. Many of the FS program staff did not clearly understand the process, nor could they provide documentation of office policies or procedures. Most program participants were unaware of their Federally assisted CR responsibilities. Therefore, FS management and program officials should provide program participants with consistent and standard operating guidelines on the FSH, FSM, Assurance Agreements, and current governing regulations.

Many of the findings in this report reflect the lack of CR monitoring by both FS Regional Offices and Headquarters. Although FS stated CR compliance reviews have been previously conducted, there was no definitive evidence provided to support the implementation of any substantial reviews.

Finally, there remains a critical need to emphasize and strengthen CR training and outreach initiatives so that both management and staff can carry out their duties more efficiently, both within and outside the organization, to address the disparities and barriers regarding program delivery to all program participants. The findings of this report will be alleviated and/or improved, if FS diligently adheres to CR laws and regulations including LEP; and updates and consistently implement its regulations, policies and procedures, as mandated.

FS must develop a detailed Corrective Action Plan (CAP) within 60 days of receipt of this Report. The plan must include timeframes for completion and identification of the responsible person for implementation of the actions. The plan also must include any progress made in these areas since the review. The CAP should be sent to:

**Department of Agriculture**
Office of Compliance, Policy and Training
Attention: Geraldine Herring, Chief
Compliance Division
300 7th Street, SW, Room 620
Washington, D.C. 20024
Facsimile: (202) 690-2345

# APPENDIX A

# Demographics for Colorado:
## National Forest and Ranger Districts Reviewed

### State of Colorado

| | Hispanic or Latino (of any race) | Not Hispanic or Latino | White alone | Black or African American alone | American Indian alone | Asian alone | Native Hawaiian & Other Pacific Island alone | Some other race | Two or more races | People Below Poverty | Families below poverty |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Colorado | 20.4% | 79.6% | 70.3% | 3.7% | 0.6% | 2.7% | 0.1% | 0.2% | 2.1% | 12.5% | 8.7% |

### Durango, Colorado
### (San Juan National Forest)

| | Hispanic or Latino (of any race) | Not Hispanic or Latino | White alone | Black or African American alone | American Indian alone | Asian alone | Native Hawaiian & Other Pacific Island alone | Some other race | Two or more races | People Below Poverty | Families below poverty |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Durango, New Mexico | 12.28% | 87.72% | 85.12% | 0.59% | 6.32% | 0.83% | 0.04% | 4.09% | 3.00% | 7.30% | 11.20% |

### Bayfield, Colorado
### (Columbine Ranger District)

| | Hispanic or Latino (of any race) | Not Hispanic or Latino | White alone | Black or African American alone | American Indian alone | Asian alone | Native Hawaiian & Other Pacific Island alone | Some other race | Two or more races | People Below Poverty | Families below poverty |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bayfield, Colorado | 13.24% | 86.76% | 88.45% | .21% | 4.07% | .26% | .04% | 3.26% | 3.73% | 5.80% | 2.90% |

### Pagosa Springs, Colorado
### (Pagosa Ranger District)

| | Hispanic or Latino (of any race) | Not Hispanic or Latino | White alone | Black or African American alone | American Indian alone | Asian alone | Native Hawaiian & Other Pacific Island alone | Some other race | Two or more races | People Below Poverty | Families below poverty |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pagosa Springs, Colorado | 41.34% | 58.66% | 70.58% | .69% | 2.61% | .29% | .12% | 21.31% | 4.40% | 8.20% | 11.90% |

## Dolores, Colorado
### (Dolores Ranger District)

| | Hispanic or Latino (of any race) | Not Hispanic or Latino | White alone | Black or African American alone | American Indian alone | Asian alone | Native Hawaiian & Other Pacific Island alone | Some other race | Two or more races | People Below Poverty | Families below poverty |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Dolores, Colorado | 10.90% | 89.10% | 90.38% | .32% | 2.14% | .11% | .21% | 3.10% | 3.74 | 12.40% | 16.30% |

## Demographics for New Mexico:
## National Forests and Ranger Districts Reviewed

### State of New Mexico

| | Hispanic or Latino (of any race) | Not Hispanic or Latino | White alone | Black or African American alone | American Indian alone | Asian alone | Native Hawaiian & Other Pacific Island alone | Some other race | Two or more races | People Below Poverty | Families below poverty |
|---|---|---|---|---|---|---|---|---|---|---|---|
| New Mexico | 45.9% | 54.1% | 72.0% | 2.0% | 9.3% | 1.3% | 0.1% | 12.3% | 3.0% | 19% | 14.4% |

## Taos, New Mexico
## (Carson National Forest)

| | Hispanic or Latino (of any race) | Not Hispanic or Latino | White alone | Black or African American alone | American Indian alone | Asian alone | Native Hawaiian & Other Pacific Island alone | Some other race | Two or more races | People Below Poverty | Families below poverty |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Taos, New Mexico | 56.10% | 44.90% | 89.30% | .80% | 7.30% | .90% | .10% | .00% | 2.60% | 21.50% | 23.10% |

## Bloomfield, New Mexico
### (Jicarilla Ranger District)

| | Hispanic or Latino (of any race) | Not Hispanic or Latino | White alone | Black or African American alone | American Indian alone | Asian alone | Native Hawaiian & Other Pacific Island alone | Some other race | Two or more races | People Below Poverty | Families below poverty |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bloomfield, New Mexico | 31.69% | 68.31% | 67.32% | .62% | 18.27% | .44% | .02% | 9.81% | 3.51% | 24.60% | 20.90% |

## Albuquerque, New Mexico
### (Cibola National Forest, Southwest Region)

| | Hispanic or Latino (of any race) | Not Hispanic or Latino | White alone | Black or African American alone | American Indian alone | Asian alone | Native Hawaiian & Other Pacific Island alone | Some other race | Two or more races | People Below Poverty | Families below poverty |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Albuquerque, New Mexico | 46.73% | 53.27% | 69.72% | 3.29% | 4.60% | 2.65% | .11% | 15.03% | 4.61% | 16.60% | 13.50% |

## Grants, New Mexico
### Grants Mt. Taylor District)

| | Hispanic or Latino (of any race) | Not Hispanic or Latino | White alone | Black or African American alone | American Indian alone | Asian alone | Native Hawaiian & Other Pacific Island alone | Some other race | Two or more races | People Below Poverty | Families below poverty |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Grants, New Mexico | 50.65% | 49.35% | 75.79% | .74% | 1.48% | .37% | 0.00% | 18.30% | 3.33% | 16.60% | 15.10% |

## Tijeras, New Mexico
### (Sandia Ranger District)

| | Hispanic or Latino (of any race) | Not Hispanic or Latino | White alone | Black or African American alone | American Indian alone | Asian alone | Native Hawaiian & Other Pacific Island alone | Some other race | Two or more races | People Below Poverty | Families below poverty |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Tijeras, New Mexico | 52.08% | 47.92% | 57.43% | 1.73% | 16.91% | .85% | .22% | 18.53% | 4.33% | 18.72% | 17.27% |

Members attending were from 1) Espanola District, NM; 2) El Rito Ranger District, NM; 3) La Coyote Ranger District, NM; 4) Canjilon Ranger District, NM; and 4) Pagosa Ranger District, CO. They all have grazing allotments and raise cattle. Grazing permittees.

The Northern New Mexico Stockman Association was founded in 1990 to protect grazing rights of stock (cattle) owners.

Major concerns raised by the attendees who say that the following are only the tip of the iceberg:

1. Difficulty with Forest Service (FS) when selling grazing rights and transfers must be made
2. FS threatens us if we don't abide by their rules. Fs is supposed to meet with us, but their attitude is "take it or leave it!"
3. FS has unilateral authority. No due process. We don't have input. "If you don't sign, you don't graze."
4. We must pay for environmental studies FS cooks up and this is to put us out of business.
5. FS shortens the grazing season without input from us
6. FS brings in people from other parts of the country to deal with issues of grazing about which they know nothing.
7. FS has its own style of management and doesn't listen to ranchers. We are under constant threat and it's always, "My way or the highway!"
8. In Rio Arriba, they terrorize our communities and some have turned into ghost towns.
9. FS retaliates against us by reducing or suspending our permits when we stand up for your rights.
10. FS puts fences around our allotments and water thus forcing our cattle to go long distances to water.
11. A fifth generation permittee Chacon accuses the FS of "treating him badly and because FS personnel don't know our system, they do injustices to us."
12. "FS orders us around when all what we want is to protect our rights."
13. FS terrorizes our people who go to pick herbs or collect wood in the forests by not allowing us to engage in these activities. They are constantly patrolling the forest.
14. FS manages the ranches in this way because they know we are poor and can't defend ourselves. Our appeals for justice don't go anywhere. (Compares FS to the Nazis and their Gestapo tactics)
15. People here are poor because BLM and FSW have gradually been taking our lands away.
16. FS conspires with environmentalist groups to get our ranchers out of business and destroy our way of life. FS really doesn't take care of the lands.
17. FS uses intimidation, constant threats, discrimination, and retaliation in their dealings with the ranchers.

18. Women don't stand a chance with the FS. One woman attendee said that she owns a large allotment and during a recent drought FS asked her to get her cattle out of the forest although no other rancher was told to do so. She said she paid her full permit.

19. FS makes arbitrary decisions. Most FS upper management people are white and they get their Hispanic employees to whip and pressure us to give up our lands. FS takes our water and lands to get rid of us.

20. FS takes wood collectors to federal courts in Albuquerque where they don't stand chance because they are poor and don't know how to defend themselves.

21. Under the Treaty (Guadalupe), water is free, but FS is not taking care of the woods.

22. There is no outreach and no communication with the ranchers. All they do is work in offices and drive around in their cars.

23. One permittee from El Rito said he got out of the ranching business because of El Rito's District management of permittees. An FS supervisor (Buck Sanchez) would never cooperate with the ranchers.

24. FS never attempts to do impact studies on small ranchers and frequent change in FS personnel makes it difficult to deal with them. "Everyone has failed to help us."

25. Dave Sanchez? said that FS has not demonstrated their commitment to civil rights. "The civil rights of our people have been violated."

26. Most Hispanic ranchers don't speak English well, but FS doesn't do any outreach nor do they have any LEP and other language access materials to share with us.

Recommendations:

1. Make FS understand that they are not he police. Don't make us prisoners in our own homes. FS wants to attend only to the rich folks.

2. FS hasn't recognized the grazing rights of the ranchers – fifteen generations of Indians and Hispanics. They must do so.

3. FS should insert directives in 2012 rules to prevent forcing grazers to sign contracts???

4. Because of our sense that it is futile to appeal anything, an independent board should be created to look into these matters.

5. Environmental impact studies should be conducted on land and local communities.

6. We are now recognized as a historic heritage site reducing us to mere museum pieces. FS should recognize that we are the best stewards of the land.

HB 06-12-13

CERTIFIED MAIL and *ELECTRONIC VERSION*

Jodi Gillette, Senior Policy Advisor
Native American Affairs Domestic Policy Council
The White House
Washington, D.C. 20502
Email: JGILLETTE@WHO.EOP.GOV

Tom Vilsack, USDA Secretary
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, DC 20250
Email:

Subject: USDA Civil Rights Compliance Review Report

Dear Ms. Gillette and Secretary Vilsack:

The purpose of this letter is to bring to your attention the attached report produced by the USDA Office of
Compliance, Policy, Training and Cultural Transformation, entitled: *FOREST SERVICE COMPLIANCE
REVIEW REPORT CIVIL RIGHTS PROGRAM REVIEW Conducted At: Regions Two and Three April 1-
June 14, 2013 Onsite: April 15-19 Colorado and New Mexico Report Date: June 2013.* The Office of the
Assistant Secretary for Civil Rights (OASCR), Office of Compliance, Policy, Training and Cultural
Transformation (OCPTCT), Compliance Division (CD) conducted a CR Program Compliance Review of
the Forest Service (FS) grazing and recreational programs. The Report was approved by the office
Director and provided to us by the Office of the Assistant Secretary for Civil Rights.

The Report's Executive Summary concludes at page 4 regarding the performance of the Forest Service
(FS) agency as follows: *"This review found that both Regions Two and Three were non-compliant with
several CR requirements; inconsistent implementation of USDA/FS regulations, procedures and other
mandates."* The Report identifies several program areas of noncompliance which includes at page 5, the
process used in *"Terminating or suspending grazing permits."*

The Report's Introduction, Purpose and Scope of Review identify the FS program areas of required
compliance reviewed in the context of Federal laws and overall FS agency regulations. The Scope also
identified the specific review of the FS agency's policies with regard to minorities at page 6, 2nd
paragraph: *"The following were included in a review of the Agency's grazing land management and
recreational accessibility policies for Hispanic and Native American (American Indians)".* The issue of
access to grazing permits is of vital importance to the minority Hispanic and Native American ranchers in
Colorado and New Mexico and has long been a source of conflict with the FS over complaints of
discriminatory practices. See *David Sanchez v. Forest Service, No. FS-12-5775* and *Jarita Mesa
Livestock Grazing Association, Alamosa Livestock Grazing Association, et. al. vs. The United States
Forest Service, et al., USDC District NM, No. CIV 12-0069 JB/KBM.*

The review compliance process identified in this Report interviewed several FS District office
staff/employees in Regions Two and Three. Also interviewed as program participants were *"Grazing
Permittees"* from the various National Forests and Ranger Districts in Regions Two and Three. The

1

Report's Conclusion notes evidence of discrimination on page 18; 1st paragraph, 2nd sentence: *"Many of the program participants raised concerns of discriminatory treatment toward minority participants, resulting in many of them having their grazing permits either terminated or suspended"*. Thus, it is clear that the impetus for the review compliance process by the OCPTCT came from the minority grazing permittees themselves and not the non-minority group permittees.

The OCPTCT office Report details 36 Findings and lists the attendant corrective actions which support the merit of our long-standing complaints that discrimination against minorities was and is systemic in the entire FS agency in Regions Two and Three. The FS agency noncompliance with Federal laws and its own overall agency regulations has had a long-standing negative impact on the social, economic and cultural status of Hispanic and Native American ranching participants referred to in this report. It is important for the White House Administration and USDA to recognize that there are Native American and Hispanic families living at or below poverty level guidelines throughout New Mexico and Colorado. It is equally important to recognize that the minorities referenced in this report are dependent on the Federal lands that makeup approximately seventy percent of the land mass of our counties. For example, Region Three alone *"covers 1.8 million acres"*. The dependency and use of this Forest Lands and its natural resources by Native Americans and Hispanics predates the establishment of the US Forest Service in 1905 by several centuries, going back to the founding of the livestock industry in 1598 by early Spanish colonists. This area has also been recognized by Congress as the "Northern Rio Grande Heritage Area" for the presence and contributions of its many native communities. Yet the long discriminatory practices of the US Forest Service against these native ranchers has sharply reduced and crippled their livestock economy and their very existence as land based peoples.

In conclusion, the Report by the OCPTCT office identifies the root causes for the FS Agency's inability to comply with Federal Laws and overall agency regulations. The FS Agency's failure to comply with Federal law and regulations has led to numerous confrontations between the agency and the minority participants identified in the Report. This long history of the FS Agency decisions to terminate, suspend and reduce the participants' grazing permits has devastated the social and economic sustainability of Hispanic and Native American families in the state of New Mexico and Colorado. The cumulative impact of these adverse FS decisions extends to our School Districts, Counties and State. As stated above, the *David Sanchez v. Forest Service, No. FS-12-5775* and *Jarita Mesa Livestock Grazing Association, et al. v. USFS, USDC District NM, No. CIV 12-0069 JB/KBM.* prompted this civil rights compliance review of the various FS agency's identified in the Report. We feel that the numerous findings by the OCPTCT office are thorough and justified. However, we are concerned that the Report will not have the proper corrective action to eliminate discrimination in the US Forest Service, Regions 2 and 3, unless a directive to that effect from your offices to the appropriate USDA offices is forthcoming. At this point we also find it necessary to request from USDA the documents and overall evidence that supports the findings and executive summary decision in the Report collected by the OCPTCT Staff, via a separate FOIA request to follow. We also request to be included directly in the overall corrective action process with USDA.

Sincerely,

Original Signed

David P. Sanchez (Point of Contact)
Board of Directors
Northern New Mexico Stockman's Association

Sincerely,

Original Signed

Ted J. Trujillo, Attorney
Rio Arriba County, NM
P.O. Box 2185

P.O. Box 855
Espanola, NM 87532
(505) 927-9024
sanchezranches@gmail.com

Espanola, NM 87532
(505) 753-5150
tedjtrujillo@gmail.com

Cc: President Barack Obama, White House
U. S. Representative Michelle Lujan-Grisham, US House Agriculture Committee
U.S. Senator Tom Udall
U.S. Senator Martin Heinrich
U. S. Representative Ben Ray Lujan
U.S. Representative Steve Pierce
Thomas Tidwell, Chief, U.S. Forest Service
Tony Tooke, U.S. Forest Service
Ty Vicenti, President, Jicarilla Apache Nation
Gil Vigil, Executive Director, Eight Northern Indian Pueblos Council
Joshua Madalena, Governor, Jemez Pueblo
Jimmy R. Nuton Jr., Chairman, Southern Ute Tribe
Ben Shelly, President, Navajo Nation
Carlos Salazar, President, Northern New Mexico Stockman's Association
Tomas Campos, Rio Arriba County Manager
Moises Morales, Rio Arriba County Clerk
Rudy Arredondo, President National Latino Farmers and Ranchers Trade Association
Lorette Picciano, Executive Director Rural Coalition/Coalicion Rural
Alfonso Abeyta, Rural Coalition - Colorado
Dr. John Fowler, NMSU

Point of contact for NNMSA: David P. Sanchez, Chairman of the Issues Committee, P. O. Box 855, Espanola, NM 87532. Ph# 505-927-9024

3

# El Rito Citizens Caucus

P.O. Box 1, El Rito NM 87530                                    (575) 581-9520

January 22, 2014

Hon. Tom Vilsack
Secretary
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington DC 20250-0003

Dear Secretary Vilsack:

The undersigned citizens of El Rito and other communities in Northern New Mexico are extremely disturbed over the conduct of U.S. Forest Service law enforcement officers, who are not only harassing, but terrorizing people in the Carson and Santa Fe National Forests, which are integral parts of our historic homeland.

These USFS officers are doing so while serving under the command of USFS Southwestern Region (Region 3) Special Agent in Charge Robin Poague and Patrol Commander Aban Lucero.

The Gestapo intimidation tactics, perpetrated against the people of the Juan Jose Lovato Land Grant and other land grants and surrounding areas of Northern New Mexico by these officers are unconscionable and constitute gross, flagrant and intentional violations of our civil rights.

In this regard we draw your attention to a Jan. 6, 2014, letter sent to you by the Northern New Mexico Stockmen's Association and a review conducted last spring by the USDA Office of Compliance, Policy, Training, and Cultural Transformation.

Recent arrests/incarcerations and the issuance of federal citations in Rio Arriba County by these USFS officers occurred under color of law with those officers claiming jurisdiction to do so under State of New Mexico statutes.

However, Rio Arriba Sheriff Thomas R. Rodella has specifically declined to commission any USFS officer and, as such, the USFS officers have no authority to enforce state laws or arrest/incarcerate/cite our citizens for alleged violations of state law. Sheriff Rodella's concerns in this regard are based, in part, on the representations contained in this letter/petition.

The recent arrests/citations in question included supposed violations of state law DUI/open container, vehicle insurance, vehicle registration, and driver's license-on-demand violations.

These Gestapo tactics terrorizing land grant heirs and other residents of Northern New Mexico seem to be tactics in a USFS campaign to drive these U.S. citizens out of the national forests and complete the final stages of federal government efforts to seize all of the resources of our historic homeland from us, deny us use of the forests, and effectively destroy a culturally unique community with roots in this land dating back centuries before the American conquest of 1848.

Mr. Secretary, you may not be aware of the long history of conflict involving the land grants, federal policies, the national forests and other federal-controlled lands—a history that includes episodes of violence, civil strife and even insurrection (as some have characterized the 1967 Rio Arriba County Courthouse Raid in Tierra Amarilla led by land grant activist Reies Lopez Tijerina).

Other dramatic incidents occurred during and following the courthouse raid era and have included assaults on USFS personnel in the recent past.

We deplore outbreaks of violence—past, present or future—and in no way condone them. But as matters now stand, such potential outbreaks are simmering due to the outrage in communities over the activities and tactics of your law enforcement personnel. We seek to forestall any such incidents.

We write and petition you, not to threaten you or any USDA/USFS personnel or any other individuals, but to implore the USDA/USFS to work with us in maintaining a civil and cooperative posture between our communities and USFS law enforcement officers.

We beseech you to order those officers to stand down from their Gestapo tactics, to observe the rule of law in their dealings with our communities, and to cease their charade in utilizing their purported, bogus jurisdiction under state law as terroristic tactics in furtherance of oblique, but nonetheless sinister, USFS goals—goals that are painfully obvious to us, but are otherwise difficult to achieve solely via the aboveboard enforcement of federal statutes and regulations.

Sincerely and respectfully,


Felipe Martinez,                                 Juan Garcia
Chair, El Rito Citizens Caucus,                  President
On Behalf of the Caucus                          Juan Jose Lovato Land Grant

cc: Tom Tidwell, Chief, USFS
    New Mexico Congressional Delegation
    Sheriff Thomas R. Rodella

Co- signors of this communication are:

**Signature**                    **Printed Name**                  **Address**

_____    _____    _____


_____    _____    _____


_____    _____    _____

Letter to USDA Secretary Tom Vilsack—Additional Signatures

**Signature**                    **Printed Name**                    **Address**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Letter to USDA Secretary Tom Vilsack—Additional Signatures

**Signature**                    **Printed Name**              **Address**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Letter to USDA Secretary Tom Vilsack—Additional Signatures

**Signature**                          **Printed Name**                **Address**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Letter to USDA Secretary Tom Vilsack—Additional Signatures

**Signature**                          **Printed Name**                    **Address**

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____



# Attorney General of New Mexico

**GARY K. KING**
Attorney General

**ALBERT J. LAMA**
Chief Deputy Attorney General

February 14, 2014

Honorable Ben Ray Lujan
Congress Of the United States
Santa Fe Office
P.O. Box 31129
Santa Fe, NM 87594

Re:   <u>USDA Civil Rights Compliance Review Report</u>

Dear Representative Lujan:

It has been brought to our attention that a report dated June 2013, issued by the USDA Office of Civil Rights, found that US Forest Service operations in New Mexico are non-compliant with many Civil Rights program requirements and responsibilities. My office is similarly concerned with these findings and the impact they may have on New Mexico. I would like to offer my assistance and any necessary resources in order to foster better communications and relationships with US Forest Service personnel and the citizens of our State.

I look forward to speaking with you soon concerning the matter. Please contact me if you have any additional questions.

Sincerely,

GARY K. KING
New Mexico Attorney General

cc: Dave Sanchez

# El Rito Citizens Caucus

P.O. Box 1, El Rito NM 87530                    (575) 581-9520

February 14, 2014

Hon. Tom Vilsack
Secretary
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington DC 20250-0003

Dear Secretary Vilsack:

The undersigned citizens of El Rito and other communities in Northern New Mexico are extremely disturbed over the conduct of U.S. Forest Service law enforcement officers, who are not only harassing, but terrorizing people in the Carson and Santa Fe National Forests, which are integral parts of our historic homeland.

These USFS officers are doing so while serving under the command of USFS Southwestern Region (Region 3) Special Agent in Charge Robin Poague and Patrol Commander Aban Lucero.

The intimidation tactics, perpetrated against the people of the Juan Jose Lovato Land Grant and other land grants and surrounding areas of Northern New Mexico by these officers are unconscionable and constitute gross, flagrant and intentional violations of our civil rights.

In this regard we draw your attention to a Jan. 6, 2014, letter sent to you by the Northern New Mexico Stockmen's Association and a review conducted last spring by the USDA Office of Compliance, Policy, Training, and Cultural Transformation.

Recent arrests/incarcerations and the issuance of federal citations in Rio Arriba County by these USFS officers occurred under color of law with those officers claiming jurisdiction to do so under State of New Mexico statutes.

However, Rio Arriba Sheriff Thomas R. Rodella has specifically declined to commission any USFS officer and, as such, the USFS officers have no authority to enforce state laws or arrest/incarcerate/cite our citizens for alleged violations of state law.  Some of Sheriff Rodella's concerns in this regard are based, in part, on the representations contained in this letter/petition.

The recent arrests/citations in question included supposed violations of state law DUI/open container, vehicle insurance, vehicle registration, and driver's license-on-demand violations.

These tactics terrorizing land grant heirs and other residents of Northern New Mexico seem to be an intentional USFS campaign to drive these U.S. citizens out of the national forests and complete the final stages of federal government efforts to seize all of the resources of our historic homeland from us, deny us use of the forests, and effectively destroy a culturally unique community with roots in this land dating back centuries before the American conquest of 1848.

Mr. Secretary, you may not be aware of the long history of conflict involving the land grants, federal policies, the national forests and other federal-controlled lands—a history that includes episodes of violence, civil strife and even insurrection (as some have characterized the 1967 Rio Arriba County Courthouse Raid in Tierra Amarilla led by land grant activist Reies Lopez Tijerina).

Other dramatic incidents occurred during and following the courthouse raid era and have included assaults on USFS personnel in the recent past.

We deplore outbreaks of violence—past, present or future—and in no way condone them. But as matters now stand, such potential outbreaks are simmering due to the outrage in communities over the activities and tactics of your law enforcement personnel. We seek to forestall any such incidents.

We write and petition you, not to threaten you or any USDA/USFS personnel or any other individuals, but to implore the USDA/USFS to work with us in maintaining a civil and cooperative posture between our communities and USFS law enforcement officers.

We beseech you to order those officers to stand down from these aforementioned tactics, to observe the rule of law in their dealings with our communities, and to cease their charade in utilizing their purported, bogus jurisdiction under state law as an obvious campaign in furtherance of oblique, but nonetheless sinister, USFS goals—goals that are painfully clear to us, but are otherwise difficult to achieve solely via the aboveboard enforcement of federal statutes and regulations.

Sincerely and respectfully,


Felipe Martinez,                                        Juan Garcia
Chair, El Rito Citizens Caucus,                President
On Behalf of the Caucus                         Juan Jose Lovato Land Grant

cc: Tom Tidwell, Chief, USFS
      New Mexico Congressional Delegation
      Sheriff Thomas R. Rodella

Co- signors of this communication are:

**Signature**                      **Printed Name**                      **Address**

_____


_____


_____

Letter to USDA Secretary Tom Vilsack—Additional Signatures

| **Signature** | **Printed Name** | **Address** |
| --- | --- | --- |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Letter to USDA Secretary Tom Vilsack—Additional Signatures

**Signature**                    **Printed Name**              **Address**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Letter to USDA Secretary Tom Vilsack—Additional Signatures

| Signature | Printed Name | Address |
|-----------|--------------|---------|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Letter to USDA Secretary Tom Vilsack—Additional Signatures

| Signature | Printed Name | Address |
|-----------|--------------|---------|
|           |              |         |
|           |              |         |
|           |              |         |
|           |              |         |
|           |              |         |
|           |              |         |
|           |              |         |
|           |              |         |
|           |              |         |
|           |              |         |
|           |              |         |
|           |              |         |



**U.S. Department of Justice**

*United States Attorney*
*District of New Mexico*

---

P.O. Box 607          Phone: (505) 346-7274
Albuquerque, NM 87103     Fax: (505) 346-7296

April 29, 2014

<u>Via Facsimile 505-753-9812</u>

Sheriff Thomas R. Rodella
1122 Industrial Park Road
Espanola, NM 87532

   Re: <u>Meeting with Acting U.S. Attorney Damon P. Martinez</u>

Dear Sheriff Rodella:

   Thank you for returning my call earlier today. As we discussed, I sent you an email on Friday, April 25, 2014, conveying an invitation for a meeting with Acting U.S. Attorney Damon P. Martinez to discuss the relationship between your office and the U.S. Forest Service. A copy of the email is enclosed for your convenience.

   I greatly appreciate your immediate agreement to participate in such a meeting, which we have tentatively scheduled for 9:00 a.m. on Wednesday, May 7, 2014 at the U.S. Attorney's Office in Albuquerque. I understand that you wish to confer with other County officials to determine whether they are able to travel to Albuquerque for the meeting, or whether they wish to participate by conference call. As we agreed, I will call you tomorrow to confirm the meeting and how the various participants will join in the meeting.

   Thank you and please do not hesitate to call me if you have any questions regarding this matter.

   Very truly yours,

   DAMON P. MARTINEZ
   Acting United States Attorney

   ELIZABETH M. MARTINEZ
   Executive Assistant U.S. Attorney
   (505) 224-1469

Enclosure

| | |
|---|---|
| **From:** | Martinez, Elizabeth (USANM) |
| **Sent:** | Friday, April 25, 2014 12:27 PM |
| **To:** | TRodella@rio-arriba.org; commission@rio-arriba.org; tedjtrujillo@gmail.com |
| **Subject:** | Invitation from Acting U.S. Attorney Damon P. Martinez |

To:   Thomas R. Rodella, Rio Arriba County Sheriff
       Danny Garcia, Chairman, Rio Arriba Board of County Commissioners
       Ted J. Trujillo, Rio Arriba County Attorney

Gentlemen:

Acting U.S. Attorney Damon P. Martinez is aware that the relationship between Rio Arriba County Sheriff Thomas R. Rodella and U.S. Forest Service officials has become increasingly strained over the past several months as the result of differing views regarding the authority of U.S. Forest Service law enforcement officers on the national forest lands within Rio Arriba County. In an effort to facilitate a positive working relationship between County and Federal officials, Mr. Martinez invites you to meet with him and U.S. Forest Service officials at the U.S. Attorney's Office in Albuquerque at a mutually convenient date and time during the week of May 5-9, 2014.

Please let me know if you are amenable to participating in this meeting so that I may work with you to identify a meeting date and time that works for everyone. Thank you and please do not hesitate to contact me if you have any questions regarding this matter.

**Elizabeth M. Martinez | Executive AUSA & Counsel to the U.S. Attorney | Public Affairs Officer**
U.S. Attorney's Office, District of New Mexico, P.O. Box 607, Albuquerque, New Mexico 87103
Tel: (505) 224-1469 |                                         | Fax: (505) 346-7205 | E-mail: elizabeth.martinez@usdoj.gov

**Jake Arnold**

Jake Arnold
Wednesday, April 30, 2014 12:05 PM
'Ted J Trujillo'
FW: Meeting With U.S. Attorney

**From:** Info RASO
**Sent:** Tuesday, April 29, 2014 5:06 PM
**To:** Thomas Campos
**Subject:** Meeting With U.S. Attorney

Dear Tomás:

The new U.S. Attorney for New Mexico has asked Sheriff Tommy Rodella and other RASO representatives to attend a meeting with him and his staff regarding the U.S. Attorney's position on stops/detainment/issuance of citations/arrests etc. of Rio Arriba citizens by U.S. Forest Service law enforcement officers both within outside the boundaries of the Carson National Forest in Rio Arriba County. These stops etc. involve both federal laws/regulations and state statutes.

This meeting is scheduled for the U.S. Attorney's office in Albuquerque at 9 a.m. May 7, 2014, at 9:00 a.m.

The U.S. Attorney's staff asked the sheriff to relay this invitation to you and the RAC commissioners (and any other RAC officials who have some interest/role in this matter).

Could you please let the commissioners/any other RAC officials know of this meeting.

I will be letting County Attorney Ted Trujillo know about this invitation directly.

Sheriff Rodella, of course, will attend that meeting and I will accompany him as a RASO resource person.

As you know, these matters re" the stops etc. are the subject of much concern to many RAC citizens and legal issues surrounding them are in dispute, murky and far from resolved. The sheriff has declined to commission any U.S. Forest Service officers as RASO deputies and consequently it is the sheriff's position that these U.S. Forest Service officers are not peace officers in RAC under state statutory provisions. At least one senior U.S. Forest Service official has made public statements confirming the sheriff's position in this regard.

A U.S. Forest Service "order" issued in May, 2012 (and set to expire at the end of this month), by the then-acting Carson National Forest, Diana Trujillo, appears to be the basis for many of these stops etc. The legality of that order is in dispute; the statutory/regulatory basis of its validity/enforcement is in question.

I can provide you with pertinent documents re: the order/underlying laws referenced in the preceding two paragraphs above should you wish.

If you would care to ride down to Albuquerque the morning of 5/7/14 morning with the sheriff and me in his RASO vehicle, please let me know. We will be leaving Española about 7:00 a.m.

Regards,

Jake Arnold
RASO Public Affair Officer

(505) 753-3329--RASO HQ

(575) 581-9520--direct landline

**From:** Jake Arnold
**Sent:** Wednesday, April 30, 2014 12:05 PM
**To:** 'Ted J Trujillo'
**Subject:** C.F.R. 261.50 et seq Orders etc.
**Attachments:** Carson Order 02-412.pdf

Ted—

The attached document t is the "order" by which the USFS justifies its citations/arrests under state law.

Note that in the order Diana Trujillo references not only the C.F.R., but also a federal statute.

Copied below are numerous items directly related to Diana's May, 2012, order, the requirements related to such orders under the C.F.R. and the federal statutory authority. Also copied below are several items (from the news media) dealing with the USFS oppositions in this regard.

Sending you another message re: a May 7, 2012, meeting called by the U.S. Attorney to deal with U.S. Forest Service law enforcement matters. U.S. Attorney's Office called Tommy Rodella today to announce/invite us to that meeting.

--Jake

---

Title 16 U.S. Code provisions (not including those sections repealed or non-germane/irrelevant) as referenced in Diana Trujillo's May, 2012, order and then referenced in that initial provision Diana referenced:

## 16 U.S. CODE § 551 - PROTECTION OF NATIONAL FORESTS; RULES AND REGULATIONS

The Secretary of Agriculture shall make provisions for the protection against destruction by fire and depredations upon the public forests and national forests which may have been set aside or which may be hereafter set aside under the provisions of section 471 of this title, and which may be continued; and he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction; and any violation of the provisions of this section, sections 473 to 478 and 479 to 482 of this title or such rules and regulations shall be punished by a fine of not more than $500 or imprisonment for not more than six months, or both. Any person charged with the violation of such rules and regulations may be tried and sentenced by any United States magistrate judge specially designated for that purpose by the court by which he was appointed, in the same manner and subject to the same conditions as provided for in section 3401 (b) to (e) of title 18.

# 16 U.S. CODE § 475 – PURPOSES FOR WHICH NATIONAL FORESTS MAY BE ESTABLISHED AND ADMINISTERED

All public lands designated and reserved prior to June 4, 1897, by the President of the United States under the provisions of section 471 of this title, the orders for which shall be and remain in full force and effect, unsuspended and unrevoked, and all public lands that may hereafter be set aside and reserved as national forests under said section, shall be as far as practicable controlled and administered in accordance with the following provisions. No national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States; but it is not the purpose or intent of these provisions, or of said section, to authorize the inclusion therein of lands more valuable for the mineral therein, or for agricultural purposes, than for forest purposes.

# 16 U.S. CODE § 477 – USE OF TIMBER AND STONE BY SETTLERS

The Secretary of Agriculture may permit, under regulations to be prescribed by him, the use of timber and stone found upon national forests, free of charge, by bona fide settlers, miners, residents, and prospectors for minerals, for firewood, fencing, buildings, mining, prospecting, and other domestic purposes, as may be needed by such persons for such purposes; such timber to be used within the State or Territory, respectively, where such national forests may be located.

# 16 U.S. CODE § 478 – EGRESS OR INGRESS OF ACTUAL SETTLERS; PROSPECTING

Nothing in sections 473 to 478, 479 to 482 and 551 of this title shall be construed as prohibiting the egress or ingress of actual settlers residing within the boundaries of national forests, or from crossing the same to and from their property or homes; and such wagon roads and other improvements may be constructed thereon as may be necessary to reach their homes and to utilize their property under such rules and regulations as may be prescribed by the Secretary of Agriculture. Nor shall anything in such sections prohibit any person from entering upon such national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof. Such persons must comply with the rules and regulations covering such national forests.

# 16 U.S. CODE § 479 – SITES FOR SCHOOLS AND CHURCHES

The settlers residing within the exterior boundaries of national forests, or in the vicinity thereof, may maintain schools and churches within such national forest, and for that purpose may occupy any part of the said national forest, not exceeding two acres for each schoolhouse and one acre for a church.

# 16 U.S. CODE § 480 - CIVIL AND CRIMINAL JURISDICTION

The jurisdiction, both civil and criminal, over persons within national forests shall not be affected or changed by reason of their existence, except so far as the punishment of offenses against the United States therein is concerned; the intent and meaning of this provision being that the State wherein any such national forest is situated shall not, by reason of the establishment thereof, lose its jurisdiction, nor the inhabitants thereof their rights and privileges as citizens, or be absolved from their duties as citizens of the State.

# 16 U.S. CODE § 481- USE OF WATERS

All waters within the boundaries of national forests may be used for domestic, mining, milling, or irrigation purposes, under the laws of the State wherein such national forests are situated, or under the laws of the United States and the rules and regulations established thereunder.

The C.F.R. provisions under which Diana Trujillo issued the May, 2012, order, as referenced in that order:

§ 261.50 Orders.

(a) The Chief, each Regional Forester, each Experiment Station Director, the Administrator of the Lake Tahoe Basin Management Unit and each Forest Supervisor may issue orders which close or restrict the use of described areas within the area over which he has jurisdiction. An order may close an area to entry or may restrict the use of an area by applying any or all of the prohibitions authorized in this subpart or any portion thereof.

(b) The Chief, each Regional Forester, each Experiment Station Director, the Administrator of the Lake Tahoe Basin Management Unit and each Forest Supervisor may issue orders which close or restrict the use of any National Forest System road or trail within the area over which he has jurisdiction.

(c) Each order shall:

(1) For orders issued under paragraph (a) of this section, describe the area to which the order applies;

(2) For orders issued under paragraph (b) of this section, describe the road or trail to which the order applies;

(3) Specify the times during which the prohibitions apply if applied only during limited times;

(4) State each prohibition which is applied; and

(5) Be posted in accordance with § 261.51.

(d) The prohibitions which are applied by an order are supplemental to the general prohibitions in Subpart A.

(e) An order may exempt any of the following persons from any of the prohibitions contained in the order:

(1) Persons with a permit specifically authorizing the otherwise prohibited act or omission.

(2) Owners or lessees of land in the area;

(3) Residents in the area;

(4) Any Federal, State, or local officer, or member of an organized rescue or fire fighting force in the performance of an official duty; and

(5) Persons engaged in a business, trade, or occupation in the area.

(6) Any other person meeting exemption requirements specified in the order.

(f) Any person wishing to use a National Forest System road or trail or a portion of the National Forest System, should contact the Forest Supervisor, Director, Administrator, or District Ranger to ascertain the special restrictions which may be applicable thereto.

[42 FR 2957, Jan. 14, 1977; 42 FR 24739, May 16, 1977, as amended at 42 FR 35959, July 13, 1977; 46 FR 33521, June 30, 1981; 66 FR 3218, Jan. 12, 2001]

§ 261.51 Posting.

Posting is accomplished by:

(a) Placing a copy of the order imposing each prohibition in the offices of the Forest Supervisor and District Ranger, or equivalent officer who have jurisdiction over the lands affected by the order, and

(b) Displaying each prohibition imposed by an order in such locations and manner as to reasonably bring the prohibition to the attention of the public.

§ 261.54 National Forest System roads.

When provided by an order, the following are prohibited:

(a) Using any type of vehicle prohibited by the order.

(b) Use by any type of traffic prohibited by the order.

(c) Using a road for commercial hauling without a permit or written authorization.

(d) Operating a vehicle in violation of the speed, load, weight, height, length, width, or other limitations specified by the order.

(e) Being on the road.

(f) Operating a vehicle carelessly, recklessly, or without regard for the rights or safety of other persons or in a manner or at a speed that would endanger or be likely to endanger any person or property.

[42 FR 2957, Jan. 14, 1977, as amended at 46 FR 33521, June 30, 1981]

---

Statement issued to Albuquerque Journal by Mark Chavez, USFS. On 3/14/14:

Below is our statement from the Forest Service, U.S. Department of Agriculture

The Forest Service appreciates the opportunity to clarify confusion regarding its jurisdiction on National Forest System lands and roads. Federal regulations, **36 C.F.R. § 261.50 *et seq.*,** authorize Forest Service officials to enter orders permitting Forest Service officers to issue federal violation notices for violations of the state motor vehicle code on National Forest System lands and roads. This ensures consistent enforcement of the motor vehicle code throughout the state and across agencies. **The current order authorizing Forest Service officers to issue federal violation notices in the Carson National Forest has been in place since May 2012.** The Forest Service does not issue citations for violations of state law unless its law enforcement officers are deputized to do so. The violation notices recently issued by the Forest Service at the Taos Ski Valley for alleged motor vehicle violations were all federal violation notices.

Respectfully,

Mark

**Mark M. Chavez**

USDA - Forest Service

---

From a story appearing in the Albuquerque Journal 4/4/14:

The Forest Service has come under fire after its officers recently undertook a Saturday drug raid with a dog at the Taos Ski Valley parking area – within the Carson National Forest – that resulted only in citations for "possession amounts" of marijuana and prescription drugs as well as tickets and warnings for motor vehicle violations like cracked windshields. Also, some Rio Arriba County residents have complained about arrests on state charges that they say Forest Service agents have no right to make without being deputized by a local sheriff.

Special Agent in Charge Robin L. Poague, of the Southwestern Region of the U.S. Forest Service, said in Monday's news release: "Federal regulations authorize Forest Service officials to enter orders permitting Forest Service officers to issue federal violation notices for violations of the state motor vehicle code on National Forest System lands and roads.

"This ensures consistent enforcement of the motor vehicle code throughout the state and across agencies. The current order authorizing Forest Service officers to issue violation notices in the Carson National Forest has been in place since May 2012. The prosecution of (David) Martinez on this DUI charge was initiated pursuant to this authority."

From a story appearing in the Albuquerque Journal 4/1/14:

# Rio Arriba complaints

A Rio Arriba County citizens group also has complained recently about Forest Service police actions.

The El Rito Citizens Caucus sent a letter Jan. 22 to U.S. Department of Agriculture Secretary Tom Vilsack, who oversees the Forest Service, complaining about "Gestapo intimidation tactics" by the Forest Service against the people who live on land grants and in other parts of northern Mexico, citing arrests for violations such as DWI, lack of car insurance or registration and similar violations.

The letter said Forest Service agents can't legally enforce state law without a commission from a sheriff. Rio Arriba Sheriff Tommy Rodella has declined to commission the federal agents.

Mark Chavez, a Forest Service spokesman in Albuquerque, said in a prepared statement that Forest Service agents can in fact issue federal violation notices to enforce state law on Forest Service lands and roads, but also said the Forest Service "does not issue citations for violations of state law unless its law enforcement officers are deputized to do so."

"The violation notices recently issued by the Forest Service at the Taos Ski Valley for alleged motor vehicle violations were all federal violation notices," Chavez added.

Chavez said he hadn't seen the letter from the Citizens Caucus.



# UNITED STATES DEPARTMENT OF AGRICULTURE
## FOREST SERVICE
## CARSON NATIONAL FOREST

## PROHIBITIONS

Pursuant to 16 U.S.C. § 551 and 36 C.F.R. § 261.50(a) and (b) the following acts are prohibited on all National Forest System lands within the Carson National Forest, in the state of New Mexico (the "restricted area").

1. Operating a vehicle carelessly, recklessly, or without regard for the rights or safety of other persons or in a manner or at a speed that would endanger any person or property. 36 C.F.R. § 261.54(f)
2. Operating a vehicle in violation of the New Mexico Motor Vehicle Code. 36 C.F.R. § 261.54(d)
3. Possessing or using a vehicle off National Forest System roads. 36 C.F.R. § 261.56

## EXEMPTIONS

Pursuant to 36 C.F.R. § 261.50(e), the following persons are exempt from this order:

1. Persons with a Forest Service permit specifically authorizing the otherwise prohibited act or omission.

## PURPOSE

The purpose of this Order is to protect resources and to provide for public health and safety.

## IMPLEMENTATION

1. This Order will be in effect from the date signed, and shall remain in effect until May 31, 2014.
2. Any violation of this prohibition is punishable as a Class B misdemeanor by a fine of not more than $5,000.00 for individuals and $10,000.00 for organizations, or by imprisonment for not more than six (6) months, or both. [18 U.S.C. §§ 3559, 3571, and 3581]
3. This Order supersedes, rescinds, and replaces any previous orders prohibiting the same acts covered by the Order.

Done at Taos, New Mexico, this 25 day of MAY, 2012.

DIANA TRUJILLO
Acting Forest Supervisor
Carson National Forest

# Agenda Items for 7 May 14 Meeting with US Attorney

Info RASO

**Sent:** Thursday, May 01, 2014 4:29 PM
**To:** Elizabeth.Martinez@usdoj.gov

Dear Ms. Martinez:

Yesterday I had indicated to you that the May, 2012, USFS order issued by Acting Carson National Forest Supervisor Diana Trujillo might be the central focus of our meeting with the U.S. Attorney in Albuquerque next week.

In addition to that agenda item--for next week's meeting or a follow-up meeting--let me suggest some additional agenda items.

1.) USFS law enforcement officer authority pursuant to NMSA 1978 29-1-9 and 29-1-11(E);

2. USFS law enforcement officer authority pursuant to NMSA 1978 68-2-1 (Forest Conservation Act), specifically NMSA 68-2-14 and NMSA 1978 6-2-26;

3. The federal Assimilated Crimes Act in reference to the Carson National Forest and more specifically in reference to land grants incorporated into that national forest via agreements between the USDA/USFS, the US Farm Security Administration and the New Mexico Rural Rehabilitation Corporation circa 1946;

4. Issuance of citations by USFS law enforcement officers for alleged violations of state traffic laws occurring on county, state and US highways in Rio Arriba County, those highways being situated on dedicated rights-of-way under the administration/control/jurisdiction of the State of New Mexico/Rio Arriba County although such highways may be adjacent to Carson National Forest and/or pass near/through portions of that national forest and/or pass through "checkerboard lands, the ownership/control over which includes individuals holding fee simple title or patents, state agencies, federal agencies, and sovereign Indian nations (examples of such highways being US 64, US 84, US 285, SR 554, SF 110, SR 96, SR 17, SR 111, SR 519, SR 95, SR 512, SR 537, SR 112, and SR 595 among others).

5. Observance of reasonable-suspicion, probable-cause and other Fourth Amendment and due process requirements on the part of USFS law enforcement officers in the performance of their missions associated with any of the above items.

6 In expansion of #5 above, one particular issue is the detention of travelers on the highways described in #4 above for investigation of perceived or suspected violations of any law, state or federal, when the detention does not take place at a location clearly within the boundaries of the Carson National Forest or the perceived/suspected violation is not clearly understood to have occurred within the boundaries of that national forest.

Now, that's a lot to have on any plate, but the somewhat truncated synopsis of issues above fairly well covers the deep concerns of Sheriff Rodella, the RASO research/resource staff, other local officials, and numerous citizens of Rio Arriba County who look to the sheriff for protection of the persons, homes, property and rights, but concurrently support evenhanded enforcement of all laws/regulations, state and federal, by law enforcement agencies, state and federal, in accordance with observance of their rights by those engaged in that protection.

Certainly discussion of some of these items may well be more suitable at follow-up meetings.

Best regards,

Jake Arnold



### *Rio Arriba Sheriff's Office*
1122 Industrial Park Road, Española NM 87532
Voice (505) 753-3329 ~ Facsimile (505) 753-9812
### *Sheriff Thomas R. Rodella*

May 1, 2014

Hon. Gary King
Attorney General
State of New Mexico
Villagra Building
408 Galisteo Street
Santa Fe NM 87501

<u>Hand Delivered</u>

Dear General King:

The enclosed documents, copies of communications between my office and the U.S. Attorney's Office, should be self-explanatory.

Given you attendance and comments at a meeting with USFS officials at the Rio Arriba County annex several weeks ago, when we discussed USFS law enforcement issues, perhaps you would find it appropriate to attend this May 7, 2014, meeting in Albuquerque along with us.

The U.S. Attorney's office asked me to invite any other state/county officials I felt could be of assistance.

Best regards,


Thomas R. Rodella
Rio Arriba Sheriff

## RE: Tomorrow's Meeting

Martinez, Elizabeth (USANM) [Elizabeth.Martinez@usdoj.gov]

**Sent:** Tuesday, May 06, 2014 2:36 PM
**To:** Info RASO
**Attachments:** Map -- abq_map_2008.2.pdf (288 KB) ; Map -- abq_map_2008.pdf (31 KB)

Good afternoon, Mr. Arnold.

The federal government will be represented by the following individuals at tomorrow's meeting:

Acting U.S. Attorney Damon Martinez
Executive AUSA Elizabeth Martinez
Supervisory AUSA Kimberly Brawley
AUSA Ruth Keegan
Trial Attorney Andrew Smith, DOJ ENRD
Assistant Regional Counsel Cassandra Currie, U.S. Department of Agriculture
Special Agent in Charge Robin Poague, USFS
Assistant Special Agent in Charge Michael Gardiner, USFS
Patrol Captain Dan Reed, USFS

We have arranged for a dial-in conference call for individuals who are not able to attend the meeting or may be late in arriving.

PHONE NUMBER: 866-654-9184
PASS CODE: 8543567#

The U.S. Attorney's Office is located in the Hyatt Regency Complex which is at the corner of 3rd Street and Tijeras in downtown Albuquerque. The address is 201 3rd Street NW and the receptionist for the office is on the 9th floor of the Bank of Albuquerque office tower. Maps of the area are attached.

Please do not hesitate to call me if you have any questions or need further direction on getting to the office.

We look forward to seeing all of you in the morning.

**Elizabeth M. Martinez | Executive AUSA & Counsel to the U.S. Attorney | Public Affairs Officer**
U.S. Attorney's Office, District of New Mexico, P.O. Box 607, Albuquerque, New Mexico 87103
Tel: (505) 224-1469 |                                        | Fax: (505) 346-7205 | E-mail:
elizabeth.martinez@usdoj.gov

---

**From:** Info RASO [mailto:InfoRASO@rio-arriba.org]
**Sent:** Tuesday, May 06, 2014 11:16 AM
**To:** Martinez, Elizabeth (USANM)
**Subject:** Tomorrow's Meeting

Dear Ms. Martinez:

The Rio Arriba contingent for tomorrow's meeting will include Rio Arriba Sheriff Thomas R. Rodella, RASO Public Affairs Officer Jake Arnold, Rio Arriba County Attorney Ted Trujillo, NM state Representative Debbie Rodella and El Rito Citizens Caucus Chair/former Rio Arriba County Commissioner Felipe Martinez.

As you may recall, Rep. Rodella initiated a meeting with USFS Patrol Captain Dan Reed at her Roundhouse office during the past legislative session. Sheriff Rodella and I also attended that meeting, at which USFS law enforcement activities/specific incidents in Rio Arriba County were the focus.

We extended your invitation to the county manager and the county commissioners, but have not heard back from them as of this morning. If any of those officials have responded to that invitation directly to you, please let me know.

Could you also let me know who at your end will be participating in tomorrow's meeting?

As some of us will likely be car-pooling and urgent law enforcement-related events, as yet unknown, may transpire overnight/early tomorrow, any/all of us may be running a bit late. If so, we will keep you informed of our progress via cell telephone.

(My cell number is 505-927-9112.)

Ted Trujillo and Felipe Martinez are likely traveling to Albuquerque together and, due to family/business commitments, may be running late in any event. Is it too late to set up a conference-call protocol so that they could participate via their cell telephones for the first part of the meeting while they are on the road if they are, in fact, delayed?

Lastly, where is this meeting to occur? We understand it will occur at the U.S. Attorney's office, but the communications we have received all seem to reference a post office box mailing address, not a physical address.

Best regards,

Jake Arnold
RASO PAFO

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager at postmaster@rio-arriba.org. This message may contain confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

**AGENDA**
**Federal Jurisdiction in Rio Arriba County**
**Meeting at U.S. Attorney's Office**
**May 7, 2014**

1. May 25, 2012 USFS order issued by Acting Carson National Forest Supervisor Diana Trujillo

2. USFS law enforcement officer authority pursuant to NMSA 1978 29-1-9 and 29-1-11(E)

3. USFS law enforcement officer authority pursuant to NMSA 1978 68-2-1 (Forest Conservation Act), specifically NMSA 68-2-14 and NMSA 1978 6-2-26;

4. The federal Assimilated Crimes Act in reference to the Carson National Forest and more specifically in reference to land grants incorporated into that national forest via agreements between the USDA/USFS, the US Farm Security Administration and the New Mexico Rural Rehabilitation Corporation circa 1946

5. Issuance of citations by USFS law enforcement officers for violations of state traffic laws occurring on county, state and US highways in Rio Arriba County, those highways being situated on dedicated rights-of-way under the administration/control/jurisdiction of the State of New Mexico/Rio Arriba County although such highways may be adjacent to Carson National Forest and/or pass near/through portions of that national forest and/or pass through "checkerboard lands, the ownership/control over which includes individuals holding fee simple title or patents, state agencies, federal agencies, and sovereign Indian nations (examples of such highways being US 64, US 84, US 285, SR 554, SF 110, SR 96, SR 17, SR 111, SR 519, SR 95, SR 512, SR 537, SR 112, and SR 595 among others).

6. Observance of reasonable-suspicion, probable-cause and other Fourth Amendment and due process requirements on the part of USFS law enforcement officers in the performance of their missions associated with any of the above items.

7. In expansion of #5 above, one particular issue is the detention of travelers on the highways described in #4 above for investigation of perceived or suspected violations of any law, state or federal, when the detention does not take place at a location clearly within the boundaries of the Carson National Forest or the perceived/suspected violation is not clearly understood to have occurred within the boundaries of that national forest.

## Jake Arnold

**From:** Montoya, Susan [smontoya@ap.org]
**Sent:** Tuesday, May 06, 2014 5:02 PM
**To:** Jake Arnold
**Subject:** RE: USFS Investigates TSV Incident

Jake,
You see this today? Retired Forest Service special agents point to "state of crisis."
www.peer.org/news/news-releases/2014/05/06/retirees-decry-forest-service-law-enforcement-meltdown/
Susan

---

**From:** Jake Arnold
**Sent:** Thursday, April 03, 2014 9:10 AM
**To:** Montoya, Susan
**Subject:** FW: USFS Investigates TSV Incident

<u>Sent yesterday (4/2/14) to NNM Stockmen's Association VP David Sanchez with cc to various other interested parties.</u>

Dave:

Copied below is the Taos News story about the USFS law enforcement captain from Arizona coming over to Taos Ski Valley to investigate the incident there a few weeks ago. This development is certainly of interest to you and the other officers of the Northern New Mexico Stockmen's Association, to us at the Rio Arriba Sheriff's Office, and to the members of the El Rito Citizens Caucus. (A similar story appeared in the print edition of the Santa Fe New Mexican today, 4/2/14)

This patrol captain mentioned in the story, Cheri Bowen, is directly under the supervision of Aban Lucero, the patrol commander for the entire USFS Southwestern Region. One of the matters at issue in the continuing controversy over the TSV incident is the memo Commander Lucero sent out to his subordinates re: citation-writing quotas. Some USFS officials have denied there is any such quota and dispute that any quota has anything to do with the inordinate number of dubious citations being written by USFS law enforcement officers in this region.

However, PEER (Public Employees for Environmental Responsibility) has documentation of Commander Lucero's quota memo and a good analysis of how the demand to meet those quotas came down from the USFS Law Enforcement Director in Washington, David Ferrell.

Director Ferrell is the direct superior of USFS Region 3 Special Agent in Charge Robin Poague. SAC Poague is the USFS law enforcement counterpart—in rank/authority--to Region 3 Forester Cal Joyner. But neither Forester Joyner nor SAC Poague supervise each other—both report directly to their superiors in Washington.

SAC Poague, in turn, is the direct supervisor of Commander Lucero, who is the direct supervisor of Captain Bowen, as mentioned above.

Commander Lucero is also the direct supervisor of USFS Lt. Dan Reed (newly arrived here), who is the direct supervisor of the USFS law enforcement (uniformed) officers who conducted the TSV operation. While Bowen is of higher rank than Reed, those two patrol supervisors hold similar

position on the USFS law enforcement command structure, which is independent of the national forests' management structure.

Presuming that the quota matter lies at the root, in part, of overzealous/improper citation-issuing practices by the line officers here (TSV and Rio Arriba), then the Commander Lucero quota memo would be something Captain Bowen would need dot investigate/address. Captain Bowen would then be effectively investigating her boss, Commander Lucero, and not only his disputed memo, but also his overall command decisions/policies/instructions in this regard. She would need to address the issue of whether or not Commander Lucero has pressured the line officers hereabouts to issue citations in instances that would have those line officers violating citizens' rights and operating outside their legal authority—both within the boundaries of the national forests and in adjacent areas not within those boundaries.

The notion that Captain Bowen could do so, i.e. investigate the actions of her direct supervisor, fairly and without bias is problematic. So, is Captain reporting directly to SAC Poague or Director Farrell in Washington in this regard? Can she come to any sound conclusions about Commander Lucero's role in the TSV operation and/or could she come to any sound conclusions re: the complaints about USFA law enforcement officer activities in Rio Arriba County as articulated by you, me, Sheriff Tommy Rodella, State Rep. Debbie Rodella, ERCC Chair Felipe Martinez, Juan Jose Lovato Land Grant President Juan Garcia, and the hundreds of people in Rio Arriba who have signed the letter/petitions to USDA Secretary Tom Vilsack?

Of interest is a 11/8/13 letter to Regional Forester Joyner sent by Larry Voyles, director of the Arizona Game and Fish Department, and two Arizona sheriffs. This letter addresses their concerns over enforcement of state (Arizona) motor vehicle statutes by USFS law enforcement officers in that state. The "cc" list of recipients sent copies of this letter numbers 22 and includes high-ranking state and federal officials. It appears that the USFS law enforcement practices are not just problems in Taos and Rio Arriba Counties, New Mexico, but in other states as well.

That letter from the Arizona officials is available at:

http://www.azgfd.gov/outdoor_recreation/documents/TravelMgmt/Joyner%2072%20hr%20ltr%20110 813.pdf

It would also appear that perhaps the Arizona folks did not direct their complaints to the proper USFS authorities (those whose policies/directives are generating these problems) generating the problems. Regional Forester Joyner may not be the person to resolve them as the solution to the law-enforcement-related complaints at issue in Arizona, TSV and Rio Arriba may lie directly in the hands of Director Ferrell and Secretary Vilsack in Washington.

--Jake Arnold (in my capacity with RASO and in my capacity with the ERCC)

Taos News—4/1/14 (online)

# Forest Service officials visit Taos Ski Valley to probe drug sweep

by **Andrew Oxford**

A senior Forest Service law enforcement official will visit Taos Ski Valley this week to meet with local leaders as the agency conducts an internal review of a controversial operation in the resort community Feb. 22 that prompted complaints from tourists and residents alike.

Capt. Cheri Bowen, from Coronado National Forest, and a "review team" will address concerns about the operation with the officers involved as well as executives, municipal officials and former Gov. Gary Johnson, who is a resident of the community.

The visit, scheduled April 2-5, comes as Forest Service officials backpedaled on the incident and resort executives advised staff swept up in the saturation patrol to await the agency's internal review before paying any citations.

"The intent of the visit is to determine what happened, what worked well, what didn't work well, and what can be done better next time," Forest Service spokesperson Larry Chambers told *The Taos News*.

The review was prompted by a slew of complaints and questions surrounding a saturation patrol at the resort during which four Forest Service Law Enforcement and Investigations personnel accompanied by a drug-sniffing dog issued 13 violation notices including five for possession of marijuana and one for illegal possession of prescription drugs. Three notices were also issued for expired motor vehicle registrations, two for speeding, one for driving without insurance and one for passing in a no passing zone.

The officers also issued four verbal warnings.

The sight of federal agents leading a drug-sniffing dog around vehicles in the ski area's parking lot and the unusually heavy traffic enforcement along State Road 150 rankled local residents as well as the visitors upon whom the area's economy depends.

"People felt threatened, bullied, and because of this intimidation, felt violated and that they had no choice but to comply...," Taos Ski Valley Mayor Neal King wrote in a March 4 letter to a Forest Service Law Enforcement and Investigations official.

The village did not dispute the right of federal authorities to patrol Forest Service land within the municipality, he added, nor did he dispute the constitutionality of the officers' actions Feb. 22.

But King expressed frustration with the method in which the operation was conducted, writing that officers were "not personable and/or polite, but overbearing and aloof."

"In a bad snow year when the local community, and state, is fighting for every tourist dollar, bad publicity such as this does not help," the mayor wrote, recounting that "we were put on notice that people will not be returning to our ski valley because of this unwarranted operation."

Local leaders also felt caught off guard by federal law enforcement with the mayor adding officials "had no information for the reasoning behind the operation and [were] unable to give any positive responses to the many inquiries we received during and after this event."

The ordeal left Taos Ski Valley, Inc. CEO Gordon Briner with one big question.

3

"The thing we keep asking is who ordered this. Who thought this was a great idea?" he told *The Taos News* Monday (March 31), remarking that he had not seen anything like the Feb. 22 operation in his 16 years at the resort.

Bowen reached out to Briner after the incident and ensuing outcry, he said, and is among those scheduled to meet with her this week.

But they are not just concerned about the operation's impact on tourism. Resort staff were also cited during the saturation patrol.

Conversations with Forest Service officials prompted resort executives to advise those employees to await the outcome of the agency's internal review of the operation before paying any fines.

The Forest Service also received criticism for the controversial sweep from beyond Taos.

Sen. Tom Udall spoke about the operation with the agency's Southwest regional supervisor, according to a congressional staffer.

Sen. Martin Heinrich, who serves on the committee that oversees the Forest Service, also raised concerns about the operation with agency officials.

"The senator hopes [the Forest Service] will promptly address these concerns and take note of them in planning future operations," Heinrich's communications director, Whitney Potter, told *The Taos News*.

At the local level, village administrator Mark Fratrick said the community wants to improve its communications with federal law enforcement. "We'd like to just have a good relationship," he said Monday. "We're OK with a presence up here just maybe not that strong a presence going forward."

The village's interactions with Carson National Forest officials "couldn't be better," Fratrick added. "It's just a little strained on the law enforcement side at this time," he said, noting law enforcement has a separate command structure and is not answerable to Carson National Forest administrators.

A review of the operation is expected in the coming weeks, according to Chambers.

"Once the after-action review of the operation there is completed, we will begin to implement recommendations."

© 2014 The Taos News. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.

The information contained in this communication is intended for the use of the designated recipients named above. If the reader of this communication is not the intended recipient, you are hereby notified that you have received this communication in error, and that any review, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify The Associated Press immediately by telephone at +1-212-621-1898

and delete this email. Thank you.
[IP_US_DISC]


msk dccc60c6d2c3a6438f0cf467d9a4938

On 10/22/11 at approximately 3:30pm, I was traveling north bound on US84 in the Ghost Ranch area. Ahead of me were two forest service trucks that were clearly marked as such. The forest service trucks were approximately 1/2 a mile ahead of me, also headed north.

As we approached the Ghost Ranch Conference Center turnoff, I saw two other vehicles enter onto US84, north bound, ahead of the forest service trucks. As we proceeded north I could tell that the two vehicles that had just entered onto US84 were driving slower than the two forest service trucks.

As we neared the old Ghost Ranch Museum area, the two forest trucks were right behind the other two vehicles. As we proceeded north on the straight of way, I was able to pass all vehicles. Later, when I was near the Echo Amphitheater, I saw that the two forest service trucks were no longer behind me. I did see the other two vehicles, still north bound.

Approximately five miles further-up, I saw a forest service truck approaching me from behind, traveling at a high rate of speed, with its emergency lights engaged. I immediately pulled onto the east shoulder. I stayed in my pickup, because I was in fear for my well-being, due to the driver of the forest service truck exiting his vehicle and started shouting something to the effect of "Sheriff Rodella, what are you doing, don't you know what the speed limit is?" Through my rear view mirror, I saw the individual and recognized him to be Aban Lucero, a Captain in the Law Enforcement Bureau of the Forest Service Department.

(Note: I recognized Mr. Lucero because of the fact that Mr. Richard Guillen, Mr. Leo Martinez and I, had met with him and two other individuals several months prior to this. In this meeting, Mr. Lucero was asking that I commission his officers as Rio Arriba Sheriff deputies. I refused to do so, and made it absolutely clear that I was not pleased with how his officers were treating people during traffic stops. Mr Lucero was visibly irate with my decision; and several times asked me to reconsider my decision. In Mr. Lucero's presence, one of his officers stated that the people who were hauling wood from the forest were drunk anyhow. They were very aggressive in their effort to be commissioned.)

Mr. Lucero then approached my vehicle and at that time another forest service truck drove up at a high rate of speed and the driver approached my passenger side. I could see a black object in his hand. I was unsure what he had in his hands; but, his approach caused me great concern for my safety. I recognized that at this point I was being detained and not free to leave. I felt that they were determined to harass me for something other than an alleged traffic violation. I opened the passenger side window so that it was clear that I posed no threat. I was concerned and afraid that what the

1

officer on the passenger side had in his hands was a gun. Mr. Lucero proceeded to berate me for the handling of the forest contracts that I had entered into with them. Mr. Lucero continued to question why I had allowed a particular deputy to work forest patrol. I made it clear to Mr. Lucero that I had no way of knowing that there were issues regarding this deputy.

I felt this was not the proper venue to discuss this matter, and to please allow me to leave. He continued his tirade, which was making me extremely nervous, and I felt he wanted me to react negatively so he could arrest me. I continued to request to be allowed to leave, even mentioning that I had a pressing appointment, that I was already late for.

Mr. Lucero stated to me in a loud, almost threatening voice, "both sides of the road are forest land, so, I have authority over you." At this time, I believed that Mr. Lucero was going to arrest me. I then told Mr. Lucero, "take whatever action you're going to take or let me go." He didn't answer, and I left. The forest service trucks turned and proceeded south.

*Thomas L Rodella*

ATTORNEY COMMUNICATION

2