UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 14-2783 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **THOMAS R. RODELLA**, | ) | |
| | ) | |
| Defendant. | ) | |

## UNITED STATES' SENTENCING MEMORANDUM

The United States submits the following memorandum to assist the Court in determining

the appropriate sentence to impose against this Defendant:

### History and Characteristics of Defendant Thomas Rodella

This Court shall consider the defendant's history and characteristics when imposing a

sentence.  18 U.S.C. §3553(a)(1).  "No limitation shall be placed on the information concerning

the background, character, and conduct" of this defendant.  18 U.S.C. § 3661.  Accordingly,

what follows is a narrative that briefly describes 20 years of Defendant Rodella's abuse of power

and unchecked aggression.

1. Defendant's abuse of power while serving as an NMSP officer

In 1985, then-NMSP Officer Thomas Rodella was suspended for "physically and brutally

attacking" his former wife.  NMSP Inter-Departmental Correspondence, July 19, 1985, at p. 132,

attached hereto as Exhibit 1.  The NMSP Internal Affairs Department also concluded that the

defendant had abused his position with the NMSP when he threatened his wife and a male

relative with his service revolver on two separate occasions, and when the defendant attempted

to run his former wife off the road with his marked unit. Some of these events occurred while the defendant had been under the influence of alcohol and marijuana.[1] *Id.* at 132, 136. Astonishingly, the defendant was only suspended for 30 days for all of these violent and illegal acts. *Id.* at 130.

In 1994, the NMSP interviewed officers under the command of then-Sergeant Thomas Rodella following allegations of ticket fixing for personal and political gain. Twenty-five of the 29 officers interviewed stated that they believed the defendant had solicited them to dismiss or cancel tickets. NMSP Intra-Departmental Correspondence, July 18, 1994, at 229, attached as Exhibit 2. The political incentive was to promote his wife, Debbie Rodella, for State Representative. *Id.* at 274. The NMSP Internal Affairs department further concluded the defendant had abused his position as an NMSP sergeant because his officers reported that they feared the defendant's retaliation if they did not fix tickets for the defendant's personal gain. *Id.* at 274. Even though the NMSP concluded that the defendant had violated the law, rules, and policies, the defendant was suspended for a mere 30 days. *Id.* at 219, 224.

In 1995, the NMSP suspended the defendant for 30 days for violating Jicarilla Tribal law when he shot at a mule deer decoy. NMSP Intra-Departmental Correspondence, March 14, 1995, at 944-947, attached hereto as Exhibit 3. The NMSP Internal Affairs also concluded that the defendant had abused his position with the NMSP when he attempted to improperly influence the Jicarilla police officer who issued the citation. *Id.* at 701, 950.

In the findings regarding Defendant's poaching incident, DPS Secretary Darren White and NMSP Chief Frank Taylor noted that the defendant's "disciplinary history is extensive." *Id.* at 944. In the interest of brevity, however, this Sentencing Memorandum has recounted only those incidents involving abuse of power that the NMSP found to be "sustained."

---

[1] The defendant reported to Pretrial Services that he has never consumed controlled substances.

2.  <u>Defendant's abuse of power while serving as a Rio Arriba County Magistrate</u>

In 2005, just a few months after being appointed as a Rio Arriba County Magistrate, the defendant personally involved himself in an effort to release a friend's father who had been arrested for drunken driving.  Judicial Standards Commission Petition for Permanent Removal, April 29, 2008, at 12, attached hereto as Exhibit 4.  The Judicial Standards Commission concluded that the defendant lied under oath during its investigation.  *Id.* at 31.  This incident forced the defendant to step down from his position as Rio Arriba County Magistrate.

In 2006, while the defendant was campaigning for election to regain the position of Rio Arriba County Magistrate, he promised a married couple he would help them with any legal problems they might confront if they helped him win his election.  Before the election, the defendant learned that the married couple was experiencing a problem with a renter.  *Id.*  The defendant met with the couple and instructed them to wait until after the election to file their complaint.  *Id.*  He further instructed the couple to excuse the other judge to ensure that the defendant would hear the case.  *Id.*  The couple reported the defendant's improper conduct after they and the defendant had a falling out.  The Judicial Standards Commission, and ultimately the New Mexico Supreme Court, concluded that the defendant had violated numerous rules within the Code of Judicial Conduct.  *Id.*  Both entities also concluded that the defendant lied during the investigation.  *Id.* at 31; *In the Matter of Thomas R. Rodella,* 144 N.M. 617, 625 (2008), attached hereto for the Court's convenience.

In 2007, while serving as an elected Rio Arriba County Magistrate, the defendant met with a victim in a domestic violence case over which he was presiding.  144 N.M. at 622.  The victim had been subpoenaed by the State to testify in her husband's trial.  During this *ex parte* meeting, the defendant told the victim that there would be no adverse consequences if she

refused to testify.  *Id.*  Consequently, the victim failed to appear at trial.  *Id.*  The victim reported

the *ex parte* conversation to the victim's advocate, and the matter was referred to the district

attorney's office.  *Id.*  The defendant prepared a recusal document, which he subsequently altered

in an attempt to defraud the district attorney's office.  *Id.*; Exhibit 4 at 17-19.  The Supreme

Court of New Mexico and the Judicial Standards Commission concluded that the defendant lied

during the investigation.  144 N.M. at 623; Exhibit 4 at 31.

Defendant's repeated instances of abuse of power as a Rio Arriba County Magistrate

resulted in the Judicial Standards Commission recommending his permanent removal from

judicial office.  Exhibit 4 at 31.  On review, the Supreme Court concluded that the defendant had

committed willful misconduct and ordered his permanent removal from the bench.  144 N.M. at

629.

3.  Defendant's abuse of power while serving as Rio Arriba County Sheriff

The witnesses in the following incidents testified at trial.[2]

In March 2013, Jacob Ledesma was traveling with his family in northern New Mexico

when he passed the defendant who was driving an unmarked sheriff's vehicle.  The defendant

turned on his emergency lights to stop Mr. Ledesma.  The defendant, who was not in uniform,

approached Mr. Ledesma, showed him his driver's license, and accused him of passing in a no-

passing lane.  Mr. Ledesma informed the defendant that he had passed in a passing zone and that

he did not recognize the defendant.  He also told the defendant that a driver's license meant

nothing.  The defendant became angry and threw his badge at Mr. Ledesma.

In August 2013, Lisa Gonzales and her husband were driving behind a vehicle pulling a

camper in northern New Mexico when the defendant suddenly appeared in their rearview mirror

---

[2]  Once the media reported the instant indictment, the U.S. Attorney's Office and the F.B.I. received additional calls regarding the defendant's misconduct while serving as sheriff.  This Sentencing Memorandum, however, recounts only those instances of misconduct that have been documented with sworn testimony at trial.

and began tailgating their small vehicle.  The defendant was driving a huge unmarked truck.

Once the camper turned off of the highway, Ms. Gonzales' husband accelerated to the speed

limit.  Suddenly, the huge truck's emergency lights began to flash.  Mr. Gonzales could not

immediately pull to the side because there was no shoulder.  He put on his right-turn blinker to

indicate his intention to pull to the side.  The defendant entered the oncoming traffic lane until he

was abreast of the Gonzales' car.  He then yelled an obscenity and ordered them to pull to the

side.  Once they were able to stop, the defendant blocked the Gonzales' car with his truck.  The

rear of the defendant's truck protruded out onto the traffic lane.  The defendant, who was not in

uniform and who had not identified himself, approached Mr. and Ms. Gonzales.  The defendant

moved his jacket, which revealed a gun and badge.  He thrust his head inside their car and yelled

at them for speeding.  Yet, the defendant issued no warning or citation.

In January 2014, Yvette Maes was driving late at night in rural northern New Mexico

with her 15-year-old daughter.  Ms. Maes was driving the speed limit when a large SUV

approached her car and began to tailgate her.  The SUV was traveling dangerously close to Ms.

Maes' car even though there was no oncoming traffic to prevent the SUV from passing her.  Ms.

Maes decided to slow down to encourage the SUV to pass her.  As the SUV finally passed Ms.

Maes' car, she flashed her lights because its driver had endangered her and her child.  The SUV

turned on its emergency lights and stopped Ms. Maes.  The defendant exited the SUV,

approached Ms. Maes, and yelled at her for flashing her lights.  He claimed he was responding to

an emergency even though he did not have his emergency lights on when he tailgated her and did

not keep them on after he left her to continue on his way.  Furthermore, the defendant threatened

Ms. Maes with jail even though he issued no warning or citation.

## The Nature and Circumstances of the Offense

Section 3553(a)(1) requires this Court to consider the nature and circumstances of the offense committed by the defendant.  Since the Court presided over the trial, the United States will only highlight certain aspects of the defendant's conduct during his commission of these crimes.

First, it is reprehensible when a law enforcement officer who has sworn to protect the public becomes the predator.  Here, the defendant became the predator when the victim had the audacity to demonstrate frustration at the defendant's tailgating.  The victim pulled to the side of the road to permit the defendant to pass.  The defendant would have continued on his way but for the victim throwing up his hands as if to say, "what the Hell?"  Now, the defendant's ego had been challenged.  As Ms. Gonzales testified at trial, the defendant described Rio Arriba County as his county.  So, the defendant met the challenge through his road rage.

His uncontrollable aggression could easily have caused serious injury or death to the victim.  The defendant jumped into the victim's car with his gun pointed at the victim's head. The gun was loaded, had no safety mechanism, and could easily have discharged during the struggle.  All this occurred while the victim pleaded for his life and the defendant repeatedly told him, "it's too late."  Furthermore, the defendant endangered the victim and the entire community by driving at excessive speeds.

Second, the defendant used his son to drive the pursuit vehicle, extract the victim from his car and restrain him.  This circumstance of the offense is remarkable given that Thomas Rodella, Jr.'s medical records reveal he was under the influence of medication that treats "major"[3] mental disorders at the time of this criminal episode.  These medical records also report

---

[3]  According to the Physician's Desk Reference (PDR), Remeron and Wellbutrin are prescribed for persons experiencing "major" psychiatric disorders.  Trial Exhibits 29 and 30.

that the defendant's son suffers from an inability to control his own aggression.  A copy of the United States' cross-examination of Thomas Rodella, Jr., is attached as Exhibit 5.  Defendant's son testified that, during the period relevant to this offense, he was experiencing (a) severely impaired concentration; (b) severe irritability that affected him in everything he did and that led to periods of violence; (c) poor concentration that made his daily tasks very difficult; (d) severe difficulty getting along with people; (e) an unusual susceptibility to becoming startled; and (f) angry outbursts that arose with little or no provocation.  Exhibit 5 at pp. 75, 82-83, 85-87, 91.  The defendant's son also testified that the medications were not controlling these symptoms.  *Id.* at p. 91.  Most troubling is that, as Lt. Randy Sanches testified, the defendant's son was armed with a semi-automatic pistol at the scene of the crime.

Third, once the defendant learned that the NMSP was investigating the victim's complaint, the defendant falsified a report recounting the events and submitted it for inclusion into Deputy Andy Gutierrez' case file.  A reasonable inference can be drawn that he also falsified his son's witness report based on Undersheriff Vince Crespin's testimony that the defendant brought both witness accounts to the RASO at the same time, and based on the fact that the reports appear to be nearly identical.  Both reports are attached hereto as Exhibits 6 and 7 for the Court's comparison.

Fourth, as a result of the defendant's crimes, the victim's thumb was injured such that it required corrective surgery.  *See* Exhibit 8.  The jury did not find beyond a reasonable doubt that the defendant sustained an injury.  The lack of such a finding, however, could be a product of the defense incorrectly arguing the law to the jury and the United States' failure to correct the error during its rebuttal.  That is, the defense argued that since the victim did not know whether it was the defendant or his son who *caused* the injury, the jury could not find that the victim sustained

bodily injury during the defendant's assault.[4]  In fact, the Court's jury instruction Number 12 states that the injury must *result* from the defendant's acts.  The fourth element of Section 242 does not require that the defendant directly inflict or cause the injury.  The intake form prepared during the victim's booking at the detention facility documents that the defendant reported the thumb injury as a result of the defendant's assault.  The injury caused pain and impairment of function to a degree that necessitated surgery.  Clearly, the victim sustained an injury as a result of the defendant's violation of Section 242.

### The Need for a Strict Sentence

In considering the need for a particular sentence, the Court shall determine what sentence will reflect the seriousness of the offense, promote respect for the law, and provide just punishment.  18 U.S.C. § 3553(2)(A).  There are few offenses more serious than those that involve violent civil rights violations by a law enforcement officer.  A strict sentence will not only reflect the seriousness of this offense, but will promote respect for the law.  Given what the victim suffered at the hands of the defendant – the assault, surgery, three months of physical therapy, and lost wages – the only just punishment is a strict one.  Also, § 3553(a)(2)(B) supports a strict sentence because it would afford adequate deterrence to criminal conduct by other law enforcement officers throughout this state.

Section 3553(2)(C) is of particular relevance in support of the United States' request for a strict sentence because it requires the Court to protect the public from further crimes of the defendant.  As described above, the defendant has a long history of violating the law – and an equally long history of avoiding the consequences.  There is every reason to expect the defendant will continue his criminal behavior unless and until a strict sentence is imposed.

---

[4]  Of course, the United States need not prove the injury beyond a reasonable doubt for sentencing purposes.  *See United States v. Washington,* 11 F.3d 1510, 1516 (10th Cir. 1993); *United States v. Mendez-Zamora,* 296 F.3d 1013, 1020 (10th Cir. 2002) (burden of proof in sentencing is preponderance of the evidence).

**Conclusion**

For nearly 20 years, the defendant's abuse of power and unchecked aggression have gone largely unpunished.  This time, the defendant's criminal conduct stepped into federal jurisdiction.  His conviction was just, and the United States asks the same for his sentence.

Respectfully submitted,

DAMON P. MARTINEZ
United States Attorney

*/s/ Filed Electronically*
TARA C. NEDA
JEREMY PEÑA
Assistant United States Attorneys
P.O. Box 607
Albuquerque, New Mexico 87103
(505) 346-7274

I HEREBY CERTIFY that on November 18, 2014, I filed the foregoing electronically through the CM/ECF system, which caused the below counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

Robert J. Gorence and Louren Oliveros
Attorneys for Thomas R. Rodella

*/s/ Filed Electronically*
Tara C. Neda, Assistant U.S. Attorney