# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                        No. CR 14-2783 JB

THOMAS R. RODELLA and
THOMAS R. RODELLA, JR.,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the United States' Notice of Intention to Offer Expert's Testimony, filed August 27, 2014 (Doc. 34)("Notice"); and (ii) the Defendant's Motion to Strike Expert Testimony of Manuel T. Overby, filed September 9, 2014 (Doc. 50)("Motion"). The Court held a hearing on September 16, 2014. The primary issues are: (i) whether expert testimony about nationally accepted police procedures is relevant to whether Defendant Thomas R. Rodella used excessive force and acted reasonably; and (ii) whether expert Manuel Overby may define terms within the law enforcement field. Because an expert witness may not testify whether a defendant violated the Constitution of the United States or whether he or she acted reasonably, because a violation of a nationally accepted police procedure is not a violation of the Constitution, because testimony about nationally accepted police procedures may mislead and confuse the jury into believing that a violation of a nationally accepted police procedure equates to a constitutional violation, because it is unclear from where these nationally accepted police procedures come, and because an expert witness may define certain terms within his field, the Court will grant the Motion in part and deny it in part.

## FACTUAL BACKGROUND

The Superseding Indictment, filed September 9, 2014 (Doc. 55)("Indictment"), alleges that on March 11, 2014, in Rio Arriba County, New Mexico, Rodella, while acting under color of state law, subjected a person -- Michael Tafoya -- to "unreasonable seizure by a law enforcement officer." Indictment at 1. Specifically, Rodella allegedly used unreasonable force and caused an "unlawful arrest by deputies of the Rio Arriba County Sheriff's Office." Indictment at 1. "This offense resulted in bodily injury" to a person, and included the "use and threatened use of a dangerous weapon." Indictment at 1. The Indictment further alleges that Rodella carried and brandished a firearm "during and in relation to a crime of violence for which the defendant may be prosecuted in a court of the United States," and that, "in furtherance of such crime, possessed and brandished said firearm." Indictment at 1-2.

## PROCEDURAL BACKGROUND

The United States filed the Notice on August 27, 2014, stating that it intends to introduce Overby's expert testimony. See Notice ¶ 1, at 1. Overby's testimony "will define terms used in" the fields of "law enforcement use of force, defensive tactics and emergency vehicle operations," will "educate the jury regarding nationally accepted law enforcement procedure and practice," and will "present opinions applying those procedures and practices to the facts." Notice ¶ 1, at 1.

1. **Manuel T. Overby.**

Overby attended New Mexico State University from 1991 to 1997 and obtained a Bachelor of Science in Agriculture, with a major in Wildlife Science. See Manuel T. Overby Resume at 2, filed August 27, 2014 (Doc. 34-1)("Overby Resume"). Overby then served as a Conservation Officer with the New Mexico Department of Game and Fish in Santa Fe, New Mexico, from February, 1999, to November, 2012. See Overby Resume at 1. As a Conservation

Officer, Overby enforced the laws of the State of New Mexico as they pertain to Chapter 17, which included "writing and serving search and arrest warrants, investigating wildlife related crimes, writing case reports, and collecting and maintaining evidence." Overby Resume at 1. Chapter 17 concerns game, fish, and outdoor recreation. See N.M. Stat. Ann. § 17-1-1. As a Conservation Officer, Overby also served as a Lead Defensive Tactics Instructor for the Department of Game and Fish, which included being certified by the Department of Public Safety in defensive tactics, use of force, and as a general instructor. See Overby Resume at 1. Overby trained both veteran officers and recruits in Back Country and mentored and trained recruits in the field. See Overby Resume at 1. Overby additionally performed supervisory duties, including evaluating the performance of trainees, investigating and addressing questionable behavior and performance of subordinates, reviewing district-wide case reports and progress reports, creating schedules, and delegating duties. See Overby Resume at 1. Overby taught courses in hunter education, bear awareness, defensive tactic techniques, use of force applications, and a variety of other Department of Public Safety certified courses. See Overby at 1. Overby also assisted in management projects for a variety of wildlife animals and managed situations that involved human and wildlife conflicts. See Overby at 1-2. Additionally, Overby provided technical guidance to various agencies and townships in road obliteration, travel management plans, wildlife conflict resolution, ordinance development, trash-handling practices, and search and seizure laws during drug enforcement operations. See Overby Resume at 2.

After leaving the Department of Game and Fish in November, 2011, Overby joined the New Mexico Department of Public Safety in the Law Enforcement Academy in Santa Fe as an Advanced Instructor. See Overby Resume at 1. At the Law Enforcement Academy, Overby coordinated, designed, constructed, and reviewed existing and new curriculum for new recruits

and experienced law enforcement officers.  See Overby Resume at 1.  Overby specializes in the areas of "Use of Force and Defensive Tactics."  Overby Resume at 1.  Overby also has instructor certificates in: Use of Force, Defensive Tactics, Firearms, Active Shooter, Emergency Vehicle Operations, and Instructor Development.  See Overby Resume at 1.  Overby is still employed with the Law Enforcement Academy.  See Overby Resume at 1.

   2.   **Overby's Report.**

   The United States "asked [Overby] to assess the alleged actions of Rio Arriba County Sheriff Tommy Rodella on March 11, 2014, against nationally accepted police practices as well as the objective reasonableness test of the 4th Amendment to the U.S. Constitution."  Evaluation and Summary of the Alleged Actions of Sheriff Rodella at 1, filed August 27, 2014 (Doc. 34-2)("Overby Evaluation").   Based on a review of Rodella's statements and the statements of Tafoya, Overby made of number conclusions on whether Rodella's conduct fell below nationally accepted police practices.  See Overby Evaluation at 1-3.  Overby's conclusions are as follows:

> **Assuming the truth of Sheriff Rodella's statements, I have identified the following departures from nationally accepted procedures in the field of law enforcement:**
>
> Sheriff Rodella's initial attempt to engage M.T. fell below nationally accepted police practices.  Off duty officers have no requirement to act when faced with petty misdemeanor or misdemeanor traffic violations that occur in their presence.  Because personal vehicles are not equipped with the necessary equipment to properly notify the public of police presence and intent to stop, performing traffic stops in personal vehicles falls below nationally accepted procedures.  Common practice for off duty police officers is to report the license plate number and vehicle description to the local dispatch so an on duty and properly equipped police officer can respond and investigate the incident.  It would not be uncommon for an off duty police officer to remain near the scene or attempt to keep the individual in his sights to aid in identification of the offender.  National practices do not authorize an off-duty officer to violate the law himself in order to address an observed traffic violation.

If the Mazda pulled over on its own accord, although not a common practice, it would be acceptable for an off duty police officer to pull over and approach the vehicle, identify himself and check to make sure the driver was safe and not suffering from a medical condition or require some other form of help.

However, it falls below nationally accepted procedures for an off duty police officer to enforce the law under those circumstances because he or she would not be immediately recognizable by the public as a police officer given their civilian clothing. Additionally, the off-duty officer would not have the tools he or she may need to effect an arrest should the situation so require. As an additional point, accepted law enforcement practice is for an officer to stop his vehicle behind a suspect's vehicle, as opposed to in front, whenever possible, out of concerns for officer safety.

Once M.T. drove away from the initial encounter, Sheriff Rodella's pursuit of M.T. fell below accepted procedures in the field of law enforcement. Accepted practice would be to let the car drive away. Additionally, Sheriff Rodella's call to Undersheriff Vince Crespin fell below accepted procedures, which require an officer to call dispatch rather than a specific officer because dispatch is better equipped to assess the availability of uniformed officers in the area.

Sheriff Rodella's pursuit of M.T., in excess of the applicable speed limits, violated nationally accepted procedures. It is unacceptable for an off-duty officer travelling in a private vehicle with a civilian family member in his vehicle to engage in a high-speed pursuit in an attempt to address a petty misdemeanor or misdemeanor traffic violation. Off duty officers are expected to consider safety risks and the uncertain potential violence to which a family member could be exposed.

Once Sheriff Rodella's vehicle blocked M.T.'s vehicle at a dead end, Sheriff Rodella's decision to approach the moving vehicle on foot fell below accepted law enforcement procedures. Accepted practice would have been to park at a distance and stay in the car and watch while waiting for uniformed officers to arrive. The only justification for an off-duty officer to approach a moving vehicle on foot would be a concern that the driver was suffering a medical episode.

Sheriff Rodella's act of jumping through the car window with his firearm drawn deviates from nationally accepted law enforcement procedures. Officers should not jump into a moving vehicle and expose themselves to increased dangers associated with that action. Additionally, officers should not jump into the front seat of a vehicle with a gun drawn. It is relatively easy to disarm a person who has only one hand on their gun. Nationwide practice is to never get within arm's reach of a person or suspect while an officer's gun is drawn.

Sheriff Rodella made no mention of searching M.T. after he was subdued. Nationally accepted police practice is to search every suspect for weapons

immediately after the suspect's hands are restrained, to prevent potential harm to the officer. Additionally, a full search should have been conducted after the arrest and prior to placing the suspect into a patrol car.

**Assuming the truth of M.T.'s statements rather than Sheriff Rodella's statements when the two conflict, I identified the following additional departures from nationally accepted procedures in the field of law enforcement:**

An off-duty police officer should not tailgate a vehicle for any distance other than to gain the license plate number to report to dispatch. If no license number was visible, standard practice for an off-duty officer who had observed a traffic violation would be to let it go. Furthermore, once the vehicle alleged to have committed a traffic violation had stopped, there would be no need for an off-duty officer and a civilian family member to approach the suspect's vehicle on foot.

Following the initial encounter, Sheriff Rodella's continued pursuit of M.T. violated national law enforcement procedures. There is no reason for an off duty officer to follow closely in his personal vehicle or to attempt to make contact with the driver a second time, especially because it would be difficult for a panicked driver to recognize he was a law enforcement officer.

Sheriff Rodella's actions upon exiting his vehicle violated national law enforcement procedures. According to national law enforcement procedures, officers should draw a firearm only upon indications that a suspect poses an immediate threat of death or serious bodily injury. In high risk or felony stops, procedure is for officers to exit their vehicles with weapons drawn, staying behind police vehicles for cover, and using verbal commands to control the situation prior to approaching a suspect's vehicle. A petty misdemeanor or misdemeanor traffic violation standing alone is insufficient to justify an officer drawing a firearm. Moreover, it is a violation of nationally accepted law enforcement procedures for an off-duty officer to perform such a procedure while in plain clothes, in an unmarked private vehicle and accompanied by a private citizen, unless uniformed and equipped law enforcement officers are immediately present and available. Also, according to national procedures, an officer should not exit his vehicle to approach a suspect's vehicle without knowing that the suspect vehicle was totally stopped or actually blocked in.

Sheriff Rodella's entering into M.T.'s vehicle with a firearm in hand was a violation of nationally accepted law enforcement procedures. Police officers should not jump into vehicles with a firearm drawn because the firearm could be taken away in a struggle and used against the officer. It is unacceptable, according to national law enforcement procedures, for a police officer to shove a gun in a suspect's face. It is equally unacceptable for a police officer to make threatening statements such as "it's too late," when a suspect begs for his or her life.

Sheriff Rodella violated nationally accepted law enforcement procedures when he said, "You wanna see my badge, mother fucker!  Here's my badge!"  It is also contrary to accepted practice to pull a suspect's head up by his hair and hit him in the face with a badge.  Police officers should anticipate that when he or she is dressed in plain clothes and driving unmarked private vehicles, members of the public might have difficulty identifying him or her as an officer.  An officer is never justified in letting his anger and frustration interfere with his judgment and it is completely unacceptable to strike a suspect in the face with a badge.

Overby Evaluation at 1-3.

### 3. **The Motion and Response**.

Rodella moves to strike Overby's testimony, arguing that "his testimony is neither probative nor relevant to the instant case."  Motion at 1.  Rodella argues that this "type of expert testimony is not only disallowed in the Tenth Circuit, but the evidence is neither relevant nor probative to establish whether or not Mr. Rodella used excessive force in this case."  Motion at 1.  Rodella argues that, while the threshold for relevance "is not high, there must be 'sufficient materiality and probative value to provide a fact-finder with a basis for making some inference, or chain of inferences.'"  Motion at 3 (quoting United States v. Medina-Copete, 757 F.3d 1092, 1105 (10th Cir. 2014)(internal quotation marks omitted)).  Rodella contends that, after "an exhaustive search, there appears to be no criminal cases on this issue within the Tenth Circuit where testimony on standard operating procedures [SOPs] has been admitted at trial."  Motion at 3.  Rodella argues that, in this district, "evidence regarding the violation of standard operating procedures is not admissible to prove a constitutional violation in civil rights cases, and the rule should be no different in this case, where the violation of civil rights is the basis for the criminal charges."  Motion at 3.

Rodella contends that "Overby's purported testimony that Mr. Rodella did not comply with the standard operating procedures is neither probative nor relevant," because the "testimony

will not make the likelihood of Mr. Rodella's use of force on Michael Tafoya during his arrest any more or less probable." Motion at 4. Rodella contends that whether Rodella used a "pistol to assault Mr. Tafoya will not be proved by Mr. Overby's testimony that Mr. Rodella did not comply with standard operating procedures or national law enforcement standards." Motion at 4. Rodella contends that if "this type of testimony is not admissible in a civil case . . . it most certainly is not relevant in a criminal case." Motion at 4. Rodella argues that the United States Court of Appeals for the "Third Circuit has found that testimony regarding the violation of a standard operating procedure in a case charged under 18 U.S.C. § 242 is prejudicial." Motion at 4 n.1 (citing United States v. Tyler, 124 F. App'x 124, 129 (3d Cir. 2005)(unpublished)). Rodella contends that Overby's testimony "will not provide the jury with any useful information relating to the charges in this case." Motion at 5. Rodella argues that, "even if the Court finds that the expert testimony of Manuel Overby is relevant, the testimony is highly prejudicial," and that his testimony regarding nationally accepted law enforcement procedure and practice "will confuse the jury as to the requirements of the law and runs the risk of inserting standards beyond that which are required by the federal criminal statutes." Motion at 5. Rodella further argues that Overby's testimony "serves only to inflame the jury and convince them, even if [Rodella] is not guilty under the criminal statute, he is a bad person who should be convicted regardless." Motion at 5.

The United States responds by arguing that the Motion deals with "decisions by this Court excluding testimony that certain conduct violated local" SOPs, but Overby's opinions do not "relate to a local SOP." United States' Response to Defendant's Motion to Strike Expert Testimony of Manuel T. Overby, filed September 12, 2014 (Doc. 75)("Response"). The United States argues that "Overby's testimony" will hew "closely to lines of testimony that the Tenth

Circuit specifically approved in" Zuchel v. City and County of Denver, 997 F.2d 730, 742-43 (10th Cir. 1993)("Zuchel"). Response at 2. The United States argues that, in Zuchel, the United States Court of Appeals for the "Tenth Circuit affirmed the admission of" an expert's testimony "from a non-attorney expert in the field of law enforcement practices." Response at 2. The United States contends that the Tenth Circuit approved the admission of the expert's testimony, because the expert "'stated his belief that the conduct was inappropriate based on [his] understanding of generally accepted police custom and practice in Colorado and throughout the United States,'" rather than giving "'an opinion on whether [the defendant's] conduct was unconstitutional.'" Response at 2 (quoting Zuchel, 997 F.2d at 742-43)(alterations in Response but not in original). The United States contends that the testimony in Zuchel "is indistinguishable from the testimony the United States intends to elicit from Mr. Overby." Response at 2.

The United States seeks to reconcile Tanberg v. Sholtis, 401 F.3d 1151 (10th Cir. 2005)("Tanberg"), and Zuchel by arguing that the Tenth Circuit in Tanberg was concerned with SOPs, because of (i) uniformity and (ii) "creating a disincentive for progressive local SOPs." Response at 2. The United States argues that these two concerns do not apply "to testimony regarding nationally accepted practices in law enforcement," because "testimony about national practices is a uniform standard throughout the United States," and because "no local police agency would consider repealing progressive SOPs based on testimony about national practices." Response at 3. The United States argues that, in excluding SOPs in prior cases, the Court "relied heavily on Marquez v. City of Albuquerque, 399 F.3d 1216 (10th Cir. 2005)("Marquez"). Response at 3. The United States contends that the "standard of review was likely dispositive" in Marquez. Response at 3. The United States argues that the Tenth Circuit held that "the

district court had not abused its discretion in finding the testimony irrelevant and confusing."
Response at 3. The United States argues that the "expert in Marquez also apparently sought to
testify that any use of force beyond the minimum is *ipso facto* unreasonable, which is contrary to
law." Response at 3.

The United States argues that Overby's testimony "will be helpful to the jury," because
most jurors "do not necessarily know that such an act is indeed contrary to national practice and
why." Response at 3. The United States contends that Overby "will explain practices that are
not obvious to jurors." Response at 3. The United States argues that the "jury needs to hear
from a qualified law enforcement expert in order to understand considerations that only a
practitioner in the field would anticipate," and that Overby's testimony will inform, but not
supplant, "the jury's determination of whether Defendant's actions were reasonable." Response
at 4. The United States argues that, to prevent jury confusion, jury instructions would
"adequately inform the jury of their role in applying the law of the Fourth Amendment to the
facts of the case." Response at 4.

4.     **The September 16, 2014, Hearing.**

The Court held a hearing on September 16, 2014. See Transcript of Hearing at
88:11-116:3 (taken September 16, 2014)(Peña, Gorence, Court)("Tr.").[1] Overby did not testify
at the hearing. At the hearing, the United States argued that Overby will testify only to
nationally accepted police practices and not to SOPs, which the United States maintained that
court treats differently. See Tr. at 89:5-16 (Peña). The United States acknowledged that the
Court has excluded testimony of nationally accepted police procedures in Vondrak v. City of Las

---

[1]The Court's citations to the transcripts of the hearings refer to the court reporter's
original, unedited version. Any final transcripts may contain slightly different page and/or line
numbers.

Cruces, No. CIV 05-0172 JB/LAM, 2009 WL 3241555 (D.N.M. Aug. 25, 2009)(Browning, J.),

but argued that the Court did not consider the Tenth Circuit's reasoning in Zuchel. See Tr. at

89:21-90:14 (Peña, Court). The United States also agreed with the Court that the Tenth Circuit

has given district courts more discretion in deciding whether to admit expert testimony on

nationally accepted police standards than on whether to admit evidence of SOPs. See Tr. at

90:15-24 (Peña, Court). The United States referenced Tanberg to argue that the Tenth Circuit

treats SOPs differently than nationally accepted police practices, because courts are concerned

with the lack of uniformity in SOPs between different jurisdictions; if prosecutors argued that a

violation of an SOP would constitute a constitutional violation, then the Constitution would vary

between different jurisdictions. See Tr. at 91:7-22 (Peña). The United States argued that the

lack-of-uniformity concern does not apply to testimony regarding nationally accepted police

practices, because the testimony involves a national, uniform standard. See Tr. at 91:23-92:3

(Peña).

        The United States argued that Overby's testimony would be relevant to the

reasonableness of Rodella's actions, because Overby would testify that "basically no officer"

would have pursued the victim in a private Jeep, but instead would have written down the license

plate of the victim and called dispatch. Tr. at 92:17-93:12 (Peña, Court). The United States

contended that SOPs may be used to show Rodella's state of mind but that testimony of

nationally accepted standards can be used to show the constitutionality of Rodella's actions. See

Tr. at 94:1-14 (Peña, Court); id. at 96:8-96:21 (Peña, Court). The Court voiced its concern that

Overby's testimony will be used at the end of the United States' case-in-chief to merely

summarize the United States' version of events, which the Court believes is an inappropriate use

of an expert. See Tr. at 95:22-96:6 (Court). The United States suggested that, rather than relying

on the testimony of the witnesses, Overby could state conclusions and opinions based on hypothetical situations. See Tr. at 96:7-20 (Peña). The United States addressed Rodella's concern about hearsay by arguing that Overby could either sit-in on the trial, listen to witnesses, and draw his conclusions from their testimony, or he could testify in hypotheticals. See Tr. at 107:9-18 (Peña). The Court asked the United States whether Overby would testify to everything he put into his report and whether there is a nationally accepted standard for every single action that Rodella allegedly took, and the United States replied that Overby might not offer every opinion in his report and that the Court would have to hear Overby's testimony to find out if there is a nationally accepted standard for each action that Rodella took. See Tr. at 110:12-112:15 (Peña, Court). The United States emphasized that Overby "would be offering opinions regarding the reasonableness" of Rodella's conduct, which is the "ultimate touch stone in this case." Tr. at 112:18-113:2 (Peña).

Rodella responded by arguing that Overby does not delineate from where these nationally accepted police practices come or where they have been adopted. See Tr. at 97:7-17 (Gorence). Rodella argued that Overby has not cited to any authority which provides these nationally accepted police practices, but instead is merely stating that it is his opinion what these nationally accepted practices are. See Tr. at 97:14-99:16 (Peña, Gorence, Court). Rodella maintained that Overby has been only a Game and Fish officer in New Mexico, and not a federal officer, and that Overby has not provided his methodology for showing how he came up with his opinions or what materials he reviewed in comparing police practices around the nation. See Tr. at 99:12-100:2 (Gorence). Rodella argued that if Overby is permitted to testify, then all of the hearsay statements, on which Overby relied in forming his opinions, must also be admitted for cross-examining Overby. See Tr. at 100:12-101:13 (Gorence). Rodella stated that he has "not

found a single case in the United States of America in a 242 action that allows" for this type of expert testimony. Tr. at 101:13-16; id. at 104:19-105:2 (Gorence). Rodella argued that evidence of nationally accepted police practices and of SOPs could be relevant in a civil case, where training and adequate supervision are at issue, but that they are irrelevant when it comes to deciding whether Rodella acted reasonably, or whether he deprived the victim "of his right to be free from excessive force and unlawful arrest as defined by the [C]onstitution." Tr. at 101:3-103:1 (Gorence). Rodella argued that the rationale from Tanberg -- that SOPs are irrelevant to whether the constitution was violated -- applies the same to national standards. See Tr. at 104:5-18 (Gorence). Rodella further argued that, even if the testimony is being offered for the willfulness element, it would act as a back door to show that a violation of the nationally accepted practices equates to a constitutional violation. See Tr. at 105:2-9 (Gorence).

## LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided Daubert v. Merrell Dow Pharmaceuticals, Inc., [509 U.S. 579 (1993),] trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide." United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011)(Browning, J.). "The Court now must not only decide whether the expert is qualified to testify, but, under Daubert v. Merrell Dow Pharmaceuticals, Inc., whether the opinion testimony is the product of a reliable methodology." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224. "Daubert v. Merrell Dow Pharmaceuticals, Inc. requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224.

1.       <u>**Rule 702 of the Federal Rules of Evidence**</u>.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Rule 702 thus requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." <u>United States v. Muldrow</u>, 19 F.3d 1332, 1337 (10th Cir. 1994). Rule 702 uses a liberal definition of "expert." Fed. R. Evid. 702 advisory committee's notes to 1972 proposed rules ("[W]ithin the scope of this rule are not only experts in the strictest sense of the word, e.g. physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values."). An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." <u>LifeWise Master Funding v. Telebank</u>, 374 F.3d 917, 928 (10th Cir. 2004). The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met. <u>See</u> <u>Morales v. E.D. Etnyre & Co.</u>, 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing <u>Bourjaily v. United States</u>, 483 U.S. 171, 175 (1987)). Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications." <u>Gardner v. Gen.</u>

Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted). A witness may acquire expertise on a subject based on experience in that field. See United States v. Medina-Copete, 757 F.3d 1092, 1104 (10th Cir. 2014)("In [United States v.] Garza, we held that 'police officers can acquire specialized knowledge of criminal practices and thus the expertise to opine on such matters.'")(quoting United States v. Garza, 566 F.3d 1194, 1199 (10th Cir. 2009)). "But witnesses 'relying solely or primarily on experience . . . must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" United States v. Medina-Copete, 757 F.3d at 1104 (quoting Fed. R. Evid. 702 advisory committee's note (2000 Amendment))(alteration in opinion but not in original). Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion").

2.    **The Standard in Daubert v. Merrell Dow Pharmaceuticals, Inc.**

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., LP, No. CIV 03-1160 BB/LAM, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)). The Supreme Court of the United States articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including:

(i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 594-95. The court is also to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence. See Witherspoon v. Navajo Ref. Co., LP, 2005 WL 5988649 at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). The Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp.:

> Rule 702 requires the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." [Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1120 (10th Cir. 2004)](quoting Daubert, 509 U.S. at 589 . . .). This obligation involves a two-part inquiry. Id. "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.'" Id. (quoting Daubert, 509 U.S. at 592 . . . .). In making this determination, the district court must decide "whether the reasoning or methodology underlying the testimony is scientifically valid. . . ." Id. (quoting Daubert, 509 U.S. at 592-93 . . .). Second, the district court must further inquire into whether proposed testimony is sufficiently "relevant to the task at hand." Daubert, 509 U.S. at 597 . . . .

397 F.3d at 883-84 (footnote omitted). "The second inquiry is related to the first. Under the relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case. . . . The evidence must have a valid scientific connection to the disputed facts in the case." Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the Supreme Court); Daubert v. Merrell Dow Pharm., Inc., 509 U.S.

at 591)).  If the expert's proffered testimony fails on the first prong, the court does not reach the second prong.  See Norris v. Baxter Healthcare Corp., 397 F.3d at 884.  In Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court expanded the rules under Daubert v. Merrell Dow Pharm., Inc., to non-scientific expert testimony.  See 526 U.S. at 141 ("We conclude that Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge.'").  The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert v. Merrell Dow Pharmaceuticals, Inc., will not apply to all cases:

> Our emphasis on the word 'may' thus reflects Daubert's description of the Rule 702 inquiry as a flexible one.  Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test.  And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

In conducting its review under Daubert v. Merrell Dow Pharmaceuticals, Inc., the court must focus generally on "principles and methodologies, and not on the conclusions generated." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, No. CIV 05-0619 JB/DJS, 2006 WL 4060665, at *11 (D.N.M. Sept. 26, 2006)(Browning, J.)(citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 595).  "Despite this focus on methodology, 'an expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (alterations omitted)(internal quotation marks omitted). The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury.  See Norris v.

Baxter Healthcare Corp., 397 F.3d at 881. The Tenth Circuit noted in Hollander v. Sandoz

Pharmaceuticals Corp., 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in
> assessing reliability under Daubert, and because, in light of that discretion, there
> is not an extensive body of appellate case law defining the criteria for assessing
> scientific reliability, we are limited to determining whether the district court's
> application of the [sic] Daubert manifests a clear error of judgment or exceeds the
> bounds of permissible choice in the circumstances. . . . Thus, when coupled with
> this deferential standard of review, Daubert's effort to safeguard the reliability of
> science in the courtroom may produce a counter-intuitive effect: different courts
> relying on the essentially the same science may reach different results.

289 F.3d at 1206. The United States Court of Appeals for the Ninth Circuit noted in Claar v.

Burlington Northern Railroad Co., 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the
> antithesis of this method. Certainly, scientists may form initial tentative
> hypotheses. However, scientists whose conviction about the ultimate conclusion
> of their research is so firm that they are willing to aver under oath that it is correct
> prior to performing the necessary validating tests could properly be viewed by the
> district court as lacking the objectivity that is the hallmark of the scientific
> method.

29 F.3d at 502-503.

> Once reliability is established, however, it is still within the district court's
> discretion to determine whether expert testimony will be helpful to the trier of
> fact. In making that determination, the court should consider, among other
> factors, the testimony's relevance, the jurors' common knowledge and experience,
> and whether the expert's testimony may usurp the jury's primary role as the
> evaluator of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083 JB/WPL, 2006 WL 4079623, at *10 (Dec. 15,

2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th

Cir. 2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion.

See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated

connective tissue disease is an untested hypothesis. At worst, the link has been tested and found

to be untenable.  Therefore, there is no scientific basis for any expert testimony as to its specific presence in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d at 1228 ("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation.").  A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.  The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).  See Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193, 1209 (10th Cir. 2002)(noting a lack of similarity between animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)("Test results on animals are not necessarily reliable evidence of the same reaction in humans.").  Courts have excluded experts' opinions when the experts depart from their own established standards.  See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N. R.R. Co., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

> **3.**  **Necessity of Evaluating an Issue Under Daubert v. Merrell Dow Pharmaceuticals, Inc.**

The restrictions in Daubert v. Merrell Dow Pharmaceuticals, Inc. apply to both "novel" expert testimony and "well-established propositions."  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593 n.11 ("Although the Frye[2] decision itself focused exclusively on 'novel' scientific

---

[2]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule Fed. R. Evid. 702, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." 293 F. at 1014.

techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence.").   "Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended."  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593 n.11.  "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201."  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 593 n.11.

"[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert . . . ."  Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009).  "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability."  Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780.  Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable.  See Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with the PCR methodology, and in fact some courts have indicated their acceptance of it.").

## LAW REGARDING THE RELEVANCY OF EVIDENCE

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402, 403).  "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  United States v. Gutierrez-Castro, No. CR 10-2072 JB, 2011 WL

3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.")).  "The standard for relevancy is particularly loose under rule 401, because '[a]ny more stringent requirement is unworkable and unrealistic.'"  United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012)(Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's notes).  Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible.  See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.  See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989).  "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]."  United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991))(internal quotation marks omitted).  "In performing the 403 balancing, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value."  Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d 1262, 1274 (10th Cir. 2000).  The "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly."  United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980). The Supreme Court has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(citation omitted).

Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response from the jury, or if the evidence otherwise tends to adversely affect the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged. See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999). "Evidence is not unfairly prejudicial simply because it is damaging to an opponent's case." United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008)(quoting United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003)). Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" United States v. Caraway, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee notes)(emphasis in original).

## EXPERT TESTIMONY ON ULTIMATE ISSUES

Rule 704 of the Federal Rules of Evidence states:

**(a)    In General -- Not Automatically Objectionable.**  An opinion is not objectionable just because it embraces an ultimate issue.

**(b)** **Exception.** In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

Fed. R. Evid. 704. "Traditionally, there was a general doctrine that witnesses could not give their opinion or conclusions on an ultimate issue of fact." Vondrak v. City of Las Cruces, 2009 WL 3241555, at *10. "The stated justification was sometimes that such testimony usurps the function or invades the province of the jury." Vondrak v. City of Las Cruces, 2009 WL 3241555, at *10 (quoting 1 Kenneth Broun, McCormick on Evidence § 12 (6th ed. 2006 update)). The Federal Rules of Evidence reflect that the common-law ultimate-issue rule has been abolished. See United States v. Smith, 156 F.3d 1046, 1054 (10th Cir. 1998). Although rule 704(a) permits an expert to testify about areas that embrace an ultimate issue, there are some other limitations, aside from those expressed in rule 704(b), regarding testimony on ultimate issues. More specifically, the Tenth Circuit has stated: "[A]n expert may not state legal conclusions drawn by applying the law to the facts." A.E. by and Through Evans v. Indep. Sch. Dist. No. 25, of Adair Cnty., Okla., 936 F.2d 472, 476 (10th Cir. 1991).

"Rule 704(b) prohibits an expert from expressly stating the final conclusion or inference as to a defendant's mental state; it does not prevent an expert from testifying to facts or opinions from which the jury could conclude or infer that the defendant had the requisite mental state." United States v. Ganadonegro, No. CR 09-0312 JB, 2012 WL 592170, at *5 (D.N.M. Feb. 17, 2012)(Browning, J.)(citing United States v. Torres, 53 F.3d 1129, 1141-42 (10th Cir. 1995)). The restrictions in rule 704(b) do not apply to lay witnesses, see United States v. Goodman, 633 F.3d 963, 968 (10th Cir. 2011), although the lay witnesses' testimony must still be helpful to the trier of fact to satisfy rule 701, see Fed. R. Evid. 701(b). "[Rules 701, 702, and 403] afford ample assurances against the admission of opinions [under rule 704] which would merely tell the

jury what result to reach, somewhat in the manner of the oath-helpers[3] of an earlier day."

United States v. Barile, 286 F.3d 749, 759-60 (4th Cir. 2002).  Pursuant to rule 704, it is the task

of the courts "to distinguish [helpful] opinion testimony that embraces an ultimate fact from

[unhelpful] opinion testimony that states a legal conclusion."  United States v. Perkins, 470 F.3d

at 158 (internal quotation marks omitted).  In making that determination, a court should consider

whether the question tracks the language of the legal principle or statute at issue, and then

consider whether any terms employed have a specialized legal meaning.  See United States v.

Perkins, 470 F.3d at 158. Curiosity

## LAW REGARDING STANDARD OPERATING PROCEDURES

In Whren v. United States, 517 U.S. 806 (1996), the Supreme Court of the United States

examined the application of SOPs to traffic-stop cases as a method by which a court could

determine if an officer made a pretextual stop.  See 517 U.S. at 813-14.  In concluding that the

Fourth Amendment's reasonableness requirement "allows certain actions to be taken in certain

circumstances, whatever the subjective intent," the Supreme Court stated:

---

[3]During medieval Anglo-Saxon trials, oath-helpers would swear that a party, who testified under oath, was telling the truth and that "his oath [was] clean and unperjured."  A. H. F. Lefroy, The Anglo-Saxon Period of English Law, 26 Yale L.J. 291, 298-99 (1917).

> Oath helpers were an important part of the Anglo-Saxon form of trial by oath, known as compurgation.  A party would swear his own oath to the truth of his claim and the oath helpers would swear to the truthfulness of the party's oath, or, as it was later refined, to their belief in its truth.  These oath helpers did not need to have personal knowledge of the facts and were originally often kinsmen of a party.  As the rule developed, the accused in a criminal case was not permitted to choose the oath helpers, nor could his relatives serve in that capacity.  The oath helpers were chosen and struck in the manner of a modern petit jury.  In this later form, oath helpers thus held a more impartial relationship to the parties than do present-day expert witnesses.

Daniel J. Steinbock, Expert Testimony on Proximate Cause, 41 Vand. L. Rev. 261, 281 n.109 (1988).

Indeed, it seems to us somewhat easier to figure out the intent of an individual officer than to plumb the collective consciousness of law enforcement in order to determine whether a "reasonable officer" would have moved to act upon a traffic violation. While police manuals and standard procedures may sometimes provide objective assistance, ordinarily one would be reduced to speculating about the hypothetical reaction of a hypothetical constable -- an exercise that might be called virtual subjectivity.

Moreover, police enforcement practices, even if they could be practicably assessed by a judge, vary from place to place and time to time. We cannot accept that the search and seizure protections of the Fourth Amendment are so variable and can be turned upon trivialities.

517 U.S. at 815 (citations omitted). See United States v. Botero-Ospina, 71 F.3d 783, 787-88 (10th Cir. 1995).

The Supreme Court has stated that "[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provisions." Davis v. Scherer, 468 U.S. 183, 194 (1984)(footnote omitted). Consistent with other circuit courts, the Tenth Circuit holds that the violation of state law and SOPs will not turn an otherwise constitutional use of force into a constitutional violation. See Tanberg, 401 F.3d at 1167 ("Even if [the defendant officer] violated the SOPs, this violation would not create a violation of a clearly established constitutional right ex nihilo."); Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001)(excluding expert affidavit which stated that the "officers' use of force did not conform with accepted police guidelines and practices," because "claims based on violations of state law and police procedure are not actionable under § 1983"); Romero v. Bd. of Cnty. Comm'rs of Cnty. Lake, 60 F.3d 702, 704 (10th Cir. 1995)("[V]iolations of state law and police procedure generally do not give rise to a § 1983 claim.")(citations omitted). See also Greenridge v. Ruffin, 927 F.2d 789, 792 (4th Cir. 1991)(upholding the trial court's decision to exclude officer's failure to follow standard arrest procedures, because it was not relevant to whether the officer acted reasonably in using force); Diaz v. Salazar, 924 F. Supp.

1088, 1097 (D.N.M. 1996)(Hansen, J.)("The fact that their conduct may not have conformed with police regulations or training does not operate to create constitutional liability under Section 1983.").

The clearly established law also does not permit introduction of evidence that officers violated SOPs to establish a constitutional violation. See, e.g., Tanberg, 401 F.3d at 1167-68. The clearly established law requires the exclusion of any evidence regarding the violation of SOPs, because such evidence is irrelevant to the Fourth-Amendment inquiry. See Tanberg, 401 F.3d at 1168. In Tanberg, Judge McConnell discussed the propriety of admitting SOPs as evidence of a constitutional violation in an excessive-force, and an assault-and-battery, case. 401 F.3d at 1167-68. The Tenth Circuit held that the proffered SOP was irrelevant to the issues in the case:

> In the exclusionary rule context, the Supreme Court has rejected the use of local police regulations as a standard for evaluating constitutionality of police conduct, on the ground that such a "basis of invalidation would not apply in jurisdictions that had a different practice." Whren v. United States, 517 U.S. 806, 815 (1996). That logic would seem to apply equally to damage suits under § 1983. This Court has consistently held that the violation of police regulations is insufficient to ground a § 1983 action for excessive force. Marquez v. City of Albuquerque, 399 F.3d 1216 (10th Cir. 2005); Medina[ v. Cram], 252 F.3d at 1133; Romero v. Board of County Com'rs of County of lake, State of Colo., 60 F.3d 702, 705 (10th Cir. 1995); Wilson v. Meeks, 52 F.3d 1547, 1554 (10th Cir. 1995). . . . That an arrest violated police department procedures does not make it more or less likely that the arrest implicates the Fourth Amendment, and evidence of the violation is therefore irrelevant. If [the defendant] violated the SOP governing the use of force in effecting arrest, that fact might well be pertinent to the Albuquerque Police Department's future decisions to promote, retain, or discipline him; it is not relevant to determining if Plaintiff's arrest violated the reasonableness requirement of the Fourth Amendment.

Tanberg, 401 F.3d at 1163-64. As the Tenth Circuit explained:

> Although plaintiffs frequently wish to use administrative standards, like the Albuquerque SOPs, to support constitutional damages claims, this could disserve the objective of protecting civil liberties. Modern police departments are able -- and often willing -- to use administrative measures such as reprimands, salary

adjustments, and promotions to encourage a high standard of public service, in excess of the federal constitutional minima. If courts treated these administrative standards as evidence of constitutional violations in damages actions under § 1983, this would create a disincentive to adopt progressive standards. Thus, we decline Plaintiffs' invitation here to use the Albuquerque Police Department's operating procedures as evidence of the constitutional standard.

Tanberg, 401 F.3d at 1164.

In Medina v. Cram, Judge Tacha reviewed the relevance of SOPs to a Fourth Amendment excessive-force claim. See 252 F.3d at 1133. The police responded to a call regarding Medina's refusal to return to jail on a bail bond violation and statement that he was armed with a gun. See 252 F.3d at 1126. After their arrival, the police tried to convince Medina to leave his house peacefully. See 252 F.3d at 1126. Instead, Medina told the officers that he needed more time, was suicidal, and was armed with a handgun. See 252 F.3d at 1126. Ultimately, Medina "emerged from the house with his left hand in a cup and his right hand wrapped in a towel concealing a staple gun, which Mr. Medina intended as a representation of a weapon." 252 F.3d at 1126. Although ordered to stop, Medina "walked" toward and onto the street. 252 F.3d at 1126. The officers' use of bean-bag rounds did not stop Medina's movement. See 252 F.3d at 1126. After the bean-bag rounds failed to stop Medina, "an officer released an attack dog, which bit [Medina] and released, returning to the officer." 252 F.3d at 1126. The "attack dog was released a second time," causing Medina to drop to the ground and expose the staple gun. 252 F.3d at 1126. As he dropped to the ground, Medina pointed the staple gun in the direction of other officers. See 252 F.3d at 1126. Two officers shot Medina five times. See 252 F.3d at 1126.

In response to the officers' assertion of qualified immunity, Medina submitted an affidavit of an expert who opined that the officers' use of force did not conform with accepted

police guidelines and practices, and was, therefore, excessive.  See 252 F.3d at 1133.   The

expert's affidavit did not persuade the Tenth Circuit:

> We have, of course, recognized that claims based on violations of state law and
> police procedure are not actionable under § 1983.  Romero, 60 F.3d at 705 (state
> law and police procedure); Wilson I, 52 F.3d at 1554 (police department
> regulation); see also Davis v. Scherer, 468 U.S. 183, 194-96 (1984)(rejecting the
> argument that § 1983 liability may be based solely on a violation of a state statute
> or regulation).

252 F.3d at 1133.

In the cases in which the Court has addressed this issue, most, and all recent, cases have

ruled that evidence regarding the violation of police procedure is not admissible in an excessive

force case.  See Montoya v. Sheldon, No. CIV 10-0360 JB/WDS, 2012 WL 5476882, at *9-10

(D.N.M. Oct. 31, 2013)(Browning, J.)(excluding evidence that defendants violated SOPs, where

plaintiffs sought to introduce the violations for the "jury to put into context and fully understand

the significance of the Defendants' actions in detaining, arresting, charging and prosecuting

Plaintiffs," and not to show that the defendants' actions were unreasonable, because the plaintiffs

"hope the jury will use the APD SOPs to find that [the defendants] did not conform their conduct

to the SOPs, and thus acted unreasonably under the circumstances"); Mata v. City of

Farmington, 798 F. Supp. 2d 1215, 1219 (D.N.M. 2011)(Browning, J.)(excluding, under rule

402, "evidence that the Defendant Officers did not follow SOPs and police training, because this

evidence is not relevant"); Jonas v. Bd. of Comm'rs of Luna Cnty., 699 F. Supp. 2d 1284, 1299

(Browning, J.)("The clearly established law also does not permit a plaintiff to establish a

constitutional violation with evidence that the officers violated SOPs and their training.");

Vondrak v. City of Las Cruces, 2009 WL 3241555, at *14 (concluding that "expert testimony

that refers to SOPs or other established law-enforcement standards" was inadmissible under

Tenth Circuit precedent); Chamberlin v. City of Albuquerque, No. CIV 02-0603 JB/ACT, 2005

WL 2313527, at *4 (D.N.M. July 31, 2005)(Browning, J.)("[U]nder United States v. Marquez and Tanberg, evidence of the SOPs is irrelevant to whether [defendant officer] acted objectively reasonably.  Accordingly, the Court will preclude [plaintiff] from offering testimony or evidence about SOPs on his § 1983 claim.").

In Chamberlin v. City of Albuquerque, the primary issue was whether the Court should allow the plaintiff, Chamberlain, to introduce the Albuquerque Police Department's SOPs.  See 2005 WL 2313527, at *1.  Because of Tanberg and Marquez, the Court granted the defendant police officer's motion in limine to exclude the SOPs.  See 2005 WL 2313527, at *4.  The Court, after reviewing Tanberg and Marquez, excluded any evidence or testimony pertaining to SOPs. See 2005 WL 2313527, at *4.  In light of the recent Tenth Circuit precedent, the Court concluded that the plaintiff could not introduce the SOPs to support the allegation that the defendant officer acted unreasonably in directing his police service dog to attack the plaintiff in violation of his Fourth-Amendment rights.  See 2005 WL 2313527, at *2-4.  The Court acknowledged that, although both Tanberg and Marquez were distinguishable in that the SOPs which the plaintiff sought to introduce in Chamberlin v. City of Albuquerque were different, and that, unlike Tanberg, there was no suggestion that the plaintiff in Chamberlin v. City of Albuquerque also sought to introduce testimony whether the police department disciplined the defendant police officer for violating any SOP, the language of Tanberg was sufficiently broad and sweeping to encompass the SOPs at issue in Chamberlin v. City of Albuquerque.  See 2005 WL 2313527, at *4.  The Court stated that, under Marquez and Tanberg, evidence of the SOPs was irrelevant to whether the defendant police officer acted objectively reasonably.  See 2005 WL 2313527, at *2-3.  Accordingly, the Court precluded the plaintiff from offering testimony or evidence about the SOPs on his § 1983 claim.  See 2005 WL 2005 WL 2313527, at *2-4.

## LAW REGARDING NATIONALLY ACCEPTED POLICE PRACTICES

The Tenth Circuit has affirmed both the admission and exclusion of expert testimony on nationally accepted police practices. Compare Zuchel, 997 F.2d at 742-43 (affirming district court's admittance of expert testimony on generally accepted police customs and practices), with Marquez, 399 F.3d at 1222 (affirming district court's exclusion of expert testimony on well-established police procedures).

In Zuchel, the Tenth Circuit, in a 1993 opinion that Judge Seymour wrote, and Judges Moore and Tacha joined, held that the district court did not err in permitting an expert witness to testify that standards at the Denver Police Department fell below the "generally accepted police custom and practices."[4] 997 F.2d at 742-43. The plaintiffs filed suit against the City and County of Denver, alleging that the Denver Police Department failed to adequately train its police officers. See 997 F.2d at 733. The plaintiffs called an expert witness, who testified that a number of practices and customs of the Denver Police Department were inadequate and inappropriate in light of generally accepted police customs and practices. See 997 F.2d at 742-43. The Tenth Circuit noted that "[c]ourts generally allow experts in [the area of criminal justice, police training, police tactics, and deadly force] to state an opinion on whether the conduct at issue fell below accepted standards in the field of law enforcement." 997 F.2d at 742 (citing Samples v. City of Atlanta, 916 F.2d 1548, 1551-52 (11th Cir. 1990); Wade v. Haynes, 663 F.2d 778, 783-84 (11th Cir. 1981), aff'd sub nom. Smith v. Wade, 461 U.S. 30, 103 (1983); United States v. Myers, 972 F.2d 1566, 1577-78 (11th Cir. 1992)). While it would have been

---

[4]The expert in Zuchel used the expression "generally accepted police custom and practices," 997 F.2d at 742, as opposed to the expression "nationally accepted law enforcement procedure and practice," which is how the United States characterizes the subject of Overby's testimony, Notice ¶ 1, at 1. The subject matter of the expert testimony from Zuchel, however, appears to be similar, if not identical, to that of Overby's testimony.

improper for the expert to testify that the Denver police practices were unconstitutional, see Zuchel, 997 F.2d at 742-43 (citing Specht v. Jensen, 853 F.2d 805, 808 (10th Cir. 1988)(en banc)), the Tenth Circuit held that the expert testimony that the training techniques of the Denver police force and the use of deadly force by a specific officer was inappropriate in light of generally accepted police customs and practices was admissible testimony, see Zuchel, 997 F.2d at 742-43. Relying on Zuchel, several courts have admitted expert testimony of generally and nationally accepted police practices in excessive force cases to show that a defendant's conduct violated a national standard. See United States v. Littlejohn, No. CR 09-0040 D, 2009 WL 5065559, at *3 (W.D. Okla. Dec. 15, 2009)(Degiusti, J.); Ornelas v. Lovewell, No. CIV 11-2261 JAR/KMH, 2013 WL 3271016, at *6-7 (D. Kan. June 27, 2013)(Robinson, J.); Ortega v. City & Cnty. of Denver, Nos. CIV 11- 02394, CIV 11-2395, CIV 11-2396, CIV 11-2397 WJM/CBS, 2013 WL 438579, at *2-4 (D. Colo. Feb. 5, 2013)(Martinez, J.).

The Tenth Circuit again visited the issue of expert testimony on nationally accepted police practices in Marquez. See 399 F.3d at 1221-22. In Marquez, the plaintiff wanted to introduce expert testimony that: (i) "a police officer should always use the minimum amount of force and, therefore, . . . any use of force beyond the minimum is, *ipso facto*, unreasonable"; and (ii) that a police officer's actions "violated well established law enforcement standards."[5] 399 F.3d at 1222. The district court excluded this testimony "as irrelevant and confusing under Fed. R. Evid. 402 and 403." 399 F.3d at 1222. The Tenth Circuit, in a 2005 opinion that Judge

---

[5]While the expert in Marquez used the expression "well established law enforcement standards," 399 F.3d at 1222, as opposed to "nationally accepted law enforcement procedure and practice," Notice ¶ 1, at 1, the subject matter of the expert testimony in Marquez appears to be similar, if not identical, to that of Overby. See Vondrak, 2009 WL 3241555, at *1, *11-12 (relying on Marquez to exclude expert testimony on "nationally accepted police training" and "nationally accepted police procedures").

Holloway wrote, and Judges Kelly and Hartz joined, held that the district court did not abuse its

discretion in excluding the expert testimony. See 399 F.3d at 1222.

> Here, the district court held the testimony regarding the minimum use of force
> was irrelevant on the ground that the Fourth Amendment does not require police
> officers to use the least intrusive amount of force. Similarly, the district court
> held the testimony regarding law enforcement standards was both irrelevant and
> confusing on the ground that the violation of such standards is not *ipso facto* a
> Fourth Amendment violation. As both of these grounds are supported by well
> established precedent, it was not an abuse of discretion to exclude Kirkham's
> testimony.

399 F.3d at 1222. The Tenth Circuit noted that "'violations of state law and police procedure

generally do not give rise to a 1983 claim' for excessive force." 399 F.3d at 1222 (quoting

Romero v. Bd. of Cnty. Comm'rs, 60 F.3d 702, 705 (10th Cir. 1995)).

> Here, the only issue before the jury was whether [the defendant] acted as a
> "reasonable officer" when he ordered his police dog to apprehend [the plaintiff].
> In making this determination, the issues of whether [the defendant] used the
> minimum amount of force to apprehend [the plaintiff] and whether [the
> defendant] violated some "well established police procedure" are only
> tangentially related. This is because even if it found [the defendant] used more
> then [sic] the minimum amount of force necessary and violated police procedure,
> the jury could nonetheless find he acted reasonably.

399 F.3d at 1222 (footnote omitted). Two courts, including this one, have relied on Marquez in

excluding expert testimony on nationally accepted police practices in excessive force cases. See

Vondrak v. City of Las Cruces, 2009 WL 3241555, at *17; Ebonie S. ex rel. Mary S. v. Pueblo

Sch. Dist. 60, No. CIV 09-00858 WJM/MEH, 2011 WL 1755208, at *10 (D. Colo. May 5,

2011)(Hegarty, M.J.).

While not involving nationally recognized police standards, the Tenth Circuit's reasoning

for excluding of SOPs in excessive for cases helps shed light on the issue. In Tanberg, the Tenth

Circuit, in a 2005 opinion that Judge McConnell wrote, and Judges Lucero and Anderson joined,

affirmed the district court's exclusion of the Albuquerque Police Department's SOPs. See

401 F.3d at 1162-64.  Judge McConnell reasoned that evidence of an SOP violation is irrelevant to whether there was a constitutional violation.  See 401 F.3d at 1163-64.

> That an arrest violated police department procedures does not make it more or less likely that the arrest implicates the Fourth Amendment, and evidence of the violation is therefore irrelevant.  If [the defendant] violated the SOP governing the use of force in effecting arrest, that fact might well be pertinent to the Albuquerque Police Department's future decisions to promote, retain, or discipline him; it is not relevant to determining if Plaintiffs' arrest violated the reasonableness requirement of the Fourth Amendment.

401 F.3d at 1163-64.  In reaching this conclusion, Judge McConnell cited Marquez for the proposition that "[t]his Court has consistently held that the violation of police regulations is insufficient to ground a § 1983 action for excessive force."  401 F.3d at 1163 (citing Marquez, 399 F.3d at 1216).  Judge McConnell expressed further concern that the SOPs would only confuse the jury and not assist them.  See Tanberg, 401 F.3d at 1165.

> The similarity of the SOP addressing excessive force to the objective standard employed by state and federal law would render jury confusion even more likely, tempting the jury to conclude that if experienced police officers interpreted [the defendant's] actions as a violation of SOPs employing the same standards as the law, then [the defendant] must also have violated legal requirements.  When, as here, the proffered evidence adds nothing but the substantial likelihood of jury confusion, the trial judge's exclusion of it cannot be an abuse of discretion.

Tanberg, 401 F.3d at 1165.

Using similar reasoning, the Honorable M. Christina Armijo, United States District Chief Judge for the District of New Mexico, excluded SOPs in an excessive force case.  See L'Esperance v. Mings, No. CIV 02-0258 MCA/RLP, 2003 WL 25692557, at *3 (D.N.M. July 14, 2003)(Armijo, J.).

> This is not a negligence case involving an issue such as medical malpractice, where expert testimony is almost always necessary to define the standard of care applicable to the alleged tortfeasor.  Rather, the standard for determining whether Defendant Mings' use of force was unreasonable or excessive is defined by the interpretation of the Fourth Amendment provided by the Supreme Court and the Tenth Circuit.

L'Esperance v. Mings, 2003 WL 25692557, at *3.

**ANALYSIS**

The Court will grant the Motion in part and deny it in part. The Court concludes that Overby's testimony concerning nationally accepted police practices will not assist the jury in determining whether Rodella used excessive force, because Tenth Circuit and Supreme Court precedent dictates whether a constitutional violation based on excessive force occurred, and not from nationally recognized police practices; because if, under Tenth Circuit precedent, SOPs would confuse a jury, Overby's testimony would only confuse the jury and not assist them; and because it is unclear from where Overby derived these national standards. The Court believes, however, that Overby's testimony, defining terms in the law enforcement field, may be useful for the jury, and is, therefore, admissible.

**I.      THE UNITED STATES DID NOT ESTABLISH THAT OVERBY IS QUALIFIED TO TESTIFY ABOUT NATIONALLY ACCEPTED POLICE PRACTICES.**

The Court concludes that because of Overby's lack of practical experience, lack of nationwide experience, and lack of an advanced degree in criminology or law enforcement, Overby is not qualified to testify about nationally accepted police procedures and practices. Overby did not testify at the hearing, see Tr. at 1:1-229:21 (Peña, Gorence, Court), and it is unclear how Overby has become an expert on nationally recognized police procedures. Overby served as a Conservation Officer with the New Mexico Department of Game and Fish from 1999 to 2012 and as an Advanced Instructor with the New Mexico Department of Public Safety from 2012 to the present. See Overby Resume at 1. Based on Overby's experience in these two positions, the Court cannot say that Overby is qualified to testify about nationally accepted police practices.

Overby served in both of these positions in Santa Fe, New Mexico.  See Overby Resume at 1.  Overby's time with Department of Game and Fish involved some law enforcement activities, including writing and serving search and arrest warrants, investigating wildlife related crimes, writing case reports, and collecting and maintaining evidence.  See Overby Resume at 1. Overby, however, also engaged in a number of activities that did not directly involve law enforcement activities, including training officers, teaching hunters education courses, teaching bear awareness classes, collaborating and planning wildlife management projects, managing human and wildlife conflicts, and providing technical guidance on road obliteration, travel management plans, ordinance development, and trash handling practices.  See Overby Resume at 1-2.  Additionally, with the New Mexico Department of Public Safety, Overby is not a field agent but instead is an instructor at the Law Enforcement Academy.  See Overby Resume at 1.  It is not clear, whether merely teaching, without practical field experience qualifies Overby as an expert in law enforcement procedures.  See United States v. Allen, 207 F. Supp. 2d 856, 864 (N.D. Ind. 2002)(noting that law enforcement instructor in evidence collection and packaging may not be qualified to testify on footwear impression evidence without documentation demonstrating how frequently the expert utilizes his training and how often his proficiency is tested).

Even assuming that Overby's time with the Department of Game and Fish and the Department of Public Safety qualifies as law enforcement positions, Overby only has fifteen years of law enforcement experience -- all of which took place in one state.  Cf. Ortega v. City & Cnty. of Denver, 2013 WL 438579, at *1 (noting that expert had fifty years of law enforcement experience, twenty-five of which was as police chief).  Overby has a Bachelor of Science in Agriculture and majored in Wildlife Science, but Overby has no advanced degree in criminology

or law enforcement.  Cf. Zuchel, 997 F.2d at 742 (noting that expert had a doctorate in criminal justice).  It is unclear how Overby, without a degree in criminal justice and only fifteen years of law enforcement experience -- most of which involves training others and not practical field experience -- is qualified to testify to nationally accepted police standards.  See Overby Resume at 1-2.  Nationally accepted police standards and procedures -- by their very name -- requires knowledge and expertise of law enforcement practices and standards on a nationwide scale.  According to Overby's resume, he has only worked in a single city within a single state.  See Overby Resume at 1.  It is not clear how Overby could be an expert on nationally accepted police practices from only serving in a single city.  See Overby Resume at 1.  Because Overby does not "possess such skill, experience or knowledge" in the law enforcement field that "make[s] it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth," LifeWise Master Funding v. Telebank, 374 F.3d at 928, the Court will exercise its gatekeeping function and preclude Overby's testimony.  Kumho Tire Co. v. Carmichael, 526 U.S. at 147-50 (discussing district courts' basic "gatekeeping obligation").

## II.     OVERBY DOES NOT STATE FROM WHERE THESE NATIONALLY ACCEPTED POLICE PRACTICES DERIVE.

Even if Overby is well qualified to talk about nationally accepted police practices, he needs to explain what these practices are.  The United States admits that there is no manual or book that sets forth nationally accepted police practices.  See Tr. at 92:4-16 (Peña, Court).  Overby must derive these national practices from his experiences if they are not written somewhere.  Accordingly, what Overby is calling nationally accepted practices are, in fact, no more than his personal opinions about what should be the practice.

It is unclear how Overby, who has served as a law enforcement officer only in one city, see Overby Resume at 1, can accurately derive nationally accepted police practices, based solely

on his personal experiences. See United States v. Medina-Copete, 757 F.3d at 1104 ("[W]itnesses 'relying solely or primarily on experience . . . must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" (alteration in United States v. Medina-Copete but not in original)(quoting Fed. R. Evid. 702 advisory committee's note (2000 Amendment)). There is no indication of what, if any, methodology Overby used in deriving these nationally accepted police procedures and whether that methodology is a "reliable" one. United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224.

Indeed, the Court is skeptical that such national standards exist. Overby's proffered testimony includes testimony that it is against "nationally accepted law enforcement procedures" for a sheriff to say: "Here's my badge, mother fucker! Here's my badge!" Overby Evaluation at 3. Overby asserts that it "is also contrary to accepted practice to pull a suspect's head up by his hair and hit him in the face with a badge." Overby Evaluation at 3. Additionally, Overby opines that "it is a violation of nationally accepted law enforcement procedures for an off-duty officer to perform such a procedure while in plain clothes, in an unmarked private vehicle and accompanied by a private citizen, unless uniformed and equipped law enforcement officers are immediately present and available." Overby Evaluation at 3. These so-called nationally accepted police procedures are extremely specific. It is hard for the Court to imagine that these specific scenarios arise so frequently that there are detailed nationally accepted police procedures on each specific scenario. Based on the specificity of these purported nationally accepted police practices, the Court believes they are likely Overby's opinion on what the national practices should be than what nationally accepted practices actually are.

Because Overby's testimony is likely derived from his own experiences, and because the United States has failed to show that Overby applied a reliable methodology in deriving these nationally accepted practices, the Court will exclude his testimony about nationally accepted police practices.

## III.    EVEN IF OVERBY IS QUALIFIED TO TESTIFY ABOUT NATIONALLY ACCEPTED POLICE PRACTICES, AND THERE ARE NATIONALLY ACCEPTED POLICE PRACTICES, THE COURT WOULD PRECLUDE OVERBY FROM OFFERING HIS TESTIMONY ABOUT THESE PRACTICES.

The Court has stated in prior opinions that, if it were writing on a clean slate, it would admit testimony on best practices, SOPs, training material, and, if they exist, nationally accepted police practices in excessive force cases -- both civil § 1983 cases and criminal § 242 cases. See Solis-Marrufo v. Bd. of Comm'rs for Cnty. of Bernalillo, No. CIV 11-0107 JB/KBM, 2013 WL 1658278, at *20 (D.N.M. March 29, 2013)(Browning, J.).

> On a clean slate, the Court would still probably be where it was when it decided Taylor v. Hudson[, No. CIV 02-0775 JB/RHS, 2003 U.S. Dist. LEXIS 26736 (D.N.M. Nov. 21, 2003)(Browning, J.)]. Juries are smart and can use SOPs for all sorts of purposes other than equating a violation of a SOP with a violation of the Constitution. The Court had experience with products liability before taking the bench, and it was routine to use SOPs and guidelines for a comparison. They inform reasonableness, even if they do not define reasonableness. The Tenth Circuit has not thought SOPs can serve this useful purpose in excessive-force cases. If the Court were to allows SOPs in to test credibility, that rationale could be used to justify SOPs coming in in every excessive-force case. They could have been added in Tanberg v. Sholtis and Marquez v. City of Albuquerque to test the officer's credibility, but the Tenth Circuit did not allow them in for any purpose.

Solis-Marrufo v. Bd. of Comm'rs for Cnty. of Bernalillo, 2013 WL 1658278, at *20.

> The Court can imagine many sound arguments to support the proposition that accepted practices, or well-established practices, if not SOPs, should be considered at least relevant to an inquiry into what a reasonable officer would do. In fact, the Court wonders how the proposition that "violation of such standards is not *ipso facto* a Fourth Amendment violation" renders any reference to such standards in a reasonable-officer inquiry totally irrelevant. The most the proposition appears to establish is that an officer may fall below well established practices without violating the Constitution. Presumably, officers are trained and

have developed established practices as a means of preventing improper conduct, including conduct that might result in excessive force, illegal searches and seizures, or other civil-rights violations. Because established practices are, perhaps, more protective of arrestee's rights arguably does not mean they are irrelevant to a Fourth Amendment inquiry. Even so, the Court does not believe it has the liberty to allow such testimony in light of Tenth Circuit law. The Court will accordingly prohibit any testimony that is framed up in reference to "national" or "well-established" practices.

Vondrak v. City of Las Cruces, 2009 WL 3241555, at *17.

The Court was a civil lawyer for many years, bringing and defending cases against organizations and individuals. Organizations often have internal regulations; industries have guidelines and safety directions; professions have codes. These are a gold mine in litigation for learning what organizations and professionals see as reasonable. The Court has always thought it odd that the courts are liberal with these guidelines, codes, SOPs, training materials, safety directions, etc., in cases against corporations and individuals, but when it comes to police, they do not give the jury these tools. The refusal to give the jury this information shows a distrust of the jurors that the Court does not share. The Court has more confidence than others that a jury can hear about SOPs and best practices, but still fully understand that violations of SOPs and best practices do not necessarily mean that the defendant violated the Constitution.

A. **ADMISSION OF EVIDENCE OF A VIOLATION OF NATIONALLY ACCEPTED POLICE STANDARDS WILL BE IRRELEVANT UNDER THE TENTH CIRCUIT'S MOST RECENT STATEMENT ON SOPS.**

The Tenth Circuit has affirmed district court decisions both excluding and admitting evidence of nationally accepted police practices. See Marquez, 399 F.3d at 1222 (excluding the testimony); Zuchel, 997 F.2d at 742-43 (admitting the testimony). In both Zuchel and Marquez, the Tenth Circuit did not require the district court to either admit or exclude the expert testimony, but instead held that the district courts did not err or abuse its discretion in making their respective decisions. See Marquez, 399 F.3d at 1222 ("[I]t was not an abuse of discretion to

exclude [the expert's] testimony."); <u>Zuchel</u>, 997 F.2d at 742-43 ("[The defendant] also contends the district court erred in allowing [the expert] to testify . . . .    Accordingly, we reject [the defendant's] argument that reversal is required. . . ."). <u>Zuchel</u> and <u>Marquez</u>, thus, suggest that district courts have discretion in deciding whether to permit an expert to testify on nationally accepted police standards.  With this discretion, the Court concludes that, pursuant to the Tenth Circuit's most recent precedent, Overby's testimony regarding nationally accepted police practices is irrelevant and would be confusing to the jury.  As such, Overby's testimony will be excluded.

This case is more closely aligned with <u>Marquez</u> than <u>Zuchel</u>.  <u>Zuchel</u> involved a claim of inadequate training by the Denver Police Department.[6]    <u>See</u> 997 F.2d at 733.   In contrast, <u>Marquez</u> involved a claim of excessive force against an individual officer in addition to a claim against the City of Albuquerque.  <u>See Marquez</u>, 399 F.3d at 1219-20.  Evidence of nationally accepted police practices is more relevant in determining whether a city failed to adequately train its police force than in determining whether an individual officer used excessive force.  <u>See</u> <u>L'Esperance v. Mings</u>, 2003 WL 25692557, at *3-4.  The United States Court of Appeals for the Sixth Circuit has noted:

> Especially in the context of a failure to train claim, expert testimony may prove the sole avenue available to plaintiffs to call into question the adequacy of a municipality's training procedures.  To disregard expert testimony in such cases would, we believe, carry with it the danger of effectively insulating a municipality from liability for injuries resulting directly from its indifference to the rights of citizens.  Reliance on expert testimony is particularly appropriate where, as here, the conclusions rest directly upon the expert's review of materials provided by the City itself.

<u>Russo v. City of Cincinnati</u>, 953 F.2d 1036, 1047 (6th Cir. 1992).

---

[6]The plaintiffs in <u>Zuchel</u> also brought a claim against an individual officer for using unreasonable and excessive force, but the officer settled the case before trial.  <u>See</u> <u>Zuchel</u>, 997 F.2d at 733.

A number of courts have concluded that <u>Zuchel</u> applies to inadequate training cases.  <u>See</u> <u>L'Esperance v. Mings</u>, 2003 WL 25692557, at *3; <u>Escobar v. City of Houston</u>, No. 04-1945, 2007 WL 2900581, at *11 (S.D. Tex. Sept. 29, 2007)(Rosenthal, J.).  As Chief Judge Armijo noted:

> Expert testimony on police procedures may be relevant and admissible with respect to the related issue of whether a municipality is liable for failing to properly train or supervise an officer with respect to the use of force.  <u>See</u> <u>Zuchel v. City and County of Denver</u>, 997 F.2d 730, 742 (10th Cir. 1993).  In particular, it is possible that the "use of force" and "CCCT" models, on which the parties' police-procedures experts base their opinions, may be useful in determining whether a municipality's standard operating procedures and training regimen are in compliance with nationally accepted standards, or whether less intrusive alternatives to deadly force are available in a given situation.
>
> But such testimony and the models on which it is based are not necessarily relevant and admissible with respect to the reasonableness of the officer's conduct itself, particularly where, as here, the officer's interaction with the victim of the shooting takes place in a matter of seconds rather than minutes or hours.

<u>L'Esperance v. Mings</u>, 2003 WL 25692557, at *3-4.

Other courts have, however, applied <u>Zuchel</u> in the excesses force and unreasonable seizure cases, where an officer was being sued in his or her individual capacity.  <u>See</u> <u>Ortega v. City & Cnty. of Denver</u>, 2013 WL 438579, at *2-4; <u>Ornelas v. Lovewell</u>, 2013 WL 3271016, at *6-7; <u>United States v. Littlejohn</u>, 2009 WL 5065559, at *3.  Most of these courts did not consider <u>Marquez</u>, <u>see</u> <u>Ortega v. City & Cnty. of Denver</u>, 2013 WL 438579, at *1-5; <u>United States v. Littlejohn</u>, 2009 WL 5065559, at *1-6, and none of the courts considered <u>Tanberg</u>, <u>see</u> <u>Ortega v. City & Cnty. of Denver</u>, 2013 WL 438579, at *1-5; <u>United States v. Littlejohn</u>, 2009 WL 5065559, at *1-6; <u>Ornelas v. Lovewell</u>, 2013 WL 3271016, at *1-15.  The one case that considered both <u>Zuchel</u> and <u>Marquez</u> and permitted an expert witness to testify about nationally recognized police standards, excluded any testimony on whether the defendant violated those standards.  <u>See</u> <u>Ornelas v. Lovewell</u>, 2013 WL 3271016, at *7.  In <u>Ornelas v. Lovewell</u>, the

Honorable Julie A. Robinson, United States District Judge for the District of Kansas, concluded that <u>Zuchel</u> permitted the testimony of nationally recognized police standards, but at the same time concluded that <u>Marquez</u> prohibited testimony about whether the defendant violated those standards, because such testimony was irrelevant to whether there was a constitutional violation. <u>Ornelas v. Lovewell</u>, 2013 WL 3271016, at *7.[7]

The Court concludes that, under the most recent Tenth Circuit precedent, Overby's testimony regarding nationally accepted police standards is irrelevant to this case. The primary issue in this case is whether Rodella used excessive force and acted reasonably. Tenth Circuit and Supreme Court precedent resolves the determination of these issues and not nationally accepted police standards. <u>See</u> <u>Marquez</u>, 399 F.3d at 1222; <u>L'Esperance v. Mings</u>, 2003 WL 25692557, at *3-4. Under the most recent Tenth Circuit precedent, whether Rodella's conduct fell below nationally accepted police standards is irrelevant in determining whether he used excessive force or acted unreasonably. <u>See</u> <u>Tanberg</u>, 401 F.3d at 1163-64; <u>Marquez</u>. 399 F.3d at 1222; <u>L'Esperance v. Mings</u>, 2003 WL 25692557, at *3-4. Additionally, under <u>Tanberg</u>, permitting Overby to testify on what these nationally accepted police standards are, but excluding testimony regarding whether he violated them, would only confuse the jury. <u>See</u> <u>Tanberg</u>, 401 F.3d at 1164. Following Judge McConnell's logic in <u>Tanberg</u>, if Overby testified about nationally accepted police standards, the jury might erroneously believe that a violation of these nationally accepted police standards is also a violation of the Constitution. <u>See</u> <u>Tanberg</u>, 401 F.3d at 1165. <u>See also</u> <u>Marquez</u>, 399 F.3d at 1222; <u>L'Esperance v. Mings</u>, 2003 WL

---

[7]In the same opinion, Judge Robinson also granted summary judgment for the defendants on the basis of qualified immunity. <u>Ornelas v. Lovewell</u>, 2013 WL 3271016, at *14-15. It is, therefore, unclear whether the expert's testimony concerning nationally recognized police standards was ever presented to a jury.

25692557, at *3-4. Overby's testimony is thus, under the most recent controlling Tenth Circuit law, both irrelevant and likely to confuse the jury.

For the same reasons set out by Judge McConnell in excluding SOPs, a violation of a nationally accepted police standard is not a violation of the Constitution, and if evidence of nationally accepted police standards is introduced, the jury may erroneously conclude that a violation of these nationally accepted police standard equates to a constitutional violation. See Tanberg, 401 F.3d at 1165. While SOPs are different than nationally accepted police standards and there are additional policy considerations for excluding SOPs -- notably not to dissuade police departments from adopting progressive standards and to maintain uniformity across the country -- the relevance and confusion concerns are the same. See Tanberg, 401 F.3d at 1164-65; L'Esperance v. Mings, 2003 WL 25692557, at *3-4. Because Overby's testimony is irrelevant and because his testimony will likely confuse the jury, the Court will not permit Overby to testify about nationally accepted police standards, whether Rodella violated these standards, whether Rodella violated the Constitution, or whether Rodella acted reasonably. See Marquez, 399 F.3d at 1222; L'Esperance v. Mings, 2003 WL 25692557, at *3.

**B. ADMISSION OF THE NATIONALLY ACCEPTED POLICE STANDARDS WOULD BE INCONSISTENT WITH THE COURT'S CONCLUSION IN TWO PRIOR CASES.**

In Vondrak v. City of Las Cruces, the Court prohibited an expert witness from testifying whether a defendant violated well-established or nationally accepted police procedures. See 2009 WL 3241555, at *17. There, the plaintiff brought a § 1983 claim against two police officers, alleging Fourth Amendment violations of unlawful arrest, excessive force, and refusing to provide medical attention; the plaintiff also brought a § 1983 claim against the City of Las Cruces, alleging that the city failed to properly train its officers. See Vondrak v. City of Las

Cruces, No. CIV 05-0175 JB/LFG, 2007 WL 2219449, at *4 (D.N.M. May 14, 2007)(Browning, J.), rev'd in part by 535 F.3d 1198 (10th Cir. 2008). The defendants sought to introduce expert testimony that the defendants had followed nationally accepted police standards in handcuffing, transporting, testing, processing, and releasing the plaintiff from custody to show that their conduct was reasonable. See Vondrak v. City of Las Cruces, 2009 WL 3241555, at *2, *17. Relying on Tenth Circuit precedent, the Court excluded the expert testimony on nationally accepted police standards. See 2009 WL 3241555, at *17. The Court noted that, in Tanberg, the Tenth Circuit prohibited evidence of SOPs in a Fourth Amendment case as irrelevant, and that, in Marquez, the Tenth Circuit upheld a district court's exclusion of well-established law enforcement standards as irrelevant. See 2009 WL 3241555, at *17. The Court concluded that these two Tenth Circuit cases required the Court to exclude any testimony on nationally accepted police practices because such testimony was irrelevant. See 2009 WL 3241555, at *17.

Similarly, in Mata v. City of Farmington, the Court excluded evidence "that the Defendant Officers did not follow the [Farmington Police Department]'s or other generally accepted SOPs and police training." 798 F. Supp. 2d at 1234. The Court reasoned:

> "The clearly established law also does not permit a plaintiff to establish a constitutional violation with evidence that the officers violated SOPs and their training. The clearly established law requires the exclusion of any evidence regarding the violation of SOPs and training, because such evidence is irrelevant to Fourth-Amendment inquiry." [Jonas v. Bd. of Comm'rs of Luna Cnty,] 699 F. Supp. 2d at 1299 (discussing Tanberg v. Sholtis and Medina v. Cram). Given the controlling law, the Court finds that evidence of violations of SOPs and training is irrelevant to whether [the Plaintiffs'] rights under the Fourth Amendment were violated. See Tanberg v. Sholtis, 401 F.3d at 1163-64 ("That an arrest violated police department procedures does not make it more or less likely that the arrest implicates the Fourth Amendment, and evidence of the violation is therefor[e] irrelevant."). Because this evidence is not relevant, the Court finds that this evidence is "not admissible," and the Court will exclude this evidence. Fed. R. Evid. 402.

Mata v. City of Farmington, 798 F. Supp. 2d at 1234-35.

While the Court permitted evidence of training materials and SOPs in United States v. Gould, No. CR 03-2274, 2007 WL 1302596 (D.N.M. March 17, 2007)(Browning, J.), which it decided after Tanberg, the situation in this current case is different.  See 2007 WL 1302596, at *8-9.  In United States v. Gould, the United States brought a § 242 action against a prison official for excessive force.  See 2007 WL 1302596, at *1.  The United States sought to introduce testimony that the official violated the prison's SOPs and acted contrary to the training of the prison.  See 2007 WL 1302596, at *8-9.  The Court noted that the training materials and SOPs were "not relevant for the purpose of showing that [the official] violated [the victim's] civil rights."  2007 WL 1302596, at *8 (citing Tanberg, 401 F.3d at 1164 ("If [the officer] violated the [standard operating procedure] governing the use of force in effecting arrest . . . [that] is not relevant to determining if Plaintiff's arrest violated the [objective] reasonableness requirement of the Fourth Amendment.")(alterations in United States v. Gould but not in original)).  The Court allowed, however, evidence of the training materials and SOPs to support a charge that one of the defendants lied to the police when she stated that she was unfamiliar with the weapons at the facility and that the another defendant lacked training in a certain area.  See 2007 WL 1302596, at *9.  The Court ruled that it would admit evidence of the training material and SOPs for the purpose of proving that the defendant lied, and that it would "probably need to take objections one question at a time at trial."  2007 WL 1302596, at *9.  The Court also allowed the defendants to submit a limiting instruction[8] that the training materials could only be

_____

[8]The Court gave the following limiting instruction:

**INSTRUCTION NO. 27**

The issue in this case is not whether John Gould followed or violated generally accepted procedures and training, but whether he violated federal law. Even if you find that John Gould did not follow generally accepted procedures or

used to establish the defendant's "knowledge and not to show that [the defendant] violated [the victim's] civil rights."  2007 WL 1302596, at *1.

The United States has not alleged that Rodella lied to a federal agent about his knowledge of an SOP or of a nationally accepted police practice.  Cf. United States v. Gould, 2007 WL 1302596, at *9 (allowing evidence of SOPs and training materials to support charge that defendant lied to police about her knowledge of SOPs and training materials).  Instead, the United States is seeking to introduce evidence of the nationally accepted police practices to show that Rodella acted unreasonably and to show the constitutionality of his actions.  See Tr. at 92:17-93:12 (Peña, Court); id. at 94:1-14 (Peña, Court); id. at 95:8-21 (Peña, Court).  The Court rejected this same argument in Vondrak v. City of Las Cruces and Mata v. City of Farmington.  See Vondrak v. City of Las Cruces, 2009 WL 3241555, at *17; Mata v. City of Farmington, 798 F. Supp. 2d at 1234-35.  In both cases, the Court concluded that the testimony and evidence was irrelevant to whether the defendants violated the Constitution.  See Vondrak v. City of Las Cruces, 2009 WL 3241555, at *17; Mata v. City of Farmington, 798 F. Supp. 2d at 1234-35.  In the same way, Overby's testimony concerning nationally accepted police practices is irrelevant to whether Rodella acted reasonable and whether his actions violated the Constitution.  See

_____

his training, that does not mean that he violated anyone's constitutional rights. You may not consider whether Mr. Gould violated anyone's Constitutional rights because he may not have followed his training.  The issue you must determine is whether John Gould's conduct was objectively reasonable under the circumstances.

You also may not consider testimony about the training of John Gould or Violet Gould for the truth of the matters stated.  You may only consider testimony about training for determining the Defendants' state of mind, intent, and knowledge.

Final Jury Instructions (with citations) at 39, United States v. Gould (March 30, 2007)(No. CIV 03-2274).

<u>Vondrak v. City of Las Cruces</u>, 2009 WL 3241555, at *17; <u>Mata v. City of Farmington</u>, 798 F. Supp. 2d at 1234-35.

C.   **UNDER THE RATIONALE THAT COURTS HAVE USED IN ADMITTING TESTIMONY OF NATIONALLY ACCEPTED POLICE PROCEDURES, OVERBY'S TESTIMONY SHOULD BE EXCLUDED BECAUSE IT GOES TO THE ULTIMATE ISSUE OF THE CASE -- WHETHER RODELLA ACTED REASONABLY AND VIOLATED THE CONSTITUTION.**

Even if the Court were to permit expert testimony about nationally accepted police procedures, Overby's testimony should be excluded because it goes to the ultimate issues of the case -- whether Rodella acted reasonably and whether Rodella violated the Constitution. While the Tenth Circuit, in <u>Zuchel</u>, permitted expert testimony regarding nationally accepted police practices, it still excluded testimony regarding whether the defendant acted reasonably or whether his actions were unconstitutional. <u>See</u> <u>Zuchel</u>, 997 F.2d at 742-43 (citing <u>Specht v. Jensen</u>, 853 F.2d at 808). Judge Seymour noted that the expert in <u>Zuchel</u> did not testify whether the defendants acted reasonably or whether the defendants' conduct was unconstitutional, which, according to the Tenth Circuit, would have been improper. <u>See</u> 997 F.2d at 742-43 (citing <u>Specht v. Jensen</u>, 853 F.2d at 808). In contrast, in his report, Overby states that he was asked to "assess the alleged actions of . . . Rodella . . . against nationally accepted police practices as well as the objective reasonableness test of the 4th Amendment to the U.S. Constitution." Overby Evaluation at 1. The United States even acknowledged during the September 16, 2014, hearing that the ultimate issue in the case is whether Rodella's "conduct was reasonable under the Fourth Amendment" and that Overby's testimony "is certainly relevant to the reasonableness that basically no officer would do this." Tr. at 93:1-12 (Peña). In summing up its argument at the hearing, the United States argued that Overby "would be offering opinions regarding the reasonableness of the conduct and ultimate touch stone [sic] in this case . . . the Fourth

Amendment, unreasonable seizure." Tr. at 112:18-113:2 (Peña). The United States noted that courts have elaborated on the "ultimate constitutional standard" of when a seizure is unreasonable and then stated that Overby "will be there to offer comments, opinions on that." Tr. at 112:22-113:2 (Peña).

Even under Zuchel, this testimony is impermissible. See Zuchel, 997 F.2d at 742-43 ("However, [the expert witness] did not give an opinion on whether [the defendant's] conduct was unconstitutional. . . . [H]e stated his views only on whether [the defendant's] conduct violated standard police practices . . . ."). See also Ortega v. City & Cnty. of Denver, 2013 WL 438579, at *3 ("However, the Court sees a distinction between [an expert] testifying about whether the degree of force used was 'reasonable' (which the Court will not permit) and whether the degree of force used was in compliance with well-established modern police standards (which is permissible)."). An expert may not testify whether a defendant's conduct violated the constitution. See Zuchel, 997 F.2d at 742-43; Vondrak v. City of Las Cruces, 2009 WL 3241555, at *10. Even though the United States has classified Overby's testimony as testimony concerning nationally accepted police practices, see Notice at 1, its admitted purpose in seeking to introduce this evidence is improper, see Zuchel, 997 F.2d at 742-43; Vondrak v. City of Las Cruces, 2009 WL 3241555, at *10; United States v. Littlejohn, 2009 WL 5065559, at *3 ("In this case, the government is correct in stating that [the expert] cannot offer an opinion that Defendant's conduct was constitutionally proper, nor can he offer testimony that would, in effect, instruct the jury on the law regarding the use of force."). Overby may not testify that Rodella acted reasonably or violated the Constitution, yet this reason is the United States' stated purpose for seeking to introduce Overby's testimony. See Tr. at 93:1-12; id. at 112:18-113:2 (Peña). According to the Tenth Circuit's most recent precedent, Overby's testimony is not only

irrelevant and confusing, see Marquez. 399 F.3d at 1222, and according to Zuchel it is also

improper, see Zuchel, 997 F.2d at 742-43; Vondrak v. City of Las Cruces, 2009 WL 3241555,

at *10.

## IV. EVEN IF THE COURT WERE INCLINED TO ALLOW OVERBY'S TESTIMONY ABOUT NATIONALLY ACCEPTED POLICE PRACTICES, IT WOULD NOT ALLOW OVERBY TO TESTIFY IN THE MANNER IN WHICH HE PROPOSES.

Overby's proffered testimony is that he will analyze both Rodella's and Tafoya's

versions of events, and state whether each of Rodella's actions violated nationally accepted

police practices.  The Court is uncomfortable with this mode of testimony.  First, Overby is not

making general conclusions or opinions based on fact, but is running a play-by-play analysis of

Rodella's version of events and Tafoya's version of events.  Second, Overby would become a

conduit for hearsay.  To give this play-by-play analysis, he would have to rely on, and then

re-convey to the jury, out-of-court statements.  Third, this detailed play-by-play analysis results

in many opinions and conclusions that are not appropriate for expert testimony.  No expertise is

needed to form many of Overby's conclusions, because they are readily discernible by a lay

juror.

### A. THE COURT IS UNCOMFORTABLE WITH OVERBY GIVING A PLAY-BY-PLAY ANAYLSIS OF THE EVENT.

Overby proposes to take Tafoya's version, give a play-by-play analysis, and then take

Rodella's version of events, and give a play-by-play analysis.  See Overby Evaluation at 1-3.

The Court has, in the past, said that an expert could not look at videos and comment, scene-by-

scene, for the jury.  See Ysasi v. Brown, No. CIV 13-0183, 2014 WL 936326, at *9 (D.N.M.

Feb. 28, 2014)(Browning, J.).  The problem is that the expert is often not being an expert at all.

He or she is often stating what is obvious for the jury, who can see the video for itself.  In such

circumstances, the expert becomes a summary witness through whom the party summarizes its case.

This case is not much different. The Court does not think that some of the events require any expert testimony. Overby's testimony includes the following opinions:

> It is unacceptable, according to national law enforcement procedures, for a police officer to shove a gun in a suspect's face. It is equally unacceptable for a police officer to make threatening statements such as "it's too late," when a suspect begs for his or her life.

> Sheriff Rodella violated nationally accepted law enforcement procedures when he said, "You wanna see my badge, mother fucker! Here's my badge!" It is also contrary to accepted practice to pull a suspect's head up by his hair and hit him in the face with a badge.

Overby Evaluation at 3. An ordinary juror does not need an expert to know that it is unacceptable for a law enforcement officer to shove a gun in a suspect's face, and threaten him or her, as the suspect begs for his or her life. See Overby Evaluation at 3. An ordinary juror also does not need an expert to explain that a law enforcement officer should not grab a suspect's hair, hit him or her in the face with a badge, and say: "You wanna see my badge, mother fucker! Here's my badge!" Overby Evaluation at 3. The jury is just as capable as Overby in drawing these conclusions and does not need Overby's play-by-play analysis to assist them. See United States v. Muldrow, 19 F.3d at 1337 (holding that expert testimony must "assist the trier of fact to understand or determine a fact in issue").

The United States argues that an expert may watch a video -- or listen to a narrative -- and give frame-by-frame commentary on a particular event. See Tr. at 109:8-15 (Peña). Specifically, the United States argues that this form of expert testimony is what occurred in the

Rodney King trial.[9]  See Tr. at 109:8-15 (Peña).  In that case, the Honorable John G. Davies, United States District Judge for the Central District of California, allowed experts for both the defendants and the United States to give detailed testimony and analysis about a video.  See United States v. Koon, 833 F. Supp. 769, 776 (C.D. Cal. 1993)(Davies, J.), aff'd in part and vacated in part, 34 F.3d 1216 (9th Cir. 1996), aff'd in part and vacated in part, 518 U.S. 81 (1996).  Specifically, the defendants offered expert testimony by Charles Duke, an LAPD use-of-force expert, who gave frame-by-frame analysis of a video that the defendants' beatings of King were justified and that the defendants acted in conformity with LAPD policy.  See Laurie L. Levenson, The Future of State and Federal Civil Rights Prosecutions: The Lessons of the Rodney King Trial, 41 UCLA L. Rev. 509, 527 & n.91 (1994).

The King trial is different for two reasons.  First, the Ninth Circuit has not taken as strict of a stance against SOPs as the Tenth Circuit.  In the Ninth Circuit, SOPs may be used to establish a municipality or government entity's liability in a § 1983 action, even though an officer is sued individually, in the same case for excessive force.  See Price v. Sery, 513 F.3d 962, 964, 966 (9th Cir. 2008)(noting that SOPs can be used to prove a municipality's liability even though officer was also sued for the unconstitutional use of deadly force).  Indeed, in the King trial, the expert testified that the defendants did not violate the LAPD's policies.  See Laurie L. Levenson, 41 UCLA L. Rev. 509, supra, at 527 n.91.  Second, in the King trial, the United States and the defendants both presented experts who analyzed the video.  See United

---

[9]In the King trial, four Los Angeles Police Department ("LAPD") officers were charged with violating King's constitutional rights by using unreasonable force in violation of 18 U.S.C. § 242 or of aiding and abetting another in violating § 242.  See United States v. Koon, 833 F. Supp. at 774.  This federal trial followed a state trial, in which the four defendants were acquitted and which sparked a number of riots across Los Angeles that resulted in millions of dollars in damage, the destruction of thousands of buildings, and at least forty-five deaths.  See Laurie L. Levenson, Reporting the Rodney King Trial: The Role of Legal Experts, 27 Loy. L.A. L. Rev. 649, 649 n.3 (1994).

States v. Koon, 833 F. Supp. at 776 ("The Holliday videotape became the focus of a good deal of testimony at trial and was analyzed in thorough detail by expert and other witnesses called by each side."). In that case, it appears that the United States chose to present an opposing expert to contradict the defendants' expert, rather than arguing that the defendants' expert could not testify in the manner in which he did. Here, Rodella has not offered an opposing expert.[10] Indeed, there may not be an opposing expert to testify about nationally accepted police practices, as the Court has already expressed concerns about whether nationally accepted police practices even exist. If Overby testified whether each of Rodella's action -- as set forth by Rodella and by Tafoya -- violated nationally accepted police practices, the jury would be left hearing only Overby's opinions without the competing opinions of Rodella's expert. The Court is, thus, not persuaded that the King trial is persuasive that the Court should allow permits Overby's testimony about nationally accepted police practices in this case.

### B.    OVERBY CANNOT BE A CONDUIT OF HEARSAY.

By commenting on two versions of events, Overby's testimony becomes a conduit for hearsay. Generally, an expert comes into court and, with a precise, rifle-shot, testifies about one or two subjects, and gives a conclusion. An expert witness cannot be used as a conduit of hearsay. See Chamberlin v. City of Albuquerque, No. CIV 02-0603, 2005 WL 2313515, at *2

---

[10]At the Status Conference, Rodella indicated that he would designate an expert to testify, in the event that the Court permitted Overby to testify. See Transcript of Hearing at 24:4-10 (taken August 25, 2014)(Gorence). Rodella has not, however, designated an expert. According to the Court's Scheduling Order, Rodella had until September 8, 2014, to designate and disclose expert witnesses. See Proposed Scheduling Order, filed August 27, 2014 (Doc. 29)("Scheduling Order"). Rodella has not designated an expert to testify on nationally accepted police practices or to contradict Overby's testimony. The deadline for filing witness lists was set for September 10, 2014. See Scheduling Order at 1. Rodella has not listed any witness, much less an expert witness, to contradict Overby's testimony. See Defendant Thomas R. Rodella's Amended Trial Witness List, filed September 11, 2014 (Doc. 65). It appears that Rodella has changed his trial strategy from attempting to find a competing expert to trying only to exclude Overby's testimony.

(D.N.M. July 31, 2005)(Browning, J.)(citing 30 Charles Alan Wright, Arthur R. Miller & Kenneth W. Graham, Jr., <u>Federal Practice and Procedure: Evidence</u> § 6337 ("[A]n expert cannot be called solely as a conduit for smuggling hearsay to the jury.")). Here, Overby has an opinion about everything and just retells the story he has been told.

The United States suggests it can avoid Overby being a conduit of hearsay in two ways. First, the United States argues that Overby can be asked questions in the form of hypotheticals. <u>See</u> Tr. at 108:17-21 (Peña). "[E]xperts may express opinions based upon hypotheticals and information which would otherwise be inadmissible hearsay on its own." <u>MediaTek Inc. v. Freescale Semiconductor, Inc.</u>, No. CIV 11-5341 YGR, 2014 WL 971765, at *1 (N.D. Cal. Mar. 5, 2014)(Rogers, J.). Hypothetical questions, however, may be unduly prejudicial, if the hypothetical question is clearly meant to insert inadmissible hearsay. <u>See</u> <u>Berguido v. E. Air Lines, Inc.</u>, 317 F.2d 628, 630-32 (3d Cir. 1968)(holding that district court erred in allowing expert to be asked hypothetical question concerning the speed and altitude of an airplane, when the expert relied on hearsay to know the airplane's speed and altitude); <u>Standard Accident Ins. Co. v. Terrell</u>, 180 F.2d 1, 3 (5th Cir. 1950)(holding that hypothetical question was prejudicial because it incorporated inadmissible hearsay). Here, Overby wishes to give a play-by-play analysis of both Tafoya's and Rodella's versions of events. <u>See</u> Overby Evaluation at 1-3. To elicit this testimony through hypothetical questions, the United States would need to ask a number of specific hypotheticals that would be chockfull of hearsay. Moreover, the jury is not naive. The jury would understand that Overby is being asked hypotheticals, because at least one side believes that the factual scenario contained in the hypotheticals is true. Hypothetical questions would not prevent Overby from serving as a conduit of hearsay in this case.

Second, the United States argues that Overby can sit in the courtroom at trial and testify about the testimony he hears. See Tr. at 107:9-13 (Peña). This argument has several flaws. First, during the United States' case-in-chief, Overby would hear only the United States' version of events -- Tafoya's version. Overby would not be able to testify whether, under Rodella's version of events, Rodella violated nationally accepted police practices. The United States could offer Overby as a rebuttal witness, after Rodella has presented his case-in-chief, but then Overby's testimony would not be true rebuttal testimony -- i.e., it would be readily anticipated -- unless Rodella presented evidence or argued that his conduct complied with nationally accepted police practices. The Court has previously noted that it is "strict on rebuttal, and that if [the United States] could not anticipate the testimony, then the testimony is rebuttal, but if it could anticipate the testimony, it has to bring out the testimony in its case-in-chief and not use a rebuttal witness to have the last work before the jury." United States v. Ganadonegro, No. CR 09-0312, 2011 WL 3948759, at *1 (D.N.M. Aug. 26, 2011)(Browning, J). Here, the United States can anticipate the testimony, and, thus, Overby's testimony would not be true rebuttal testimony. See Koch v. Koch. Indus., Inc., 203 F.3d 1202, 1224 (10th Cir. 2000)("When plaintiffs, however, seek to rebut defense theories which they knew about or reasonably could have anticipated, the district court is within its discretion in disallowing rebuttal testimony.") Furthermore, Overby's testimony, as proffered, would be to simply repeat the witnesses' testimony that he heard earlier. Overby's testimony is extremely detailed, essentially taking each of Rodella's actions and stating that the act violated nationally accepted police practices. See Overby Evaluation at 1-3. The United States has not contended that Overby will listen to the testimony at trial and then conclude generally that, "based on [witness]'s testimony, Rodella's conduct violated nationally accepted police practices." Instead, Overby wants to break down the

testimony and discuss everything that Rodella allegedly did, and then state that each and every action violated nationally accepted police practices. See Overby Evaluation at 1-3. Overby would essentially be repeating to the jury the testimony that it just heard. This is not proper expert testimony.

### C. NOT EVERYTHING IS RELEVANT OR NEEDS EXPERT TESTIMONY.

Even the United States agrees that it may not allow Overby to testify about everything in his report. In his report, Overby states that it is "unacceptable for a police officer to make threatening statements such as 'it's too late,' when a suspect begs for his or her life." Overby Report at 3. At the hearing, the United States agreed that a jury does not need an expert to know this fact. See Tr. at 110:23-111:1 (Peña, Court)("THE COURT: . . . . Do we really need Mr. Over[by] to come in and say that? MR. PENA: Well, no, but certainly if there is testimony.").

When the Court asked if there was really a national standard for some things in Overby's report -- such as threatening a subject -- the United States responded that the Court would have to hear from Overby to know. See Tr. at 111:8-14 (Peña). The Court must, however, conduct its gatekeeping function before trial. See Kumho Tire Co. v. Carmichael, 526 U.S. at 141. Overby did not testify at the hearing. All the Court has is his report, which the United States admits is "poorly phrased" in parts. Tr. at 111:18-112:2 (Peña). This report is insufficient to convince the Court that Overby is qualified, and that his testimony is reliable and relevant. The United States has the burden of showing the admissibility of Overby's testimony, see Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d at 1266, yet, rather than having Overby testify at the hearing, it presented a poorly phrased report.

The Court cannot say, based on Overby's report, that his proposed testimony is appropriate expert testimony. Many of Overby's conclusions appear obvious, and are fully

within the "common knowledge and experience" of a lay juror.  Ram v. N.M. Dep't of Env't, 2006 WL 4079623, at *10 (citing United States v. Rodriguez-Felix, 450 F.3d at 1123). Accordingly, Overby's proposed testimony is not appropriate expert testimony.  The Court will, thus, exercise its gate-keeping function and exclude Overby's testimony on nationally accepted police practices.

## V.    OVERBY MAY DEFINE TERMS USED IN THE LAW ENFORCEMENT FIELD.

The United States additionally offers Overby's testimony to "define terms used in" the field of law enforcement.  Notice at 1.  Expert witnesses are routinely permitted to testify about the definition of terminology used in specific fields.  See United States v. Schurrer, No. 97-1184, 156 F.3d 1245 (10th Cir. Aug. 26, 1998)(unpublished)[11](holding that expert testimony was admissible when it included, among other things, defining "the area of risk management"); United States v. Garrett, 757 F.3d 560, 568-70 (7th Cir. 2014)(holding that expert testimony concerning common practices in the drug trade and defining "the meaning of certain industry code words" was permissible expert testimony); United States v. Feliciano, 223 F.3d 102, 109, 122 (2d Cir. 2000)(affirming district court's admittance of expert testimony when the expert

---

[11]United States v. Schurrer is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that United States v. Schurrer has persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

testified about, among other things, the terminology of a specific gang); <u>United States ex rel.</u> <u>Dyer v. Raytheon Co.</u>, No. CIV 08-10341 DPW, 2013 WL 5348571, at *14-15 (D. Mass. Sept. 23, 2013)(Woodlock, J.)(allowing expert to define the meaning of technical terms within the accounting field); <u>United States v. Diaz</u>, No. CR 05-0167, 2006 WL 2699042, at *3, *6 (N.D. Cal. Sept. 19, 2006)(Alsup, J.)(permitting expert to define slang used by street gang). Rodella has not objected to Overby testifying to define terms in the law enforcement field. <u>See</u> Motion at 1-6. Because this case involves an investigation by law enforcement officers of another law enforcement officer -- Rodella -- Overby's testimony of defining terms in the law enforcement field is relevant to this case and is permissible expert testimony. Accordingly, the Court will permit Overby to define terms in the field of law enforcement.

**IT IS ORDERED** that the Defendant's Motion to Strike Expert Testimony of Manuel T. Overby, filed September 9, 2014 (Doc. 50), is granted in part and denied in part. Manuel T. Overby is prohibited from testifying about nationally accepted police practices, whether Defendant Thomas R. Rodella violated those practices, whether Rodella violated the Constitution, and whether Rodella acted reasonably. Overby may, however, define terms in the field of law enforcement.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Tara C. Neda
Jeremy Peña
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Robert J. Gorence
Louren M. Oliveros
Gorence & Oliveros PC
Albuquerque, New Mexico

     *Attorneys for the Defendant*