FILED
United States Court of Appeals
Tenth Circuit

**November 4, 2015**

Elisabeth A. Shumaker
Clerk of Court

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.                                                                          No. 15-2023

THOMAS R. RODELLA,

      Defendant-Appellant.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 1:14-CR-02783-JB-1)**

---

John D. Cline, Law Office of John D. Cline, San Francisco, California, for
Defendant-Appellant.

Jeremy Peña, Assistant United States Attorney, (Damon P. Martinez, United
States Attorney, and Tara C. Neda, Assistant United States Attorney, with him on
the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.

---

Before **BRISCOE, EBEL** and **BACHARACH**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

      Defendant Thomas Rodella, the former sheriff of Rio Arriba County, New

Mexico, was convicted by a jury of one count of depriving a person of his

constitutional right to be free of unreasonable force and seizure, resulting in

bodily injury and including the use of a dangerous weapon, in violation of 18

U.S.C. § 242, and one count of brandishing a firearm during the offense, in

violation of 18 U.S.C. § 924(c)(1)(A)(ii).  Rodella was sentenced to a total term

of imprisonment of 121 months for these crimes.  On appeal, Rodella challenges

his convictions on several grounds.  Exercising jurisdiction pursuant to 28 U.S.C.

§ 1291, we affirm.

# I

*Factual background*

On the evening of March 11, 2014, an individual named Michael Tafoya

was driving his car from his grandfather's residence in rural Rio Arriba County to

his own residence within the county.  Tafoya stopped at the intersection of a dirt

road and a paved road known as Road 399.  There, Tafoya looked both ways

before turning left onto Road 399.  Shortly after entering Road 399, however,

Tafoya noticed a green, unmarked Jeep approaching him rapidly from behind.

The Jeep began flashing its headlights and soon thereafter began tailgating

Tafoya's vehicle.

Tafoya, upset at being tailgated by the Jeep, stepped on his brake pedal in

order to flash his brake lights at the Jeep.  The Jeep did not, however, respond to

this action.  Tafoya, increasingly frustrated, "flipped off" the driver of the Jeep

through his rear window.  Again, however, the Jeep refused to back away and

instead continued to tailgate Tafoya's vehicle.

Tafoya continued driving on Road 399 until he spotted a place where he could pull over.  There, Tafoya pulled off to the right side of Road 399.  As the Jeep passed by, Tafoya reached one of his hands near the front of his windshield and again "flipped off" the Jeep.  The driver of the Jeep responded by slamming on the brakes, coming to a stop directly on Road 399, and driving in reverse at a rapid rate of speed back to the spot near where Tafoya was parked on the side of the road.  The Jeep came to a complete stop and two men wearing plain clothes got out: defendant Rodella, who was the passenger, and Rodella's son, 26-year-old Thomas Rodella, Jr., who was the driver.  According to Tafoya, both men started walking towards his Mazda in an aggressive fashion while simultaneously telling Tafoya to "come on."  Aplee. Supp. App., Vol. IV at 789.  At no point, according to Tafoya, did Rodella flash a badge or otherwise identify himself as a law enforcement officer.  Tafoya, unaware of either man's identity and believing that the two men wanted to fight him, sped off in his vehicle down Road 399.  Rodella and his son got back in their Jeep and, with Rodella Jr. again driving, began to follow Tafoya.

Tafoya became scared when he realized that the Jeep was following him again.  In an effort to escape the Jeep, Tafoya began driving approximately 60 to 65 miles per hour on Road 399, well over the posted speed limit of 35 miles per hour.  Tafoya also mentally devised a planned route that he thought would allow

3

him to reverse course.  Tafoya, however, missed his intended turn.  Panicked,

Tafoya rolled down his windows and yelled at a jogger, "Call the police.

Someone is after me."  Id. at 795.  Tafoya then turned into a nearby driveway.

The Jeep quickly turned into the driveway behind Tafoya's vehicle.  Tafoya

shifted his vehicle into reverse, turned his steering wheel, and began driving in

reverse in an attempt to evade the Jeep.  Unbeknownst to Tafoya, there was a

metal pole anchored in the middle of the driveway.  The rear end of Tafoya's

vehicle struck the pole, stopping the rearward progress of his vehicle.

        As Tafoya's vehicle became stuck on the metal pole, Rodella jumped out of

the passenger side of the Jeep, ran towards Tafoya's vehicle, grabbed for the

handle on the front passenger-side door, but bounced off and away from the

vehicle.  Rodella approached Tafoya's vehicle again, successfully opened the

front passenger side door, and jumped into the front passenger seat.  According to

Tafoya, Rodella had a shiny silver firearm in his hand.  The firearm was later

confirmed to be a .38 Special revolver.

        Tafoya grabbed at Rodella's wrists while saying repeatedly, "Please don't

kill me."  Id. at 805.  According to Tafoya, Rodella kept trying to turn the gun

towards Tafoya.  Rodella also, according to Tafoya, responded to Tafoya by

saying, "It's too late, it's too late."  Id.  As Tafoya and Rodella continued to

struggle, Rodella Jr. approached the driver's side of Tafoya's vehicle, opened the

door, grabbed Tafoya, pulled him out of the vehicle, and threw him facedown on

4

the ground.  Tafoya struggled to get up while saying to Rodella Jr., "Please don't kill me."  Id. at 806-07.  Rodella Jr. told Tafoya to stop struggling and then said to Tafoya, "Don't you realize he's the sheriff?"  Id. at 807.  Upon hearing this, Tafoya "just kind of froze" in shock.  Id. at 808.

Tafoya, after attempting to calm himself, asked if he could see Rodella's badge in order to confirm that he was the sheriff.  Rodella responded by saying, "You want to see my badge?"  Id. at 809.  Rodella then approached Tafoya while he was still laying face down on the ground, grabbed the back of Tafoya's hair, and slapped Tafoya across the right cheek with his sheriff's badge while saying, "Here's my badge, motherfucker."  Id.  Rodella followed up by "stuff[ing] it" in Tafoya's right eye and slamming Tafoya's head into the ground.  Id. at 809-10.

Tafoya remained on the ground for several minutes until deputies from the Rio Arriba Sheriff's Office arrived on the scene.  It is undisputed that the deputies were contacted directly during the chase by Rodella.  At no time did Rodella contact a dispatcher to report the chase or to request back-up officers.

The deputies picked up Tafoya, took him to the front of his car, and frisked him.  Tafoya attempted to explain himself to the deputies, to no avail.  Tafoya was subsequently taken by a deputy to the sheriff's office, where he was detained for several hours and charged with a felony offense.  Tafoya was then transported to a county jail where he was held for several days before being bailed out by his grandfather.  The criminal charges against Tafoya were subsequently dismissed.

Upon his release from jail, Tafoya contacted the Federal Bureau of Investigation (FBI) and reported what had happened to him.

*Procedural background*

On August 12, 2014, a federal grand jury indicted Rodella on four criminal counts.[1]  Count 1 charged him with conspiring with Rodella Jr. to violate Tafoya's constitutional right to not be subjected to unreasonable seizures, in violation of 18 U.S.C. § 241.  Count 2 charged Rodella with depriving Tafoya of his civil rights, in violation of 18 U.S.C. §§ 242 and 2.  Count 3 charged Rodella with brandishing a firearm in connection with the offense alleged in Count 2, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  Count 4 charged Rodella with falsifying a document (his official written account of what happened prior to and during the arrest of Tafoya), in violation of 18 U.S.C. § 1519.

On September 9, 2014, the grand jury returned a two-count superseding indictment that omitted the conspiracy and falsification-of-document charges.  Count 1 of the superseding indictment charged Rodella with deprivation of Tafoya's constitutional right to be free of unreasonable force and seizure, in violation of 18 U.S.C. § 242.  Count 2 of the superseding indictment charged Rodella with the use of a dangerous weapon in connection with that offense, in

---

[1] The indictment also charged Rodella Jr. with the same crimes.  Those charges, however, were ultimately dismissed pursuant to the government's unopposed motion.

6

violation of 18 U.S.C. § 924(c)(1)(A)(ii).

Rodella proceeded to trial in late September 2014.  At the conclusion of all the evidence, the jury found him guilty of both counts alleged in the superseding indictment.

On January 1, 2015, the district court sentenced Rodella to a term of imprisonment of 37 months on Count 1 and a mandatory consecutive 7-year sentence on Count 2, resulting in a total term of imprisonment of 121 months.

## II

### *Sufficiency of the evidence*

In his first issue on appeal, Rodella contends that the evidence presented at trial was insufficient to support his conviction for violating 18 U.S.C. § 242.  "We review the denial of a motion for judgment of acquittal, and hence the sufficiency of the evidence to support the jury verdict, de novo."  United States v. Sparks, 791 F.3d 1188, 1190 (10th Cir. 2015).  In doing so, "[w]e view the evidence in the light most favorable to the government to determine whether a rational trier of fact could have found the elements of the offense beyond a reasonable doubt."  Id. at 1190-91.  "We do not decide matters of credibility or reweigh the evidence."  Id. at 1191.

Section 242 of Title 18 prohibits, in pertinent part, a person acting "under color of any law" from "willfully subject[ing] any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights,

privileges, or immunities secured or protected by the Constitution or laws of the United States."  18 U.S.C. § 242.  It also provides, as relevant here, that "if bodily injury results from [such] acts . . . or if such acts include the use, attempted use, or threatened use of a dangerous weapon," the defendant "shall be fined under this title or imprisoned not more than ten years, or both."  Id.

In this case, the superseding indictment alleged that Rodella "willfully deprived [Tafoya] of the right, protected and secured by the Constitution and laws of the United States, not to be subjected to unreasonable seizure by a law enforcement officer."  Dist. Ct. Docket No. 55 at 1.  Although the superseding indictment did not identify which portion of the Constitution secured this right, the indictment was presumably referring to the Fourth Amendment.  The Fourth Amendment expressly protects individuals from "unreasonable searches and seizures."  U.S. CONST. amend. IV.

As outlined in the Tenth Circuit Pattern Criminal Jury Instructions, the essential elements of the § 242 charge at issue in this case are as follows: (1) the defendant was acting under color of law when he committed the acts charged in the indictment; (2) the defendant deprived Tafoya of his right to be free of unreasonable seizures (including the right to be free from unlawful arrests and the right to not be subjected to excessive force), which is a right secured by the Constitution of the United States; (3) the defendant acted willfully, that is, the defendant acted with a bad purpose, intending to deprive Tafoya of that right; and

8

(4) the offense resulted in bodily injury to Tafoya or the offense included the use,

attempted use or threatened use of a dangerous weapon.  <u>See</u> 10th Cir. Crim.

Pattern Jury Instructions No. 2.17 (2011).

The government presented to the jury two alternative theories to establish

Rodella's criminal liability on Count 1: (1) that Rodella unlawfully arrested

Tafoya; and (2) that Rodella used unreasonable force in the course of arresting

Tafoya.  The jury ultimately found in the government's favor on both theories as

indicated on its special verdict form.  Aplt. App. at 177.  The only caveat is that,

in considering the unreasonable force theory, the jury found beyond a reasonable

doubt that Rodella "used or threatened to use a dangerous weapon," but did not

find beyond a reasonable doubt that Rodella "caused . . . Tafoya to suffer bodily

injury."  <u>Id.</u>  In his appeal, Rodella challenges the jury's findings on both theories

of criminal liability.

*a) Unlawful arrest*

Rodella argues that the evidence presented at trial did not establish that he

arrested Tafoya without probable cause.  To the contrary, he asserts, he "had

ample probable cause to arrest Tafoya . . . for violations of state law," Aplt. Br. at

16, including (a) that "Tafoya's Mazda displayed expired temporary tags on the

rear of the vehicle" and "[h]is valid plate was inside the front windshield," both

in violation of New Mexico state law, <u>id.</u>; (b) that Tafoya "committed the

misdemeanor of careless driving," in violation of New Mexico law, when he

"brake checked" in response to the Jeep initially approaching the rear of his vehicle, id. at 17; (c) that Tafoya "drove 60 or 65 MPH in a 35 MPH zone," id.; (d) that Tafoya "sped through a heavily populated area, driving fast enough that he could have flipped his car, and potentially putting other people in danger;" id. (internal citations omitted); and (e) that Tafoya "drove through a stop sign without making a complete stop," id. at 18.

The initial problem with Rodella's argument is that he failed to assert below that Tafoya committed, and thus the jury should consider, all of the alleged infractions that he now points to in his appellate brief.  At trial, the district court, pursuant to Rodella's request, instructed the jury that it should consider whether Tafoya committed four specific offenses: (1) resisting, evading or obstructing a peace officer, (2) aggravated assault on a peace officer by use of a deadly weapon (i.e., Tafoya's car), (3) careless driving, and (4) reckless driving.  Aplt. App. at 199-200 (Instruction No. 14, which discussed the concept of probable cause and outlined the types of conduct that could have given rise to probable cause in this case). Thus, Rodella has forfeited any argument that his arrest of Tafoya was justified by the unusual placement of Tafoya's license plate or the existence of the expired temporary tags.[2]

_____

[2] In any event, no witness testified at trial that the placement of Tafoya's license plate, or the existence of his expired temporary tags, violated New Mexico state law.  Thus, the jury would have had no evidence upon which to find that

(continued...)

Turning to the evidence presented at trial, it is important to note that Rodella did not testify in his own defense. That left the jury, in considering Rodella's defense to the unlawful arrest charge, to consider the testimony of the only other known eyewitnesses to the incident: Tafoya, Mark Thompson, and Rodella Jr. Thompson is the individual who owned the property where the arrest occurred and he was jogging nearby when the arrest occurred. Thompson's testimony, viewed in the light most favorable to the government, was generally supportive of Tafoya's testimony regarding what occurred. In particular, Thompson testified that: (a) Tafoya appeared scared when he first saw him (i.e., when Tafoya slowed down and yelled out his window for Thompson to call the police); (b) he heard Tafoya beg Rodella not to shoot him; and (c) after Tafoya was removed from his vehicle and forced to the ground, he heard Tafoya say to Rodella, "Why did you pull a gun on me? I didn't know you were a Sheriff," Aplee. Supp. App., Vol. V at 1107. Rodella Jr., who testified in his father's defense, painted a dramatically different picture of what occurred. For example, Rodella Jr. denied tailgating Tafoya's vehicle, denied that he backed up the Jeep directly on Road 399, denied that he or his father walked or talked aggressively when approaching Tafoya during their initial encounter (i.e., when Tafoya pulled off to the side of the road to let the Jeep pass), alleged that his father displayed

------

[2](...continued)
Rodella possessed probable cause to arrest Tafoya for these purported violations.

his badge during the initial encounter, alleged that he never drove above the speed limit while chasing Tafoya's vehicle, alleged that his father displayed his badge again when he approached Tafoya's vehicle in the driveway, and denied that his father struck Tafoya with the badge. But the jury clearly could have concluded, and presumably did conclude, that Rodella Jr.'s testimony was not credible. In turn, the jury reasonably could have, and apparently did, accept Tafoya's version of the events.

Assuming that the jury accepted Tafoya's testimony as true, they in turn necessarily would had to have found that a reasonable person in Tafoya's position would not have known that Rodella was a law enforcement officer. As a result, they would had to have found, under the instructions given to them by the district court, that Rodella was not in "uniform," as defined by New Mexico law, and thus could not have legally detained or arrested Tafoya.[3] Aplt. App. at 197 (Instruction No. 13).

Relatedly, the jury reasonably could have found that Tafoya's flight and any careless or reckless driving that he engaged in was provoked by Rodella.

---

[3] The district court instructed the jury, in pertinent part, that "[i]n New Mexico, a sheriff cannot arrest or detain an individual for a traffic violation unless he is wearing a uniform." Aplt. App. at 197 (Instruction No. 13). The district further instructed the jury that "[t]he test for whether an officer was in 'uniform' is whether there are sufficient indicia that would permit a reasonable person to believe the person purporting to be a peace officer is, in fact, who he claims to be." Id.

Although the law regarding provocation "is far from developed," both the

Supreme Court and other circuits "have touched on this issue" of what constitutes

provoked flight. United States v. Jeter, 721 F.3d 746, 753 (6th Cir. 2013)

(collecting cases). Both the Sixth and Eleventh Circuits have concluded, and we

agree, "that officers cannot improperly provoke—for example, by fraud—a person

into fleeing and use the flight to justify a stop." United States v. Franklin, 323

F.3d 1298, 1302 (11th Cir. 2003); see Jeter, 721 F.3d at 754 (holding that "[f]raud

. . . would surely suggest wrongdoing on the part of the officers and thus make a

finding of provocation more likely"); see also Illinois v. Wardlow, 528 U.S. 119,

125 (2000) (holding that an individual's "unprovoked" flight was sufficient to

give officers reasonable suspicion to conduct a Terry stop). In addition, the Sixth

Circuit has indicated, and we agree, that "[i]f police officers put a defendant in

reasonable fear of physical harm, that might also qualify as provocation." Jeter,

721 F.3d at 754. Applying those principles in this case, we conclude that the jury

reasonably could have found, based upon Tafoya's testimony, that the actions of

Rodella and his son placed Tafoya in reasonable fear of physical harm and in turn

provoked Tafoya into panicking and fleeing for his safety. In other words, we

conclude that the jury reasonably could have found that Rodella and his son

provoked Tafoya into committing the alleged traffic violations that Rodella

identified at trial.

For these reasons, we reject Rodella's challenge to the sufficiency of the evidence underlying the jury's finding that he unlawfully arrested Tafoya.

*b) Excessive force*

Rodella also challenges the sufficiency of the evidence underlying the jury's finding that he used excessive force during the arrest of Tafoya. Specifically, Rodella notes that "[t]he jury found that the government had not proven" that Tafoya suffered "any bodily injury," and he argues that "the evidence does not establish that Tafoya incurred more than de minimis emotional injury." Aplt. Br. at 20.

In support of his position, Rodella points to this court's en banc decision in Cortez v. McCauley, 478 F.3d 1108 (10th Cir. 2007). Cortez was not a criminal case, but rather a civil case in which the plaintiffs, Rick and Tina Cortez, a married couple who resided in New Mexico, filed claims against county officials under 42 U.S.C. § 1983 alleging, in part, that they had been unlawfully arrested or detained and subjected to excessive force. Defendants moved for summary judgment on the grounds of qualified immunity. The district court denied defendants' motion and defendants filed an interlocutory appeal. After a three-judge panel initially heard and decided the case, the court "granted rehearing en banc primarily to consider under what circumstances, if any, an excessive force claim is subsumed in an unlawful arrest claim." Id. at 1112. In considering Rick Cortez's claim that he was subjected to excessive force at the time of his arrest,

this court noted that the evidence, considered in the light most favorable to

plaintiffs, established that the defendants "(1) grabbed Rick Cortez by the arm

and pulled him from the doorway of his home; (2) handcuffed him; (3) placed him

in the back seat of a locked patrol car—all in the middle of the night, and (4)

ignored his pleas that the handcuffs were too tight and hurting him." Id. at 1126.

The court in turn "conclud[ed] that a small amount of force, like grabbing Rick

Cortez and placing him in the patrol car, is permissible in effecting an arrest

under the Fourth Amendment." Id. at 1128. "The closer issue," the court stated,

"[wa]s whether the failure to adjust Rick Cortez's handcuffs during an arrest

constitute[d] excessive force." Id. at 1129. The court explained:

> In some circumstances, unduly tight handcuffing can constitute
> excessive force where a plaintiff alleges some actual injury from the
> handcuffing and alleges that an officer ignored a plaintiff's timely
> complaints (or was otherwise made aware) that the handcuffs were
> too tight. Although Rick Cortez complained that the handcuffs were
> too tight, the summary judgment record presents too little evidence
> of any actual injury. We believe that a claim of excessive force
> requires some actual injury that is not de minimis, be it physical or
> emotional. The only evidence in the record is his affidavit that the
> handcuffs left red marks that were visible for days afterward. This is
> insufficient, as a matter of law, to support an excessive force claim if
> the use of handcuffs is otherwise justified.

Id. (internal citations and footnotes omitted). In a footnote to this passage, the

court also stated:

> Plaintiffs alleged that Defendants [sic] use of excessive force caused
> [actual] injury [that was not de minimis]. Aplt. App. at 26, ¶ 29. In
> order to recover on an excessive force claim, a plaintiff must show:
> (1) that the officers used greater force than would have been

15

reasonably necessary to effect a lawful seizure, and (2) some actual injury caused by the unreasonable seizure that is not de minimis, be it physical or emotional.  See Tarver v. City of Edna, 410 F.3d 745, 752 (5th Cir. 2005) (allegations of de minimis physical harm from handcuffing were insufficient, nor did plaintiff demonstrate "that he suffered psychological injury from the handcuffing").

Id. n.25.

Although this language from Cortez was broadly worded, the fact remains that the opinion dealt only with Rick Cortez's narrow claim that he was handcuffed too tightly.  And this court's post-Cortez cases reflect the view that the holding in Cortez is limited to handcuffing cases.  See Maresca v. Bernalillo Cty., — F.3d —, 2015 WL 6384984 at *11 (10th Cir. 2015)[4]; Koch v. City of Del City, 660 F.3d 1228, 1247 (10th Cir. 2011) (holding that in cases in which the manner of handcuffing is alleged to have constituted excessive force, Cortez requires proof of an actual injury that is not de minimis); Fisher v. City of Las Cruces, 584 F.3d 888, 894 (10th Cir. 2009) (stating that Cortez "explain[s]" what must be proven "in a handcuffing case").

Moreover, the Supreme Court's decision in Wilkins v. Gaddy, 559 U.S. 34 (2010), effectively rebuts any assertion that Cortez's "de minimis injury" requirement is applicable beyond handcuffing-only cases.  Wilkins involved a § 1983 claim of excessive force brought by a state prisoner against a corrections

---

[4] Maresca distinguishes some arguably broader language in Aldaba v. Pickens, 777 F.3d 1148, 1161 n.3 (10th Cir. 2015) as dicta.

officer.  The district court in <u>Wilkins</u> dismissed the action for failure to state a claim, holding that, "in order to state an excessive force claim under the Eighth Amendment, a plaintiff must establish that he received more than a *de minimis* injury."  <u>Id.</u> at 35 (internal alterations omitted).  The plaintiff prisoner appealed and the Fourth Circuit summarily affirmed the district court's decision.  The Supreme Court, however, granted the prisoner's petition for certiorari and reversed the judgment.  In doing so, the Court emphasized that in <u>Hudson v. McMillian</u>, 503 U.S. 1 (1992), it had "rejected the notion that 'significant injury' is a threshold requirement for stating an excessive force claim."  559 U.S. at 37 (quoting <u>Hudson</u>, 503 U.S. at 7).  To be sure, the Court noted, "[t]he extent of injury may . . . provide some indication of the amount of force applied."  <u>Id.</u>  But, the Court stated, "[i]njury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts."  <u>Id.</u> at 38.

Notably, the Eighth Circuit has applied <u>Wilkins</u> to Fourth Amendment excessive force claims generally, while carving out a narrow exception for handcuffing-only claims.  Specifically, in <u>Chambers v. Pennycook</u>, 641 F.3d 898 (8th Cir. 2011), the Eighth Circuit rejected the notion "that evidence of only *de minimis* injury necessarily forecloses a claim of excessive force under the Fourth Amendment."  <u>Id.</u> at 906.  To be sure, the Eighth Circuit noted, "[a] *de minimis use of force* is insufficient to support a claim, and it may well be that most plaintiffs showing only *de minimis* injury can show only a corresponding *de*

*minimis* use of force." Id. (internal citations omitted).  "But," the court stated, "it

is logically possible to prove an excessive use of *force* that caused only a minor

*injury*, and a rule that forecloses a constitutional claim in that circumstance

focuses on the wrong question."  Id.  As for handcuffing-only cases, the Eighth

Circuit stated:

> Our cases concerning excessive force claims arising from
> handcuffing do include language that might support the position of
> the officers here.  We said in Hanig v. Lee, 415 F.3d 822 (8th Cir.
> 2005), that "[f]or the application of handcuffs to amount to excessive
> force, there must be something beyond minor injuries."  Id. at 824;
> accord Crumley v. City of St. Paul, 324 F.3d 1003, 1008 (8th Cir.
> 2003).  Those decisions, however, should not be read to establish a
> general rule equating quantum of injury with quantum of force under
> the Fourth Amendment.  "Handcuffing inevitably involves some use
> of force," Wertish, 433 F.3d at 1067, and it almost inevitably will
> result in some irritation, minor injury, or discomfort where the
> handcuffs are applied.  See Rodriguez v. Farrell, 280 F.3d 1341,
> 1351 (11th Cir. 2002).  To prove that the force applied was excessive
> in that context, therefore, a plaintiff must demonstrate something
> more.  See Fisher v. City of Las Cruces, 584 F.3d 888, 898 (10th Cir.
> 2009).  As a general proposition, however, there is no uniform
> requirement that a plaintiff show more than *de minimis* injury to
> establish an application of excessive force.  See Lambert v. City of
> Dumas, 187 F.3d 931, 936 (8th Cir. 1999) (holding that "[a] single
> small cut of the lateral right eyelid and small scrapes of the right
> posterior knee and upper calf" were sufficient to support an
> excessive force claim).

Id. at 907; see Royster v. Nichols, 698 F.3d 681, 691 (8th Cir. 2012).

The Eleventh Circuit has also applied the holding in Wilkins to an

excessive force claim brought under the Fourth Amendment.  In doing so, the

Eleventh Circuit stated: "We see no reason why the same rationale [outlined in

18

Wilkins] should not apply in a Fourth Amendment excessive force case."
Saunders v. Duke, 766 F.3d 1262, 1270 (8th Cir. 2014).  "After all," the court
stated, "a plaintiff claiming excessive force under the Fourth Amendment can
seek nominal damages if he does not have compensable injuries."  Id.

In light of the authorities discussed above, we reject the central premise of
Rodella's argument, i.e., that there is a de minimis injury requirement for Fourth
Amendment excessive force claims in cases which involve more than
handcuffing.[5]  As a result, we conclude Rodella's challenge to the sufficiency of
the evidence underlying his conviction for violating 18 U.S.C. § 242 is without
merit.

*Failure to instruct on de minimis injury "requirement"*

In his second issue on appeal, Rodella contends, again citing Cortez, that
the district court violated his Fifth and Sixth Amendment right to a jury
determination on every essential element by failing to instruct the jury that, in
order to convict him on the government's excessive force theory, it had to find
that Tafoya suffered more than de minimis physical or emotional injury.

Generally speaking, "we consider the refusal to give a requested jury

---

[5]  We also note, in any event, that the evidence presented by the
government at trial, most notably Tafoya's own testimony and that of his friend,
Renee Dominguez, was more than sufficient to allow the jury to find that Tafoya
suffered significant emotional trauma as a result of Rodella's conduct in arresting
him.

instruction under the abuse-of-discretion standard." United States v. Kupfer, 792

F.3d 1226, 1229 (10th Cir. 2015). "In order to assess whether the court properly

exercised its discretion, we review the jury instructions de novo to determine

whether, as a whole, they accurately state the governing law and provide the jury

with an accurate understanding of the relevant legal standards and factual issues

in the case." United States v. Faust, 795 F.3d 1243, 1251 (10th Cir. 2015)

(internal quotation marks omitted).

The parties dispute whether Rodella preserved this argument by sufficiently

arguing it before the district court. It is unnecessary for us to resolve this dispute

because, even assuming that Rodella properly preserved the argument, there is no

merit to it. As discussed above, there is no de minimis injury requirement for

Fourth Amendment excessive force claims that involve more than mere

handcuffing. Consequently, we conclude the district court did not abuse its

discretion in refusing to instruct the jury otherwise.

*Admission of evidence of other incidents involving Rodella*

In his third issue on appeal, Rodella argues that the district court erred in

admitting evidence of his involvement in three other incidents pursuant to Fed. R.

Evid. 404(b). We review a district court's decision to admit evidence under Rule

404(b) for an abuse of discretion. United States v. Nance, 767 F.3d 1037, 1042

(10th Cir. 2014). Under this standard, we will not reverse unless the district

court's decision exceeded the bounds of permissible choice in the circumstances

or was arbitrary, capricious or whimsical.  Id.

Rule 404(b)(1) states that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  Rule 404(b)(2), however, states that "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).

*a) The three other incidents*

The following is a brief description of the three other incidents:

1) *The Maes incident.*   One night in January 2014, Yvette Maes, a resident of Alcalde, New Mexico, was driving her car in a rural area of Rio Arriba County. Maes turned onto the Chamita main road and, in doing so, noticed only headlights in the distance.  Soon thereafter, however, a large vehicle approached her from behind at a high rate of speed and eventually closed to within six feet of Maes' sedan, causing Maes to have to adjust her rearview mirror as a result of the vehicle's headlights.  Maes, who had been driving at the 45 mile-per-hour speed limit, slowed down to approximately 35 miles per hour in order allow the vehicle to pass.  The vehicle continued to tailgate Maes for approximately five minutes or longer before ultimately passing her.   Maes, upset at what had occurred, flashed her high beams at the vehicle in retaliation.  As soon as Maes did so, the top

21

lights on the passing vehicle came on.  Maes, aware for the first time that the

vehicle belonged to a law enforcement officer, stopped her vehicle and began

gathering her driver's license, registration and insurance identification card.

The driver of the vehicle, Rodella, got out and approached Maes' vehicle

on foot.  When he arrived at Maes' vehicle, Rodella did not ask her for her license

or papers.  Instead, he asked her "what the hell did [she] think [she] was doing?"

Aplee. Supp. App., Vol. VI at 1336.  Rodella was visibly upset and swore at

Maes.  Maes, who was mad because she believed that Rodella's driving behavior

had endangered her life and that of her daughter, who was riding with her,

answered him by saying, "I could ask you the same by your behavior of tailgating

me."  Id.  Rodella "responded that [Maes] didn't know what he was doing, if he

was on an emergency call, or on his way to an emergency."  Id.  Maes in turn

stated, "Yeah, right, I do not know.  You didn't have your emergency lights on.

How was I to know?"  Id.  Rodella said, "Did you know that flashing your

headlights at anyone is a form of road rage."  Id. at 1337.  Maes responded, "Yes,

as tailgating is also."  Id.  Rodella told Maes "that the appropriate thing for [her]

to have done, when someone was tailing [her] that way, is to pull over to the side

of the road."  Id.  Maes responded, "Yes, that may be true, but not in the dead of

night, not when two women [are] traveling on the road, not when you don't

recognize who is tailgating you at such a close distance.  I didn't feel that it was

safe for me to pull over to the side of the road."  Id.  Rodella said, "So what do

you think, I should take you to jail?"  Id.  Maes told Rodella that "if he felt that

that was the appropriate thing to do, then he needed to do what was right."  Id.

Rodella responded by turning around, walking back to his vehicle, and driving

away.

     2) *The Ledesma incident.*

     On March 20, 2013, Jacob Ledesma, a resident of Las Cruces, New Mexico,

was driving on State Road 84, a two-lane road that runs through Rio Arriba

County, with his wife and teenage son en route to Colorado.  Ledesma was

traveling behind two other vehicles when he observed ahead in the distance a

brown, unmarked sport-utility vehicle (SUV) parked by the side of the road.  The

SUV abruptly pulled out in front of the three vehicles, forcing all of them to

dramatically lower their speed.  Ledesma, noting that he was in a designated

passing zone and that there was no oncoming traffic, responded by passing the

SUV and the two vehicles that had been in front of him.  As soon as Ledesma

pulled in front of the SUV, however, the driver of the SUV turned on the SUV's

headlights and strobe lights, which were located within the headlights.  Ledesma,

not knowing who was driving the SUV, was unsure whether to stop.  At the

recommendation of his wife, however, Ledesma decided to pull over to the side of

the road.  The SUV responded by pulling over behind Ledesma's vehicle.

     The driver of the SUV, defendant Rodella, who was wearing a black shirt

and blue jeans, got out of the SUV, walked up to Ledesma's vehicle, and asked

Ledesma, "Do you know why I pulled you over?" Id. at 1368.  Ledesma

responded, "I don't even know who you are." Id.  Rodella, visibly upset by

Ledesma's response, pulled out his wallet and showed Ledesma his driver's

license.  Ledesma responded, "Well, I have one of those, too, but I still don't

know who you are." Id.  Rodella reached into his pocket, pulled out his badge

and threw it at Ledesma.  The badge hit the rearview mirror and was caught by

Ledesma.  After examining the badge, Ledesma said to Rodella, "Okay, why did

you pull me over?" Id. at 1369.  Rodella said, in an elevated voice, "I pulled you

over because you passed in a no passing zone." Id.  Ledesma denied having done

so and suggested that they drive back and look at the area where he had passed

Rodella's SUV.  Rodella refused to do so and instead asked for Ledesma's

driver's license, registration, and proof of insurance.  According to Ledesma,

Rodella ripped the documents out of his hands and returned to the SUV, where he

stayed for approximately 15 to 20 minutes.  Ultimately, two sheriff's deputies

arrived in a marked vehicle and Rodella left.  The deputies issued Ledesma two

citations: one for passing in a no passing zone and a second one for not having

signed his vehicle registration form.  Ledesma tried to reason with the deputies,

but one said, "He's my boss.  I have to do it [give you a citation]." Id. at 1374.

Ledesma subsequently returned to the area where he received the citations and

confirmed that he had, in fact, passed in a legal passing zone.  When Ledesma

returned home, he sent an email to Rodella and the Rio Arriba County

Commissioners explaining his side of the story.  Ledesma, however, never received a response.  The citations against Ledesma were ultimately dismissed in return for Ledesma agreeing to pay the court costs.

3) *The Gonzales incident.*

In August 2013, New Mexico resident Lisa Gonzales and her husband were driving on Highway 84 near Tierra Amarilla in Rio Arriba County.  As they were heading up a hill, a dark blue, unmarked Ford truck came up on them from behind driving very fast.  The truck pulled within approximately a car length of and began tailgating the Gonzaleses' vehicle.  As the Gonzaleses continued to drive up the hill, they came upon a truck and attached camper-trailer that was slowing down to turn left.  Mr. Gonzales, who was driving, slowed down in response.  The Ford truck continued to tailgate him.  As soon as the truck and camper pulled off of the highway in front of him, Mr. Gonzales sped up to get away from the Ford truck.  Almost immediately, the Gonzaleses became aware of lights flashing on the Ford truck.  Mr. Gonzales slowed down and put his right blinker on to signal his intent to pull over.  However, due to the highway conditions, there was nowhere to pull over immediately.  Looking ahead of him, Mr. Gonzales spotted a driveway and planned to pull in there.  Before he could do so, however, the Ford truck entered the passing lane and pulled even with the Gonzaleses' vehicle.  The driver of the Ford truck, defendant Rodella, pointed at the Gonzaleses in a threatening manner and yelled out the passenger side window of the truck, "Pull

25

the fuck over.  Now." Id. at 1429.  Mr. Gonzales pulled into the driveway that he

had located and the Ford truck pulled in immediately in front of him, blocking the

Gonzaleses' vehicle.

Rodella, who was wearing blue jeans, a blue button-down shirt, a

lightweight jacket and a black cowboy hat, got out of his truck and walked to the

Gonzaleses' vehicle.  Rodella asked, "Why didn't you pull over immediately

when I told you to?" Id. at 1432.  Mr. Gonzales said, "We were trying to find –

you know, we saw there was a place to pull over." Id.  Rodella said, in an

aggressive manner, "You don't speed in my county.  Who do you think has to

clean up the carnage?" Id.  Mr. Gonzales gave his registration and insurance

papers to Rodella, who took them with him back to his truck.  While waiting for

Rodella to return, the Gonzaleses decided "to keep [their] mouth[s] shut" and act

politely. Id. at 1433.  When Rodella returned to the Gonzaleses' vehicle, Mr.

Gonzales began responding to Rodella with the phrase, "Yes, sir." Id. at 1434.

According to Lisa Gonzales, this resulted in a noticeable change in Rodella's

demeanor.  Ultimately, Rodella returned the papers to Mr. Gonzales and stated, "I

don't want to catch you speeding through my county again." Id. at 1435.

According to Lisa Gonzales, she and her husband sat in their car for

approximately five minutes after the encounter because "[they] were shaken up."

Id. at 1436.

*b) The district court's decision to admit the evidence*

Prior to trial, the government filed a motion in limine, as well as an amended motion in limine, seeking to introduce evidence of these three incidents pursuant to Rule 404(b) in order "to show motive, intent, plan, knowledge, absence of mistake, and lack of accident."  Aplt. App., Vol. 1 at 30.  More specifically, the government asserted that these other incidents: (a) "show[ed] Defendant's motive and intent in pursuing [Tafoya], which was to express his road rage and to punish any disrespect he perceived from citizens of Rio Arriba County," id.; (b) "show[ed] that Defendant ha[d] a plan to compel citizens to submit to his authority," and that "[h]is plan [wa]s to drive in a threatening and provocative manner towards other motorists, . . . and if he succeed[ed] in provoking any disrespectful act . . . he w[ould] force the motorist to submit through a display of his authority," id. at 31; (c) "show[ed] that Defendant knew that he was expressing road rage toward [Tafoya] and knew that [Tafoya] did not know that Defendant was actually the sheriff," id.; and (d) "show[ed] absence of mistake and lack of accident," id.

On the eve of trial, the district court issued a memorandum opinion and order granting the government's motion in limine and amended motion in limine. In doing so, the district court, applying the factors outlined in Huddleston v. United States, 485 U.S. 681 (1988), concluded that the government "ha[d] established proper purposes for its 404(b) evidence."  Aplt. App., Vol. 1 at 131.

The district court further concluded that "the evidence [wa]s relevant," id.

because "the similarities between the prior incidents and the charged crime

create[d] a tendency that ma[de] the likelihood that Rodella acted willfully more

probable than if evidence of the prior incidents were excluded," id. at 134-135.

In other words, the district court stated, "[t]he [government] is tasked with

proving the high burden of willfulness, and evidence of these three prior incidents

is probative to proving willfulness, if used for the proper purposes of showing

motive, intent, plan, absence of mistake, and lack of accident." Id. at 137

(internal citation omitted). To reduce the likelihood of unfair prejudice, the

district court directed the government, during closing arguments, "to state with

particularity the proper purposes for which the jury may consider the evidence of

the three prior incidents to ensure that the jury d[id] not use the evidence for an

improper purpose." Id. at 131. Finally, the district court concluded that "the risk

of potential unfair prejudice d[id] not substantially outweigh the probative value

of the evidence." Id.

At trial, the government presented testimony from Yvette Maes, Jacob

Ledesma, and Lisa Gonzales regarding these three incidents. The government

also, during its initial closing argument, called the jury's attention to Jury

Instruction No. 7, which discussed the purpose of testimony from Maes, Ledesma,

and Gonzales. In doing so, government counsel stated, "You may consider that

evidence only as it bears on Mr. Rodella's motive, intent, plan, knowledge,

absence of mistake, or accident, and for no other purpose."  Aplee. Supp. App.,

Vol. VIII at 1841.

*c) Analysis*

"To determine whether Rule 404(b) evidence was properly admitted we

look to the four-part test set out" in <u>Huddleston</u>.  <u>United States v. Watson</u>, 766

F.3d 1219, 1236 (10th Cir. 2014) (internal quotation marks omitted).  The

<u>Huddleston</u> test requires, for admissibility, that:

> (1) the evidence was offered for a proper purpose under [Rule]
> 404(b); (2) the evidence was relevant under [Rule] 401; (3) the
> probative value of the evidence was not substantially outweighed by
> its potential for unfair prejudice under [Rule] 403; and (4) the district
> court, upon request, instructed the jury pursuant to [Rule] 105 to
> consider the evidence only for the purpose for which it was admitted.

<u>Id.</u> (quoting <u>United States v. Becker</u>, 230 F.3d 1224, 1232 (10th Cir. 2000)).

Rodella argues on appeal that the evidence of the other three incidents "was

not relevant to any disputed issue except willfulness, and it was relevant to

willfulness only through forbidden propensity inferences."  Aplt. Br. at 35.  More

specifically, Rodella argues that the link "between the three other incidents and

[his] motive and intent during the Tafoya incident depended on [him] 'acting in

conformity with an alleged character trait.'"  <u>Id.</u> at 37 (quoting <u>United States v.

Commanche</u>, 577 F.3d 1261, 1267 (10th Cir. 2009)).  In short, Rodella argues,

"[t]he other incidents . . . show that he has a propensity for road rage and for

acting aggressively when shown disrespect."  <u>Id.</u>

We recognize, as have other courts, that "other-act evidence is usually capable of being used for multiple purposes, one of which is propensity."  United States v. Gomez, 763 F.3d 845, 855 (7th Cir. 2014).  What Rule 404(b) prohibits is the admission of evidence that "require[s] a jury to <u>first</u> draw the forbidden general inference of bad character or criminal disposition."  United States v. Moran, 503 F.3d 1135, 1145 (10th Cir. 2007) (emphasis added).  In other words, Rule 404(b) is concerned "with the chain of reasoning that supports the non-propensity purpose for admitting the evidence," and it "allows the use of other-act evidence only when its admission is supported by some propensity-free chain of reasoning."  Gomez, 763 F.3d at 856.  "This is not to say that other-act evidence must be excluded whenever a propensity inference can be drawn; rather, Rule 404(b) excludes the evidence if its relevance to 'another purpose' is established *only* through the forbidden propensity inference."  Id.  Thus, "when other-act evidence is admitted for a proper purpose and is relevant, it may be admissible even though it has the potential impermissible side effect of allowing the jury to infer criminal propensity."  Moran, 503 F.3d at 1145 (internal quotation marks omitted).

In this case, the government sought admission of evidence of the other three similar acts to assist in proving willfulness, which was an essential element of the 18 U.S.C. § 242 charge.  As the district court described that element to the jury, the government was required to establish that "Rodella acted willfully, that

is, . . . Rodella acted with a bad purpose intending to deprive . . . Tafoya of" his

right to be free from excessive force and unlawful arrest.  Aplt. App., Vol. 1 at

193 (Instruction No. 12).  Rodella's involvement in the other three acts, the

government alleged, established that (a) "Rodella's motive and intent for pursuing

. . . Tafoya was to express his road rage, punish disrespect, and force . . . Tafoya

to submit to his authority and not to enforce any traffic law," (b) "Rodella had a

plan to drive in a threatening manner towards other motorists, and if he succeeded

in provoking any disrespectful act, force the motorist to submit through a display

of his authority," and (c) "Rodella did not make a mistake or accidentally forget

that his identity was not apparent to all motorists when he pursued . . . Tafoya in

a private Jeep."  Id. at 188 (Instruction No. 7).

    The jury most certainly could have inferred, in considering the evidence of

Rodella's involvement in the other three incidents, that he possessed certain

character traits, for example, anger issues and a need to exercise power over

others.  But the important point is that the jury was not required to make any such

inferences in order to also infer that Rodella purposely had his son drive in a

threatening manner in order to provoke Tafoya into a disrespectful act, that

Tafoya purposely intended to force Tafoya to submit to his authority and not to

enforce any traffic law, and that Rodella knew that his identity as a law

enforcement officer was not readily apparent to Tafoya until the very end of the

encounter.  These inferences would reasonably have "rest[ed] on a logic of

improbability that recognizes that a prior act involving the same knowledge decreases the likelihood that the defendant lacked the requisite knowledge in committing the charged offense."  Moran, 503 F.3d at 1145; see United States v. Queen, 132 F.3d 991, 996 (4th Cir. 1997) (noting that the prior doing of other similar acts is relevant in terms of "reducing the possibility that the act in question was done with innocent intent").  We therefore reject Rodella's argument that the other-act evidence required the jury to make propensity-based inferences in order to find the element of willfulness.

Rodella also argues that the other-act evidence should have been excluded by the district court under Rule 403 because it "was extraordinarily prejudicial," Aplt. Br. at 40, yet "had little probative value," id. at 42.  For the reasons discussed above, however, we conclude that the other-act evidence had significant probative value.  As a result, that leaves only the question of whether its probative value outweighed its potential for unfair prejudice.  "Unfair prejudice in the Rule 403 context 'means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Tan, 254 F.3d 1204, 1211 (10th Cir. 2001) (quoting Fed. R. Evid. 403 advisory committee's note).  Although Rodella refers generally to the concept of unfair prejudice in his appellate brief, he fails to specifically identify what type of unfair prejudice may have resulted in his case from admission of the other-act evidence.  At most, he asserts that the government "elicited unnecessary details

from the [other-act] witnesses — including about how they felt when Rodella accosted them." Aplt. Br. at 41. To the extent Rodella is implying that this testimony would have caused the jury to find him guilty on the basis of its emotions or to punish Rodella for his involvement in the other acts, the fact of the matter is that Rodella's conduct towards Tafoya was more severe than his conduct towards the drivers involved in the other three incidents. As a result, we are not persuaded that the admission of the other-act evidence posed a risk of the jury deciding the case on an improper basis.

We also note that any risk of the jury utilizing the other-act evidence in an improper manner was reduced by the limiting instruction given by the district court. That instruction informed the jury that the other-act evidence could be "consider[ed] . . . only as it b[ore] on . . . Rodella's motive, intent, plan, knowledge, absence of mistake or accident, and for no other purpose." Aplt. App., Vol. 1 at 188 (Instruction No. 7). It also emphasized to the jury that "the fact that . . . Rodella may have previously committed an act similar to the one charged in th[e] case d[id] not mean that [he] necessarily committed the act charged in the case." Id.

For all of these reasons, we conclude that the district court did not abuse its discretion in admitting the other-act evidence, under Rule 404(b).

### Prosecutorial misconduct

In connection with his challenge to the admission of the other-act evidence,

Rodella also complains that the prosecution cited the other-act evidence during its closing arguments to show propensity and for other impermissible purposes. Aplt. Br. at 45.  Because this is a separate legal issue, i.e., an allegation of prosecutorial misconduct, its analysis is entirely distinct from the question of whether the other-act evidence was properly admitted by the district court.

"We analyze whether a statement constitutes prosecutorial misconduct using a two-step process." United States v. Fleming, 667 F.3d 1098, 1103 (10th Cir. 2011).  "First, we determine whether 'the prosecutor's statements were improper.'" Id. (quoting United States v. Irvin, 656 F.3d 1151, 1171 (10th Cir. 2011)).  "Second, we determine whether the prosecutor's improper statements were harmless beyond a reasonable doubt." Id. (internal quotation marks omitted).  "The Government generally bears the burden of proving that an improper statement is harmless beyond a reasonable doubt." Id. "But when a defendant fails to object to an allegedly improper statement during trial, we review only for plain error and it is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." Id. (internal quotation marks omitted).

Rodella points to eight specific statements made by the prosecution during closing arguments.  We address them in turn.

1) At the outset of its closing, the government described Rodella as "a man who lets his distorted ego lead to aggression he cannot control."  Aplt. App., Vol.

3 at 729.  Rodella did not object to this statement.  The government immediately

followed this statement by referencing Yvette Maes' testimony opining that

"'[t]his man's ego is unbelievable.'"  Id. at 730.  The government then contrasted

that with the personality and demeanor of Tafoya.

We are not persuaded that this statement was improper because it was

focused on contrasting the personalities and demeanors of Rodella and Tafoya.  It

was not, as alleged by Rodella, aimed at asking the jury to draw conclusions

about Rodella's propensity based on the 404(b) evidence.  And, in any event,

Rodella has not established that he was prejudiced by this statement.  Indeed, the

statement was well-supported by the evidence regarding the Tafoya incident

alone.

2) In contrasting the personalities of Rodella and Tafoya, the government

noted that Tafoya's day-to-day work with disabled adults "takes a touch of

gentleness" and "a boat load of patience."  Id. at 731.  Rodella did not object to

this statement.  Quite clearly, these comments had nothing to do with the 404(b)

evidence and thus were not improper.

3) The government, in describing the incident with Tafoya, stated:

And [Tafoya] saw an SUV in an area, at a distance where he knew it
was safe for him to enter, because it's 35 miles per hour.  And as he
got onto [Road] 399, that SUV he had seen, all of a sudden, bam, on
his tail.  Boy, is that familiar, considering what else you've heard.

Id. at 732.  Rodella contemporaneously objected to this statement, arguing that it

was "improper use of a 404(b)." Id.  The district court responded by cautioning the government: "Be careful about comparing the incidents to this incident, and tie it to the willfulness." Id.

Even assuming that this statement was an improper use of the 404(b) evidence, the government has carried its burden of showing that it was not prejudicial to Rodella in light of the evidence against Rodella, the rest of the government's closing remarks, and the limiting instruction given by the district court.

4) The government, in describing the training Rodella had received from Brian Coss, an instructor with the New Mexico Department of Public Safety's Law Enforcement Academy, stated: "[Coss] also taught [Rodella], you're never to pull alongside a car in a pursuit.  Do you remember – we'll get to Ms. Lisa Gonzales in a moment." Id. at 744.  Rodella did not object to this statement.

We conclude this statement was proper because it was effectively asking the jury to find that (a) Rodella had, in the course of the Gonzales incident, knowingly ignored the training he had received, and (b) that Rodella likewise willfully disregarded his training in the course of pursuing and arresting Tafoya. It was not, contrary to Rodella's argument, asking the jury to draw inferences regarding his character or propensity for bad behavior or criminal conduct.

5) In its rebuttal argument, the government said "What about the defendant's other victims?"  Id. at 773.  The government then proceeded to

36

describe each of the other three incidents.  Rodella did not object to this statement.

We conclude this statement was proper because it was intended as a lead-in to the government's description of the other three incidents.  The government's following  explanation of those incidents was offered to establish that Rodella acted with motive, intent, knowledge or absence of mistake or accident.

6)  In describing the Gonzales incident during rebuttal, the government stated: "And then [Rodella]'s wearing a cowboy hat, a black cowboy hat – suitable, by the way, should have been black – and he puts his head in the window [of the Gonzales' car]."  Id. at 777.  Rodella did not object to this statement.

Although we agree with Rodella that the statement "should have been black" was improper, we conclude that Rodella has failed to establish that he was prejudiced by this statement.

7) The government, while describing the Gonzales incident, stated: "And do you remember I asked [Lisa Gonzales] to enact the way [Rodella] spoke.  She couldn't do it.  She was all choked up.  That happened August 2013, more than a year ago, and it still upsets her."  Id.  Rodella did not object to this statement.

Presumably, this statement was intended to persuade the jury to infer that Tafoya experienced emotional trauma at the hands of Rodella by emphasizing that Lisa Gonzales experienced emotional trauma as the result of a less-severe roadside encounter with Rodella.  To the extent this was improper, we conclude

that Rodella was not prejudiced by it.  That is because the government's evidence

was more than sufficient to directly establish that Tafoya experienced emotional

trauma from the incident with Rodella.

8) Near the end of its rebuttal, the government stated:

> So when you're thinking about Michael Tafoya, I'm
> going to ask you to think about Yvette Maes, and think
> about Lisa Gonzales.  It's been months and months, a
> year to Lisa Gonzales.  And a gun wasn't pointed at
> their heads.  How do you think Michael Tafoya felt?
> Lisa Gonzales and her husband were so upset after that,
> they had to sit in their car for five minutes, if you
> remember, before they could even continue on their
> drive home.

> He [Rodella] said he's not concerned about the
> community.  That's his mindset.  Not concerned about
> Maes, her daughter; Mr. Ledesma, his family; Lisa
> Gonzales; certainly not Michael Tafoya, willing to put a
> gun to his head to satisfy his ego.  His ego trumps all.
> And this time it has caught up to him.

Id. at 777-78.  Tafoya did not object to these statements.

These statements presumably were intended to ask the jury to infer, based

upon the totality of the incidents, that Rodella acted willfully in violating

Tafoya's constitutional rights.  As a result, they were proper.

Of the eight specific assertions of prosecutorial misconduct, Rodella

objected to only one.  Of the seven where no objection was made, Rodella has not

carried his burden to establish these closing argument statements resulted in plain

error.  Regarding the one statement which drew an objection from the defense, the

district court quickly placed the import of that statement in proper context.

Further, the court's inclusion of a limiting instruction as well only adds to our

conclusion that even if the statement was improper, it was harmless beyond a

reasonable doubt.

*Admission of evidence of training materials*

Rodella argues that the district court erred in admitting evidence of the

official training he received regarding the pursuit of suspect's vehicles.  "We

review a district court's decision to admit or exclude evidence for abuse of

discretion."[6]  United States v. Lozado, 776 F.3d 1119, 1124 (10th Cir. 2015).

As previously noted, the government presented testimony from Brian Coss,

an instructor who worked for the New Mexico Department of Public Safety's Law

Enforcement Academy.  Coss testified that in October of 2010, he taught an

"Emergency Vehicle Operator Course," including a presentation on pursuits, that

Rodella attended.  Aplee. Supp. App., Vol. VI at 1292.  Coss explained that

pursuit of a suspect vehicle is one of the more dangerous activities that law

enforcement officers can engage in.  He also explained that among law

---

[6] The government contends that Rodella failed to make this argument
below, and instead argued only that the government should be prohibited from
introducing evidence of the Rio Arriba County Sheriff's Office's standard
operating procedures for pursuing vehicles.  A review of the trial transcript,
however, suggests that defense counsel did, in fact, object to introduction of the
instructional materials that Rodella received regarding pursuit of vehicles.  See
Aplee. Supp. App., Vol. VI at 1291.  Consequently, we will treat the issue as
properly preserved.

enforcement officials, the word "pursuit" is a term of art that requires the use of

authorized emergency vehicles and "would include some type of visible lights in

the front, visible lights coming out the back, and then some type of . . . auditory

signal, such as a siren." Id. at 1302.  Coss then explained some of the principles

of pursuit he taught during that course, including not to pull in front of or

alongside a suspect vehicle, and to maintain a large cushion of space, including a

minimum of five to seven car lengths, between the patrol car and the suspect

vehicle.

Rodella argues that this evidence "had no bearing on whether [he] intended

to arrest Tafoya without probable cause or to use excessive force during the

arrest, and its unfair prejudicial impact substantially outweighed its nonexistent

probative value." Aplt. Br. at 52.  We conclude, however, that this evidence was

relevant to show that Rodella knew that his pursuit of Tafoya was unlawful for a

number of reasons (including that he was in an unmarked vehicle without any

emergency lights and was following closely behind Tafoya's vehicle rather than

maintaining a safe distance) and that he actually provoked Tafoya into

committing a series of traffic violations.  We also conclude that this evidence was

thus relevant to show that Rodella acted willfully in unlawfully arresting Tafoya

and subjecting him to excessive force.  Lastly, we note that the district court gave

the jury a specific instruction "regarding the training . . . Rodella personally

received," and informed them that they could use the evidence "only to determine

whether . . . Rodella acted willfully . . . to violate a right protected by the Constitution of the United States."  Aplt. App., Vol. 1 at 226.

For these reasons, we conclude that the district court did not abuse its discretion in admitting evidence of the training that Rodella received.

*Cumulative error*

In his final issue on appeal, Rodella argues that the cumulative effect of the district court's errors rendered his trial fundamentally unfair.  "The purpose of cumulative error analysis is to address whether the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error."  United States v. Rogers, 556 F.3d 1130, 1144 (10th Cir. 2009) (internal quotation marks omitted).

The only possible errors we identified were those involving the government's references, during closing arguments, to the other-act evidence.  To the extent that more than one such error occurred, we conclude that their cumulative effect was harmless.  As noted, the evidence of Rodella's guilt was overwhelming, and it is thus extremely doubtful that, even absent any improper closing remarks, the outcome of the trial would have been different.

III

For the foregoing reasons, we AFFIRM the district court's judgment of conviction.